IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KARI M.(SMITH)PRILLER,                )
                                      )
              Plaintiff,              )
                                      )
       v.                             )    C.A. No. 04-1286-JJF
                                      )
TOWN OF SMYRNA, DAVID S.              )
HUGG, III, individually and          )
in his official capacity as          )
Town Manager;                        )
BEVERLY A. HIRT, individually        )
and in her official capacity         )
as Director of the Smyrna            )
Public Library; and                  )
HARVEY LEGGETT, individually         )
and in his official capacity         )
as Supervisor of Streets             )
Foreman of Public Works,             )
                                      )
              Defendants.             )

**APPENDIX TO DEFENDANTS' OPENING BRIEF IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**AKIN & HERRON, P.A.**
Bruce C. Herron
Attorney I.D. No.: 2315
1220 N. Market Street, Suite 300
P.O. Box 25047
Wilmington, Delaware  19899
(302) 427-6987
Attorney for Defendants

Dated: January 31, 2006

## TABLE OF CONTENTS

Page

Complaint                                                    A-1

Excerpts from Deposition Transcript of                       A-9
Beverly Ann Hirt

Excerpts from Deposition Transcript of                       A-34
Kari M. Priller

Excerpts from Deposition Transcript of                       A-70
Harvey Leggett

Excerpts from Deposition Transcript of                       A-71
David S. Hugg, III

Town of Smyrna Personnel Policy                              A-76

August 27, 2002 Report of Employee Counseling               A-83

January 2, 2003 Letter from Town Manager                     A-86
Hugg to Harvey Leggett

January 4, 2003 Employee Progress Report                     A-87

July 16, 2003 Application for Leave                          A-90

July 18, 2003 Letter from Kari Smith to                      A-92
Town Manager Hugg

July 18, 2003 Letter from Town Manager                       A-93
Hugg to Kari Smith

July 30, 2003 Letter from Kari Smith                         A-94
to Town Manager Hugg

July 30, 2003 Letter from Town Manager Hugg                  A-95
to Kari Smith

H:\tmw5\data\files\Docs\3651.021\APPX\3581.wpd

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KARI M. (SMITH) PRILLER, | * | C.A. No. |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| TOWN OF SMYRNA; DAVID S. | * | |
| HUGG, III, individually | .. | |
| and in his official capacity | * | *COMPLAINT* |
| as Town Manager ; | * | |
| BEVERLY A. HIRT, | * | TRIAL BY JURY DEMANDED |
| individually and in her | * | |
| official capacity as | * | |
| Director of the Smyrna | * | |
| Public Library; and HARVEY | * | |
| LEGGETT, individually and in | * | |
| his official capacity as | * | |
| Supervisor of Streets/Foreman | * | |
| of Public Works. | * | |
| | * | |
| Defendants. | * | |

1.    Plaintiff Kari M. (Smith) Priller is a resident of the State of Delaware residing at 97 Skyline Locust Drive, Smyrna, Delaware 19977.

2.    Defendant Town of Smyrna is a municipal entity and a political subdivision of the State of Delaware.

3.    Defendant David S. Hugg, III, at all times pertinent hereto, was the Town Manager for the Town of Smyrna.

4.    Defendant Beverly A. Hirt, at all times pertinent hereto, was the Director of the Smyrna Public Library.

5.    Defendant Harvey Leggett, at all times pertinent hereto, was the Supervisor of Streets/Foreman of Public Works for the Town of Smyrna.

6.    This Court has original jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§1331 and 1343.

A-1

7.   This Court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

8.   Plaintiff began employment with Defendant the Town of Smyrna (hereinafter "Defendant Town") in or about March 2001, as a Children's Program Coordinator with the Smyrna Public Library, and she became full-time in July 2002.

9.   Plaintiff is a Caucasian female.

10.   Defendant Leggett is an African-American male.

11.   On December 20, 2002, Plaintiff was raped by Defendant Leggett at Plaintiff's place of work after work hours.

12.   Following the December 20, 2002, incident, Plaintiff complained to Defendant Town about the sexual harassment perpetrated by Mr. Leggett against her.

13.   Thereafter, Plaintiff's  probationary period was extended for an additional six months, allegedly for accessing the Smyrna Public Library after work hours, while Defendant Leggett was suspended for only two weeks.

14.   The extension of Plaintiff's probationary period represented both differential treatment based upon her sex and race, and retaliation in response to her complaints regarding Defendant Leggett's sexual harassment of her.  In addition, the extension of Plaintiff's probationary period provided Defendants a means for further retaliatory treatment of Plaintiff.

15.   The reasons given for the aforementioned disciplinary action against Plaintiff were pretextual.  Prior to Plaintiff's rape by Defendant Leggett, she had accessed the Library without

A-2

prior approval and had not been disciplined even after her access
to the Library had been made known to her superiors.

16. During the extended probationary period, Plaintiff
continued to suffer retaliation from Defendant through her
immediate supervisor, Defendant Hirt. Specifically, on or about
July 7, 2003, Defendant Hirt discharged Plaintiff in retaliation
for her complaints of sexual harassment.

17. The reasons proffered for Plaintiff's termination by
Defendant Town through Defendant Hirt were her alleged
falsification of a vacation leave request and alleged violation of
policy with regard to having a co-worker cover part of a scheduled
shift.

18. The reasons given for Plaintiff's termination were
pretextual. Other employees in the Smyrna Public Library had
previously obtained coverage for absences without obtaining
Defendant Hirt's approval prior to the absences and had not been
disciplined.

19. Plaintiff filed a grievance regarding her termination,
but Defendant Town and Defendant Hugg refused to afford Plaintiff
the due process guaranteed to her pursuant to the grievance
procedure.

20. The actions of Defendants in sexually harassing
Plaintiff, discriminating against her, extending her probationary
status, terminating her, and refusing to afford her due process
were wrongful and discriminatory against Plaintiff on the basis of

A-3

her race and sex and in retaliation for her exercise of protected rights.

21.   The actions of Defendants described herein were pursuant to official policy and/or practice of Defendant Town.

22.   As a direct result of the actions of Defendants, Plaintiff has sustained damages, including but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, and lost wages.

### COUNT I -- TITLE VII

23.   Plaintiff restates and hereby incorporates by reference paragraphs 1 through 22 of this Complaint.

24.   Defendant Town, acting by and through its agents, discriminated against Plaintiff on the basis of her sex and race by sexually harassing her, extending her probationary status and later terminating her for pretextual reasons, and by treating Plaintiff differently than a similarly situated employee of a different race and sex.

25.   Defendant Town, acting by and through its agents, discriminated against Plaintiff on the basis of her sex by subjecting her to a hostile work environment and by refusing to respond adequately and appropriately to her complaints of sexual harassment.

26.   Defendant Town, acting by and through its agents, retaliated against Plaintiff in response to her exercise of her protected rights by, *inter alia*, extending Plaintiff's

A-4

probationary status and terminating Plaintiff for pretextual reasons.

27.   As a direct result of the discriminatory and retaliatory conduct of Defendant Town, Plaintiff has suffered damages, including but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendant Town for:

(a)   Back pay, including interest;

(b)   Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

(c)   Pre-judgment and post-judgment interest;

(d)   Attorney's fees;

(e)   Reinstatement; and

(f)   Any other relief that this Court deems just.

### COUNT II -- SECTION 1981

28.   Plaintiff reinstates and hereby incorporates by reference paragraphs 1 through 27 hereinabove.

29.   By extending Plaintiff's probationary status and terminating Plaintiff and otherwise discriminating and retaliating against her, Defendants have violated Plaintiff's rights pursuant to 42 U.S.C. §1981.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

A-5

(a)  Back pay, including interest;

(b)  Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

(c)  Punitive damages;

(d)  Pre-judgment and post-judgment interest;

(e)  Attorney's fees;

(f)  Reinstatement; and

(g)  Any other relief that this Court deems just.

### COUNT III -- SECTION 1983

30.  Plaintiff restates and hereby incorporates by reference paragraphs 1 through 29 hereinabove.

31.  Defendants, acting under color of state law, have deprived Plaintiff of the rights afforded her under the United States Constitution and federal law, in violation of 42 U.S.C. §1983.  These rights include, but are not limited to, Plaintiff's rights to equal protection and due process of law pursuant to the Fourteenth Amendment of the United States Constitution.

32.  Such violations of law happened in the context of a continuing, widespread, and persistent pattern of constitutional misconduct by the employees of said Defendants and deliberate indifference to or tacit authorization of such conduct by said Defendants' policy-making officials after notice to the officials of said misconduct.

A-6

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

(a)  Back pay, including interest;

(b)  Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

(c)  Punitive damages;

(d)  Pre-judgment and post-judgment interest;

(e)  Attorney's fees;

(f)  Reinstatement; and

(g)  Any other relief that this Court deems just.

### COUNT IV-BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

33.  Plaintiff restates and hereby incorporates by reference paragraphs 1 through 32 hereinabove.

34.  By their actions as described in this Complaint, including but not limited to, extending Plaintiff's probationary status, terminating her, subjecting her to a sexually hostile working environment, retaliating against her, denying her due process, and otherwise subjecting her to discrimination on the basis of her race and sex, Defendants have breached the covenants of good faith and fair dealing implied under Delaware law.

35.  Defendants' actions in breaching the implied covenant of good faith and fair dealing were wilful and/or wanton.

36.  As a direct result of the wrongful conduct of Defendants and their agents, Plaintiff has suffered damages, including but

A-7

not limited to, physical and emotional injury, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for:

(a)  Back pay, including interest;

(b)  Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

(c)  Punitive damages;

(d)  Pre-judgment and post-judgment interest;

(e)  Attorney's fees;

(f)  Reinstatement; and

(g)  Any other relief that this Court deems just.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
WILLIAM D. FLETCHER, JR.
Bar I.D. #362

BY: _____
NOEL E. PRIMOS
Bar I.D. #3124
414 S. State Street
P.O. Box 497
Dover, DE   19903
(302) 674-0140
Attorneys for Plaintiff

DATED: 9-21-04
NEP:pmw:tlk

A-8

COPY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　　　　　) C.A. No.
　　　　　　　　　　　　　　　　　　　　) 04-1286 (JJF)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
 individually and in his official  )
capacity as Town Manager;　　　　　　)
BEVERLY A. HIRT, individually and  )
in her official capacity as　　　　　)
Director of the Smyrna Public　　　　)
Library; and HARVEY LEGGETT,　　　　 )
individually and in his official   )
capacity as Supervisor of　　　　　　 )
Streets/Foreman of Public Works,   )
　　　　Defendants.　　　　　　　　　　 )

　　　　　　　Deposition of **BEVERLY ANN HIRT**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street Plaza, Smyrna, Delaware, on Tuesday, August 30,
2005, beginning at 1:00 p.m.

APPEARANCES:

　　　　SCHMITTINGER & RODRIGUEZ
　　　　BY: NOEL E. PRIMOS, ESQUIRE
　　　　414 South State Street
　　　　Dover, Delaware  19901
　　　　Attorney for Plaintiff.

　　　　AKIN & HERRON
　　　　BY: BRUCE C. HERRON, ESQUIRE
　　　　PO Box 25047
　　　　Wilmington, Delaware  19801
　　　　Attorney for Defendant.

　　　　**ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

A-9

1    Q.    What was her position?

2    A.    Clerk III.

3    Q.    Clerk III.  Okay.  Do you remember what she

4  was paid when she was first hired?

5    A.    No.

6    Q.    Did she have any benefits when she was first

7  hired?

8    A.    No.

9    Q.    And were there any other applicants for the

10 position?

11    A.    Yes.

12    Q.    And did you interview any other applicants

13 besides Ms. Smith?

14    A.    Yes.

15    Q.    How many people did you interview?

16    A.    I'm not sure for that interview exactly how

17 many -- Usually on the norm, it's maybe two or three,

18 and they are narrowed down.  But I can't tell you

19 exactly what with her interview.

20    Q.    What was the deciding factor or factors to

21 let you choose Ms. Smith?

22    A.    She said she worked in a preschool.

23    Q.    Why was that important to you?

24    A.    I needed somebody that was able to work with

A-10

18

1    kids.

2           Q.    Why was that?

3           A.    Because a clerk III works with children.

4           Q.    Now, Betty and Annie, they were not clerk

5    IIIs?

6           A.    No.

7           Q.    What was their title?

8           A.    Clerk I.

9           Q.    Is clerk III a higher position?

10          A.    No.

11          Q.    The three doesn't designate that it was a

12   higher position than the one?

13          A.    No.  It was just a different position.

14          Q.    A different position.  Okay.  Did the clerk

15   III have particular responsibility for children's

16   programs in the library?

17          A.    Yes.

18          Q.    What other duties were part of the clerk III

19   position besides the children's programs?

20          A.    Weekly -- what do you call it?  Getting the

21   information for what they are going to do for the story

22   time, so I can write the press releases for the month.

23          Q.    Any other duties?

24          A.    The summer reading program.

A-11

84

1      Q.     But you certainly felt that was an

2    appropriate salary for the position, right?

3      A.     I don't know.

4      Q.     But you would assume that since it was in

5    your memo, that you felt it was appropriate, right?

6      A.     Yes, I guess, since I wrote it.  But I don't

7    remember if that was going to be the new starting with

8    the pay or starting at a different step increase and

9    then she would get four more.  I'm not sure how I got to

10   that calculation.

11     Q.     Now, when Ms. Smith was initially hired, did

12   she go on probation after her initial hire?

13     A.     Yes.  Everybody has an initial probation.

14     Q.     Of how long?

15     A.     It's either six months or a year.  I think

16   it's --

17     Q.     You don't know which one?

18     A.     I think it's six months.

19     Q.     And what is that based on?

20     A.     I'm trying to think.  I think it's six

21   months.  I can't remember if it was six months or a

22   year.

23     Q.     So she went on probation for either six

24   months or a year when she was initially hired in March

38

1          A.    It wasn't a different position.  It was just

2     a title change.

3          Q.    A title change.  So it doesn't apply to

4     title changes, the probationary rules?

5          A.    (The witness nodded head from side to side.)

6          Q.    If you could, say no for the record.

7          A.    No.

8          Q.    Okay.  Ms. Hirt, I'm going to be asking you

9     some questions about an incident that occurred at the

10    library involving Ms. Smith and Mr. Harvey Leggett in

11    December of 2002.  Are you familiar with the incident

12    that I'm referring to?

13         A.    Yes.

14         Q.    For example, I'm referring to an incident

15    that occurred in the library after normal working hours

16    on or about December 20th of 2002.  Are you familiar

17    with the incident I am referring to?

18         A.    Yes.

19         Q.    When did you first become aware of the

20    incident?

21         A.    That Friday.

22         Q.    When you say that Friday, I'm not sure what

23    day --

24         A.    December 20th.

1      Q.    The same day that it happened?

2      A.    It was the next workday.

3      Q.    The next workday.  Okay.  And how did you

4    become aware of the incident?

5      A.    At the Christmas party.

6      Q.    What is the Christmas party?  Is that a Town

7    Christmas party?

8      A.    Yes.

9      Q.    What time of day did the Christmas party

10   take place?

11     A.    2:00 or 12.

12     Q.    You don't remember which one?

13     A.    They are all different.

14     Q.    They change the times every year?

15     A.    Yes.  It was either 12 or two.  It might

16   have been 12.

17     Q.    Okay.  Sometime during the workday?

18     A.    Yes.

19     Q.    And where did the party take place?

20     A.    Public works department.

21     Q.    Is that where it usually takes place?

22     A.    It depends.

23     Q.    Well, that year it was at the public works

24   department?

A                    ng

A-14

40

1          A.      Yes.

2          Q.      Yes.   And how did you become aware?   In

3    other words, did someone have a conversation with you?

4          A.      Chief Baldwin.

5          Q.      He's the chief of police?

6          A.      Yes.

7          Q.      Did he just come up to you at the party and

8    start talking about the incident?

9          A.      He came up to me and said that I needed to

10   talk with Detective Graham.

11         Q.      That is a policeman for the Smyrna Police?

12   Detective Graham?

13         A.      Yes.

14         Q.      Did Chief Baldwin tell you what it was

15   about?

16         A.      No.

17         Q.      Did you have any idea what it was about?

18         A.      No.

19         Q.      And did you talk to Detective Graham?

20         A.      After the party, yes.

21         Q.      Where did you talk to him?

22         A.      The police department.

23         Q.      Were you concerned about what it could

24   possibly be about?

A.                  rting
          A-15      884

1        A.    Yes.

2        Q.    Did you have any idea?

3        A.    No.

4        Q.    Could you tell me about your conversation

5    with Detective Graham?

6        A.    I went to his office.  And he told me there

7    was an incident between two employees, one library and

8    one public works.  And they said that the alarm went

9    off -- Well, they had to get the key for the library

10   from one of my employees during the night.  And he

11   wanted me to just tell that employee that the alarm went

12   off.  And I said:  Okay.

13       Q.    Did he have to get the key because the alarm

14   went off?  What was the relationship between the alarm

15   and the key?

16       A.    I don't know.

17       Q.    So he told you that the alarm went off, and

18   he told you that he had to get the key from an employee?

19       A.    Right.  But the alarm -- I guess they had to

20   set the alarm or something.  I don't know.  I didn't get

21   all of the information.

22       Q.    Who was the employee that he had gotten the

23   key from?

24       A.    Annie.

1          Q.    Did he say why he was asking you that?

2          A.    No.

3          Q.    Had he been in contact with her?

4          A.    I don't know.

5          Q.    You didn't think that was a strange request,

6     that if she came into contact with you to let him know?

7          A.    I don't know.

8          Q.    Did Detective Graham say anything else to

9     you in that conversation?

10         A.    I don't remember.   It was a short

11    conversation.

12         Q.    When did you first talk to Ms. Smith about

13    the incident or communicate with her in any way?

14         A.    It was -- Let me think.   It was -- I don't

15    remember the first time.

16         Q.    Was it that day?   Later that day?

17         A.    No.

18         Q.    Was it that weekend?

19         A.    It might have been that weekend.

20         Q.    And what type of contact was it?   Was it a

21    phone call?

22         A.    An e-mail.

23         Q.    E-mail?   Where were you at the time of this

24    e-mail?

1    A.    Home.

2    Q.    And where was Ms. Smith?

3    A.    Home.

4    Q.    And who initiated the contact?

5    A.    She did.

6    Q.    And what did she say in the e-mail?

7    A.    It was kind of small talk.  Gosh, I don't

8    know all the details.  She wanted to know what -- Oh,

9    she told me that she talked to Detective Graham, that

10    she told him what I told her about Harvey.  And I told

11    her that was okay.  And then I told her I wasn't going

12    to tell anybody at work.  And she didn't want me to tell

13    anybody at work, anyway.  I think that was about it.

14    Q.    Did you let Detective Graham know that she

15    had contacted you?

16    A.    Yes.

17    Q.    Did you just call him?

18    A.    I don't remember.  I might have called him.

19    Q.    And what did he say when you told him that,

20    that she had contacted you?

21    A.    He said:  Okay.  And I told him I had saved

22    the conversation and I had it if he wanted it.

23    Q.    Did he want it?

24    A.    Actually, I'm not sure if he wanted it or if

1    talking and stuff like that.  He was never violent or

2    anything like that.  It just was, you know, sweet

3    talking type stuff.

4        Q.    And you were concerned about that?

5        A.    Well, yeah.

6        Q.    Okay.  After that e-mail communication

7    between you and Ms. Smith, did you ever talk to her

8    again about the incident or communicate with her in any

9    way about the incident that had occurred?

10        A.    At the library?

11        Q.    At the library.

12        A.    I tried, but she didn't want to talk about

13    it.

14        Q.    When was the first time that you tried?

15        A.    When she came back to work.

16        Q.    Was that on Monday?

17        A.    I don't remember when.  I was on vacation.

18    It was over Christmas.  So it was when I would have

19    returned to work and she would have been there.  I don't

20    know exactly what day it was.  But yeah, I did.  I asked

21    her how she was doing, and she said she didn't want to

22    discuss it.

23        Q.    You asked her how she was doing, and she

24    said she didn't want to discuss how she was doing?

1          A.     Uh-huh.

2          Q.     Did you specifically ask her about the

3    incident, though?

4          A.     I asked her what happened.

5          Q.     And what did she say?

6          A.     She didn't want to discuss it.

7          Q.     Did you at some point try to conduct an

8    investigation on your own to determine what had happened

9    with regard to the incident?

10         A.     No.  I let the police handle that.

11         Q.     Ultimately, there was discipline imposed on

12   Ms. Smith as a result of this incident, right?

13         A.     Yes.

14         Q.     And you imposed the discipline?

15         A.     Yes.

16         Q.     Prior to imposing that discipline, did you

17   conduct an investigation to try to determine what had

18   happened?

19         A.     Like what type of investigation?

20         Q.     An investigation is a process whereby an

21   employer tries to find out what happened with regard to

22   an incident before they actually impose discipline for

23   that incident.  So did you ever try to find out what had

24   happened with regard to the incident before imposing

1       A.     This part.

2       Q.     The upper part of both documents?

3       A.     Right.  That would have already been on my

4  computer.  What I was doing was adding to like a

5  continuation of my notes.

6       Q.     So that explains the third paragraph on

7  Hirt 5?

8       A.     Yeah.  But this would have been in my file

9  for my reference.  And this was attached, I think, with

10  either an evaluation form or something else was with

11  this one.  I can't remember right offhand.

12       Q.     When you say this one, do you mean Hirt 6?

13       A.     Yes, Hirt 6.  Hirt 5, this was from a

14  separate --

15       Q.     It's from your notes?

16       A.     Yes.

17       Q.     Now, let's look at the first paragraph of

18  Hirt 5, which is also the same as the first paragraph in

19  Hirt 6.  It says:  Kari Smith returned to the library

20  after closing when told previously that for employee

21  safety reason, employees other than the director would

22  not be allowed to work late or be allowed to come into

23  the library after hours to work on weekdays or on the

24  weekend.

1              Now, when was Ms. Smith told this?

2        A.    I don't offhand know the exact date, but it

3    was a directive that came to me from Dave Hugg that

4    nobody was to stay after work or come in.

5        Q.    Just in the library?  The directive had to

6    do only with the library, the directive from Mr. Hugg?

7        A.    I don't know about the other departments.

8    But it came to me specifically for the library, yes, for

9    safety reasons.

10       Q.    Did you ask Mr. Hugg why he had this concern

11   specifically about the library?

12       A.    Yes.  He drove by one day and the lights

13   were on, and it wasn't a day that the cleaning lady was

14   there.  It was because Kari was there.  And he wanted --

15   He asked me why she was there, and I didn't know why.  I

16   didn't know why she was there.  I had no idea why she

17   was there.

18              And so I found out the next day that she was

19   there because she hadn't finished her work.  And they

20   had told me the next day that since I couldn't answer

21   why she was there, nobody is supposed to be there.  It's

22   not safe.  So from that point on, nobody was to be in

23   the library after hours.

24       Q.    And how did you communicate this to

An'          ing
(  A-22   )4

1    Ms. Smith?

2         A.    I had sent out a memo to all employees, and

3    I'm sure I put that one in -- I don't have it with me.

4         Q.    And the memo specifically said that

5    employees would not be allowed to work after hours,

6    correct?

7         A.    Yeah.  I also told them, too.  I told them

8    the same morning.

9         Q.    But you don't remember when that was?

10        A.    No, not offhand, I don't remember.

11        Q.    Do you remember if it was in 2001?

12        A.    I don't remember the date.

13        Q.    It could have been in 2001, or it could have

14   been in 2002?

15        A.    I don't remember.

16        Q.    Now, let's look at the third paragraph.    It

17   says:  Kari and another employee from the public works

18   department went out drinking until late in the night.

19             Where did you find out that information?

20        A.    This was way after.

21        Q.    Do you mean you wrote this afterwards?

22        A.    What?

23        Q.    Do you mean you wrote this afterwards, this

24   third paragraph?

1   behavior.  I thought that I was really doing something

2   wrong, and I was really concerned over her feelings.

3   And then when she gets mad over a cigarette, yeah, it

4   hurt my feelings.

5       Q.    What do you mean you felt that you were

6   really doing something wrong?

7       A.    Well, for one, Harvey showed up at the

8   library during a time that she was scheduled to work.

9       Q.    And you felt that was something that you had

10  done wrong?

11      A.    Well, it was a mix-up in the schedules.  And

12  I don't know how it happened, but --

13      Q.    So actually, he was not supposed to be even

14  outside the library while she was working?

15      A.    No.

16      Q.    That was part of the conditions, that he was

17  not even supposed to be outside the library while she

18  was working inside the library?

19      A.    No.

20      Q.    How was that normally coordinated?  Did you

21  coordinate that with Mr. Heeger?

22      A.    Yeah.  I left a note, but it got shuffled.

23  And we don't know how that happened.  He didn't get the

24  note that her schedule had changed to full-time during

1          And we had decided that she needed a couple

2    of days off because she couldn't get a sitter.  So we

3    were trying to figure out how we would get the key to me

4    so I would have the money when I came back to work on

5    Monday, because she wasn't going to come back until

6    Tuesday night.  But I needed the money for Monday to do

7    the week's deposit.  Well, she went away, and she had

8    the key with her.

9          Q.    How did you find out she had the key with

10    her or how --

11          A.    She didn't show.  She told me she would be

12    there before 9:00 on Monday.  I called her house.  I

13    left a message on her recording.  And the other

14    employees didn't know much.  I didn't find out until

15    really Tuesday, when the other employees showed up for

16    work, that --

17          Q.    Who told you that Ms. Smith had gone to

18    Virginia?

19          A.    Annie.

20          Q.    And how did she know?  Annie and Betty told

21    you?

22          A.    No, not Betty.

23          Q.    How did she know that Ms. Smith had gone to

24    Virginia?

1        A.      I don't know how she knew.  Let me see.  Let

2    me think.  Who was working Monday?   She was supposed to

3    come back in on Tuesday.  Nancy came in on Monday

4    afternoon.

5              Annie told me Tuesday, when I was doing

6    payroll, that she was in Virginia and she wasn't coming

7    back.  And that's the morning I found out that she

8    wasn't going to be doing the program, that Nancy was

9    going to be doing the program.

10             So I didn't have the key.  And what I had to

11   do is I had to break into the box and then go buy

12   another money box that morning so I could do the money.

13       Q.      So you found out that Ms. Smith had asked

14   Nancy to do the program that evening?

15       A.      That Tuesday evening, yeah.

16       Q.      And why was that inappropriate?

17       A.      Well, the children's person is not supposed

18   to take a vacation during the summer reading program.

19   And we had discussed that, about her not taking a

20   vacation.  And Nancy was scheduled to take her vacation

21   during that time.

22             Okay.  So Kari came to me and said that she

23   didn't have a baby-sitter, that she could not work

24   Monday, Tuesday, or Wednesday.  And I told her she had

134

1      Q.    Was Nancy aware that it was inappropriate

2  for her to fill in for Ms. Smith?

3      A.    No.  Nancy was new.  Nancy had just -- she

4  was a new employee.  No, she wouldn't have known.

5      Q.    How long had she been working there?

6      A.    I don't have the exact dates.  I don't know.

7      Q.    Did you allow Ms. Conlin -- Is that her

8  name?

9      A.    Yeah.

10      Q.    Did you allow her to do the program that

11  night?

12      A.    She had to, because I could not stay that

13  night to do the program.

14      Q.    Do you know how she did?

15      A.    Yeah.  I called that evening.  She did fine.

16      Q.    And that involved what?  Sitting and reading

17  to the children?  Was that what was involved in doing

18  the children's program?

19      A.    Offhand, I don't remember what program it

20  was.  But I did check on her to make sure everything was

21  going well.

22      Q.    Toward the bottom of Hirt 10, it says:

23  Tuesday she called Nancy and told them about car might

24  not be in.  And Tuesday, she called me and asked me if

An      ng

A-27

1   Nancy left me a note.  I said no.

2              A note about what?

3       A.    Apparently --

4       Q.    A note about her not being in because of car

5   trouble?

6       A.    Yeah, yeah.  I never got a note.

7       Q.    How did you know to write that on Tuesday,

8   she called Nancy and told her about car might not be in?

9       A.    Somebody called me.  Let me see.  She called

10  me -- Somebody told me that she had called.

11      Q.    But Nancy didn't leave you a note?

12      A.    But Nancy -- no, she didn't have time to

13  leave me a note.

14      Q.    But somebody told you that?

15      A.    Yes.  It might have been Betty.  Somebody

16  told me, but I am not sure who told me.

17      Q.    We may not have all of this note, because it

18  stops in the middle of a sentence.  She told me that it

19  would cost $1,800 to fix the car and that she is trying.

20             Do you know what the rest of it said?

21      A.    She is trying?  No, not offhand.

22             (Hirt Exhibit Number 11 was marked for

23   identification and attached to the record.)

24

Ant    ting
(3  A 28  84

1        A.    Yes.   See where it says payroll is done on

2   Wednesday in that circle?

3        Q.    But isn't it true that you never received

4   a call from Ms. Smith on July 1st, as indicated in

5   Hirt 10?

6        A.    I got it on Wednesday, whatever Wednesday

7   was.

8        Q.    Wednesday, according to your notes, was

9   the 2nd.

10       A.    Okay.   Then I got it on the 2nd.

11       Q.    Does it make sense that when you said, why

12  didn't you call me on July 1st, that you were writing

13  that note to Ms. Smith?

14       A.    I have no idea.   I don't know.   The only

15  thing I can do right now is just assume.   But I don't

16  know.

17            MR. PRIMOS:   Okay.   I think there is some

18  difficulty here.   Part of it here is we are not seeing

19  the original notes.   So I don't know if you are going to

20  claim any kind of privileges to some of these notes.

21  But I mean it's difficult for us to really know what is

22  going on here without seeing the original notes and to

23  know whether there are notes superimposed on each other.

24  So I just make that request, that we actually somehow

1    on July 4th maybe?  Her six-month -- I mean her

2    probation was coming to an end.

3         Q.    Do you mean the probation that was imposed

4    as a result of the incident in the library?

5         A.    Right, right, whether she was going to be

6    temporary or a permanent employee.  That's the probation

7    that was going to come to an end.

8         Q.    And so you had a discussion with Mr. Hugg?

9         A.    Yes.

10        Q.    Did you have more than one discussion with

11   him about her possible termination?

12        A.    There might have been one or two.  There

13   might have been.

14        Q.    And did you meet with Mr. Hugg in his

15   office?

16        A.    I think once I met him in his office.  I

17   might have called him on -- you know, I wanted to go

18   over this with him after I wrote it.  I mean I did want

19   to make sure.

20        Q.    But did you call Mr. Hugg initially, before

21   you wrote this letter, to say, I am thinking about

22   possibly, or, you know, maybe we should terminate

23   Ms. Smith?

24        A.    Yeah.

1       Q.     Did you call him or meet with him in that

2   initial conversation?

3       A.     Oh, I don't remember.

4       Q.     And that was sometime during the week of

5   June 30th, correct?

6       A.     It was after -- Oh, gosh, it happened so

7   fast.  It was after -- It was after Tuesday.  I remember

8   that.  It was after I found out.

9       Q.     It was after Tuesday?

10      A.     It was after I found out what she had gone

11  through to make all of these arrangements about not

12  coming to work.

13      Q.     So it was after the 1st.  It was sometime

14  after the 1st then that you initially spoke to him about

15  it?

16      A.     Yeah, when I found out what she had done.

17      Q.     How did you present it to Mr. Hugg, the

18  issue of her employment?

19      A.     I don't know.  I just asked for a meeting.

20      Q.     And you came over and met with him?

21      A.     Yes.

22      Q.     And how did you start out the conversation?

23      A.     I don't remember.

24      Q.     Do you remember what you discussed with him?

1        A.      I don't know.  I just said I had a problem

2    that I wanted to discuss with him, a personnel problem.

3        Q.      Okay.  But I am talking about the actual

4    discussion that you then had with him.  What was said

5    during that discussion?

6        A.      I don't remember exactly what I said.  All I

7    remember is I brought up a few facts.

8        Q.      Can you tell me what some of those facts

9    were?

10       A.      I don't remember.

11       Q.      You don't remember any of the facts that you

12   brought up with him?

13       A.      Not right offhand, no.

14       Q.      Was one of the facts the situation with her

15   asking Nancy to do the children's program?

16       A.      Well, that was one of them.

17       Q.      That was one of them.  You know you

18   discussed that with him?

19       A.      Yes, because that was the part where she

20   lied.  And she falsified her vacation slip, because she

21   said she was coming back and she didn't.

22       Q.      Was another factor that you discussed with

23   him that her car was broken down and she hadn't made it

24   back to work?

147

1    A.    I told him that her car was broken down,

2  yes.

3    Q.    Did you also discuss with him some of the

4  earlier incidents involving Ms. Smith?

5    A.    I told him her performance was down.

6    Q.    Okay.  Did you discuss with him about her

7  breaking the chain of command and coming to see him

8  instead of you on March 11th or 12th?

9    A.    I don't know if I brought that one up.  I

10  don't know.

11    Q.    Did you talk about the incident with

12  Mr. Leggett in the library?

13    A.    No.

14    Q.    You didn't talk about her breaking policy by

15  being in the library after hours?

16    A.    No, because we already knew that.  That had

17  nothing to do with it.  We were just --

18    Q.    So you just discussed subsequent incidents?

19    A.    Yeah, because this was -- this is what she

20  got fired for.

21    Q.    What was what she got fired for?

22    A.    For lying and falsifying this report and

23  doing what she did.

24    Q.    That was the only reason that she was fired?

1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3

4  KARI M. (SMITH) PRILLER,          :  C.A. No.:
                    Plaintiff,       :  04-1286-JJF
5                    V.
   TOWN OF SMYRNA, DAVID S. HUGG, III, :
6  individually and in his official   :
   capacity as Town Manager;          :
7  BEVERLY A. HIRT, individually and   :
   in her official capacity as        :
8  Director of the Smyrna Public Library;:
   and HARVEY LEGGETT, individually and :
9  in his official capacity as         :
   Supervisor of Streets/Foreman of   :
10 Public Works,                       :
                    Defendants.       :

11

12              Deposition of KARI M. PRILLER, taken

13  pursuant to notice before Tanya M. Congo, a Notary

14  Public and Certified Professional Reporter, at the

15  offices of Akin & Herron, P.A. 1220 North Market

16  Street, Suite 300, Wilmington, Delaware, on Monday,

17  July 25, 2005, beginning at approximately 12:15 p.m.,

18  there being present:

19              APPEARANCES:

20              SCHMITTINGER & RODRIGUEZ, P.A.
                414 South State Street
21              Dover, Delaware 19901
                BY:  NOEL E. PRIMOS, ESQUIRE
22              Attorney for Plaintiff

23              AKIN & HERRON, P.A.
                1220 North Market Street, Suite 300
24              Wilmington, Delaware 19801
                BY:  BRUCE C. HERRON, ESQUIRE
25              Attorney for Defendants

16

1      Q.   So that would have been some time between

2   March of 2001 and July of 2002?

3      A.   Right.

4      Q.   And, then, in July of 2002 you assumed a

5   new position?

6      A.   Yes.

7      Q.   And became a full-time employee?

8      A.   Right.  Although the position didn't

9   really change.  It added more hours in the same

10  position.

11     Q.   Did the title change?

12     A.   They did change the title.  I'm not sure

13  if they did right when I was changed to full time.

14     Q.   So your initial title was Clerk?

15     A.   Clerk III.

16     Q.   Clerk III.

17     A.   And they changed the title to Children's

18  Program Coordinator.  It was the same exact job.

19  They changed the name and added more hours.

20     Q.   But your duties then didn't change?

21     A.   No.

22     Q.   When you received the full-time position,

23  did you receive any additional employee handbook or

24  personnel manual?

25     A.   No, I may have gotten a new one, but it's

A-35

37

1                    (Whereupon, the document was marked as

2    Exhibit Priller No. 5 for identification.)

3    BY MR. HERRON:

4         Q.    We've marked as Priller 5 a memo dated

5    12/16/02.  It doesn't indicate who the memo's from or

6    to whom it was sent, but let me ask if you've ever

7    seen the memo?

8         A.    Yes.

9         Q.    Do you know who prepared the memo?

10        A.    Bev.

11        Q.    Ms. Hirt prepared it?

12        A.    Yes.

13        Q.    Do you recall receiving the memo on or

14   about 12/16/02?

15        A.    Again, I don't know the exact date.  I'm

16   assuming that's the date.

17        Q.    Do you recall any discussion with Ms. Hirt

18   about the matters set forth in this memo?

19        A.    Again, I don't know if we had a specific

20   discussion about it.  Again, this is her way of

21   telling me.  She would give me a memo and, then,

22   discuss it with me.

23        Q.    You said she would give it to you in a

24   memo and, then, not discuss it with you?

25        A.    No, I said her usual way of dealing with

38

1  problems was to send a memo.  And I don't remember

2  any times when memos -- when I took a memo -- I got

3  it and I took it to her and said, what is this about.

4  I read the memo.  I understood what it was about, and

5  --

6      Q.   So, specifically, this memo which is dated

7  12/16/02, am I correct that you recall seeing the

8  memo, but, then, you don't recall whether or not you

9  had a specific discussion with Ms. Hirt about the

10  items mentioned in the memo?

11      A.   Yeah.

12      Q.   Am I correct?

13      A.   Yes, you're correct.

14      Q.   Do you remember the staff meeting to which

15  she refers in the memo?

16      A.   What line is that?

17      Q.   It's the first line.

18      A.   Oh, yes.  She would go to the meetings at

19  Town Hall, which I believe were for all the

20  supervisors of the different departments; that's my

21  understanding.

22      Q.   The second line says, the newspapers were

23  not separated, stamped and placed in the paper rack.

24  Was that part of your responsibility?

25      A.   It was part of the responsibility of

39

1  opening, however, on certain days of the week we had

2  volunteers.  I don't know if that was normally the

3  day a volunteer would have been there.  But often --

4  the Library's so small there, sometimes there wasn't

5  enough for the volunteers to do.

6           So we leave things like that which

7  anybody can do for them to do.  And I can't say

8  whether or not that was a day when that occurred, but

9  at any rate it wasn't done.

10     Q.   Can you say generally that that's part of

11  your responsibility?

12     A.   It's part of the responsibility of opening

13  for whomever opens.

14     Q.   And if you were working, you'd have the

15  responsibility for opening perhaps along with another

16  employee?

17     A.   Yes.

18     Q.   Would that also be true for the third line

19  there, newspapers being sorted and put away?

20     A.   Sorted.  I'm not sure what sorted means.

21  It sounds to me like it's the same thing as the

22  previous line.

23     Q.   All right.

24     A.   Because when you put them in the paper

25  rack you sort them into the different varieties.

A-38

40

1    Q.    The next line talks about the book drop
2  was not emptied?

3    A.    Uh-huh.

4    Q.    Is that part of the opening
5  responsibilities for the Library?

6    A.    Right.

7    Q.    And you have no specific memory of the day
8  to which she's referring here?

9    A.    No, however the book drop is outside, and
10  it is possible that I was busy with patrons the whole
11  morning.  Again, I don't really recall that whole day
12  or, you know, every event that transpired between
13  when I got there and when she got back.

14         But it's possible that I was busy with
15  other tasks and didn't -- hadn't gotten to that yet.

16    Q.    But you don't remember?

17    A.    No, I don't remember specifically.

18    Q.    The next line says, the Children's Room
19  was not set up and the computer was not set to
20  childproof.  Is that part of the opening
21  responsibilities?

22    A.    Actually, I instituted setting the
23  computer to childproof.  I didn't know it became a
24  policy.  I chose to do that because we were having
25  problems with the children's computer, and kids

1 getting into things they weren't supposed to get into

2 like the control panel.

3          So I found a program to put on there

4 to childproof it. And we never sat down and made

5 that -- you know, added that as part of the duties of

6 opening. It was, you know, assumed I suppose, but --

7 and I don't know what she means by, the Children's

8 Room was not set up. I'm not sure exactly what that

9 refers to, you know, specifically.

10          Q.    Was that part of your job

11 responsibilities?

12          A.    Working in the Children's Room?

13          Q.    Yes.

14          A.    Well, it was the responsibility of

15 everyone to go around and make sure the whole Library

16 was in order. So, again, I don't know what she's

17 referring to as set up. What was in it to be set up,

18 'cause there wasn't anything that I can remember that

19 I had to go in there and do that wouldn't have been

20 done at closing the night before in cleaning up,

21 which is normally a night duty, you know, it wouldn't

22 have been opening duties. So I'm not sure what she's

23 referring to.

24          Q.    What about the flag, the next line?

25          A.    I suppose it wasn't hung outside.

1      Q.    Is that part --

2      A.    Again, it's an outside -- it's possible I

3  was busy with clients.

4      Q.    Is that part of your job duties?

5      A.    It's part of the opening responsibilities.

6      Q.    The next line says, no check in books were

7  put away.  What is she referring to there?

8      A.    Those are the books that have been checked

9  in and they're put onto a rack to be put away.  For

10 instance, the book drop books would be checked in

11 and, then, they would be placed on this rack.

12            Again, I may have been busy with

13 patrons.  I may have been expecting a volunteer

14 because that's also one of the main duties of the

15 volunteers was to put books away.

16     Q.    Are the volunteers there every day?

17     A.    They're -- there's ones on certain days.

18 For instance, I know -- I remember one volunteer, her

19 name is Gert, and I know that she was Wednesday

20 afternoons.

21            I can't recall every volunteer and

22 when their time slot was, but often all of us would

23 leave things for them to do because, you know,

24 they're there to volunteer and they wanted things to

25 do.

43

1     Q.   Do you know or have any memory of what Ms.

2   Hirt"s referring to here when she says, a patron

3   complained that Kari was on the phone?

4     A.   I don't know who complained or who I was

5   on the phone with, or why I was on the phone.  Part

6   of my job responsibilities was contacting people.  So

7   it doesn't say it was a personal call.  It just says

8   a patron complained that I was on the phone, and she

9   never mentioned who the patron was.

10     Q.   Do you recall having a discussion with Ms.

11   Hirt about that issue?

12     A.   No, because I would have asked who the

13   patron was.

14     Q.   What about the last line there, it says,

15   Yahoo Messenger, The Hitman, was on the screen and

16   had started at 9:14 a.m.  Do you know what she's

17   referring to there?

18     A.   Yeah, we had Yahoo Messenger on both the

19   computers in the back room, and she had them on hers

20   as well in her office.

21     Q.   Did you have any discussion with her about

22   that particular issue?

23     A.   No, not before I saw this memo.

24     Q.   What about after?

25     A.   Again, I don't know if we had a discussion

A-42

1  about it.  I just know that I knew about it, you

2  know, I didn't know about it and, then, I did, which

3  I'm assuming was from this memo.

4           There's no policy written anywhere

5  that says you can't use a messenger service on your

6  computer that I found.  And as I said, she uses it

7  herself to talk to her husband, her son and her

8  friends while at work.

9      Q.   But you don't recall any discussion with

10  Ms. Hirt about that issue around that time, December

11  of '02?

12      A.   No, again, this was the discussion as far

13  as I know.  I don't remember any further discussion

14  outside of this memo.

15           MR. HERRON:  All right. This will be

16  Priller 6.

17           (Whereupon, the document was marked as

18  Exhibit Priller No. 6 for identification.)

19  BY MR. HERRON:

20      Q.   Before we get to Priller 6 let me ask you

21  another question, okay.

22      A.   Okay.

23      Q.   Before December 20th, 2002 were you aware

24  of any policy regarding employee access or entry into

25  the Library after hours?

1      A.    We had one discussion and it was regarding

2   my request to work after hours, 'cause again during

3   summer reading program is a very busy time.  So I

4   requested additional time after the Library was

5   closed so that I could focus on working on getting my

6   programs prepared, whatever needed to be prepared for

7   those, which varied depending on what the program

8   was.

9            And her saying that no, I couldn't do

10  that.  And I also requested another time to work at

11  home on a project which was also denied.

12           But that is what I remember of that

13  discussion.

14      Q.    Let's go to the first discussion that you

15  remember.  Do you know when that was, when you

16  requested --

17      A.    Just that it was during the summer reading

18  program.  I'm not sure which one.

19      Q.    Was it before December 20th, 2002?

20      A.    Yes.

21      Q.    So within the Summer of 2001 or Summer of

22  2002; is that correct?

23      A.    Yes.

24      Q.    And do you recall anything else about the

25  discussion other than Ms. Hirt saying, no, you can't

53

1  programs weren't that involved.

2              The next year I created more intricate

3  programs and bigger events. So I had a lot more to

4  do.  So I'm assuming it was.

5      Q.  So I just want to make it clear.  So it's

6  your recollection that sometime during the Summer of

7  '02 you were told that you weren't allowed to access

8  the Library after hours for safety reasons?

9      A.  No, I was told I was not allowed to work

10  after hours for safety reasons.  It didn't say

11  anything about accessing.  In fact, I was the person

12  on call for the alarm company.  If the alarm went

13  off, I was to go to the Library and turn the alarm

14  off in the middle of the night or whenever it went

15  off.

16      Q.  But you were told in the Summer of '02 you

17  weren't allowed to work in the Library after hours --

18      A.  Right.

19      Q.  -- for safety reasons, correct?

20      A.  Right.

21              MR. HERRON:  We'll take a short break.

22              (Recess)

23  BY MR. HERRON:

24      Q.  Ms. Priller, before December 20th of 2002,

25  did you know Harvey Leggett?

54

1        A.    Before September -- December 20th you

2   mean?

3        Q.    December, yes.

4        A.    Yes.

5        Q.    How long had you known him?

6        A.    I assume when I -- he worked in Public

7   Works and so one of their job duties was to come and

8   get our recycling from the Library, and that was

9   generally how I met him and knew him.  They'd come on

10  Fridays for the recycling.

11              He helped with some of the programs

12  that were outdoors, that sort of thing.

13       Q.    That was my next question.  So you had

14  some contact with him at work before December of

15  2002?

16       A.    Briefly.  I would say we were

17  acquaintances.

18       Q.    And there were two main occasions where

19  his job duties seemed to intersect with yours, and

20  one was when they come to get the recycling from the

21  Library?

22       A.    Uh-huh.  That was one that was, you know,

23  a regular time.  Others, you know, any time -- they

24  were in Public Works, so any time we had a problem,

25  you know, plumbing or any type, you know, like

55

1  repairs that would be made in the Library, it may

2  have been him or it may have been somebody else from

3  Public Works.

4            So they came on occasion as needed,

5  and regularly to pick up the recycling.

6      Q.   Before December 20th, 2002 had you ever

7  seen him outside of work?

8      A.   No.

9      Q.   Tell me what happened on December 20th,

10 2002, leading up to the incident?

11     A.   Beginning at what time?

12     Q.   Well, did you work that day?

13     A.   Yes.

14     Q.   What were your hours?

15     A.   It was a Thursday night, I believe.  So I

16 was working till 8:30.

17     Q.   Did you have any discussions with Mr.

18 Leggett that day before 8:30?

19     A.   I don't know if while I was at work I

20 talked to him.

21     Q.   So you don't recall?

22     A.   I don't recall.

23     Q.   Do you recall whether you had any

24 discussions with him at work in the week before the

25 incident?

56

1      A.   I had asked if he would help me move.   And

2  I'm pretty sure I brought that up at work because

3  that's the only time I ever saw him.   And I asked him

4  if he would be interested to help me move, and I was

5  going to pay him to help me.

6                So I don't know when that was that we

7  talked about it, but --

8      Q.   Do you have any idea when it was in

9  connection with December 20th?

10                It was before December 20th,

11  obviously, but do you know how long before?

12     A.   Not really.   I can't exactly say.

13     Q.   What was his response?

14     A.   Sure.

15     Q.   What happened after you left work?  Or did

16  you leave work at 8:30?

17     A.   Yes, I went home, changed out of my

18  business clothes.

19     Q.   Where did you live at that time?

20     A.   I lived in Smyrna at a different address.

21     Q.   What was the address that you lived at?

22     A.   I can't remember the numbers.   It was East

23  Cook Avenue, but I don't remember the numbers for it.

24  It was in Smyrna.

25     Q.   So you went home after work?

57

1       A.    Right.  Went home, changed.

2       Q.    What did you do then?

3       A.    And we, at some point, had decided to meet

4  at Bella Via, the Italian food place in Smyrna.

5       Q.    When you say, we, who are you referring

6  to?

7       A.    Harvey and I.

8       Q.    So when did you decide that?

9       A.    I don't recall.  But I do know that I had

10  a phone conversation with him, but I don't remember

11  except it was before he, you know.

12       Q.    Was it that day?

13       A.    To discuss going out.  No, I don't think

14  it was -- it was further ahead of time than that.  It

15  was when he asked if I would like to go have a drink.

16            I believe he asked me that at work.

17  And, then, later we discussed it over the phone.

18       Q.    Do you recall what day he asked you to go

19  have a drink?

20       A.    No.

21       Q.    Was it within a week before December 20th?

22       A.    It was fairly closer.  I don't know the

23  definite time, but it was pretty close to the date.

24       Q.    And, then, when did you make definite

25  plans, if you did, to meet him that night?

58

1       A.   We made plans over the phone, and that's

2  all I -- you know, I don't know how far ahead of time

3  it was.  Just that I remember he wanted to go to

4  Wilmington or something, and I said, no.

5            But, basically, we just ended up

6  deciding, why not go out after work on Thursday and

7  go have a beer, and discuss the move.

8       Q.   And was that discussion -- you said that

9  was a phone call?

10      A.   Right.

11      Q.   Was that when you were at home?

12      A.   Yes, I was at home then.

13      Q.   And did you make definite arrangements to

14  meet somewhere on that Thursday night?

15      A.   Yes, we made arrangements to meet at Bella

16  Via.

17      Q.   Did you, in fact, meet him at Bella Via?

18      A.   Yes.

19      Q.   Do you remember what time that was?

20      A.   I would say probably around 9:30, if I

21  left work, went home, changed and, then, went there.

22  Nine, 9:30.

23      Q.   Is that an Italian restaurant slash bar?

24      A.   It was not a bar, but they served beers.

25  It's just a restaurant that served beer.

A-50

59

1        Q.    What happened then?

2        A.    We had a pitcher, a small pitcher of beer

3   that we shared, and, you know, we talked about

4   getting the truck and where to get it from.

5               I made a point of telling him that we

6   were out as friends.

7        Q.    I'm sorry.

8        A.    I made a point of letting him know that we

9   were only out as friends.

10       Q.    Did he suggest otherwise, or --

11       A.    No, but I just wanted to make sure

12  because, you know, when he asked about going to

13  Wilmington, you know, it made me think that perhaps

14  he, you know, wanted it to be more than that.  I

15  don't know.

16               I knew that he wanted to go out.  So I

17  just -- he's the one that offered and I wanted to

18  make sure that it's clear what was the purpose of us

19  being there.

20       Q.    Did you have dinner there or anything to

21  eat?

22       A.    When I generally had to work till 8:30 at

23  the Library, I'd have dinner at the Library.  It's

24  kind of like a lunch hour but it's dinner hour.

25       Q.    How much did you have to drink?

A-51

60

1      A.    We drank the small pitcher of beer

2  together and it maybe filled two Pilsner glasses, you

3  know, one each, one for him and one for me.

4      Q.    How long did you stay at the restaurant?

5      A.    I would say maybe thirty, forty-five

6  minutes.

7      Q.    What happened then?

8      A.    I wanted us to go play pool.  So we went

9  to a place he knew that had a pool table in town.

10  And I don't know what the name of the place was at

11  the time because it keeps changing names, but it was

12  an Irish pub.  I think now it's an Irish pub, too.

13  It's on the corner of Market, South Market Plaza and

14  Commerce Streets.

15          So we each drove separately there and

16  we met again there.

17      Q.    What time was that, approximately?

18      A.    Maybe 10:00, 10:30.

19      Q.    What happened then?

20      A.    We played pool several times.  We had a

21  couple of beers each.  I don't remember anything else

22  special happening, just that we played pool and had

23  some beers, talked.

24          And the only other thing that I

25  remember that's unrelated is that a bat was in the

61

1    bar and they had to capture it.  But that has nothing

2    to do with anything.  It's just that I remember it

3    happening.

4        Q.    How long did you stay there?

5        A.    I'm not sure.  We just played.  I mean, I

6    wasn't on any kind of time constraint, so I wasn't

7    really paying attention to what time it was and I

8    don't usually wear a watch, and I didn't have a cell

9    phone at the time.  So I don't generally check the

10   time unless I had to be somewhere.

11       Q.    Did you see anyone else you knew there?

12       A.    No, but he did.

13       Q.    Who did he see, did he tell you?

14       A.    No, I don't know who they were.  I just

15   knew that he knew people at the bar.

16       Q.    Did you see anybody else at the restaurant

17   that you knew?

18       A.    No, he knew the waiters and waitresses

19   there, but other than that -- I mean, I'd recognize

20   them because I've eaten there before, but I didn't

21   know anybody.

22       Q.    What happened after you stayed at the pool

23   hall for awhile?

24       A.    Well, I realized that I shouldn't drive.

25   And I said that I should take a walk and just walk

62

1   around and maybe get some fresh air, you know.  So I

2   suggested we walk down Main Street, just walk, you

3   know, up and around.  We walked around the block that

4   we were on.  We walked over across to the Crystal

5   Palace.  And I think I actually went in there to use

6   the bathroom, 'cause I know what it looks like   .

7   inside.

8        Q.    That's a bar?

9        A.    That's another bar, yes, more for like

10  kids, you know, not teenagers, but younger people.

11              And, then, we headed down Main Street.

12  We were just walking and talking.

13       Q.    Did you have any more beer --

14       A.    No.  No.

15       Q.    -- at the Crystal Palace?  So by that

16  point you had three or four beers or how many?

17       A.    Yeah, probably three, four.

18       Q.    And Mr. Leggett had the same, or do you

19  remember how many he had?

20       A.    I think it was approximately the same.

21       Q.    So you were walking down Main Street?

22       A.    Uh-huh.

23       Q.    What happened then?

24       A.    Well, we were walking passed Faries

25  Funeral Home, and there was a large plant on the curb

63

1  for pick up.  And it was like a palm, you know, about

2  four feet high.  And so I -- at the time I didn't

3  know it was an artificial plant.  I thought it was

4  real because it had such thick leaves.  But -- so I

5  decided to pick it up and take it to the Library to

6  give to the Library 'cause they had a lot of plants

7  in the Library.

8            So I --

9      Q.    It was out in the trash?

10     A.    Sitting on the curb.  It wasn't like in a

11 trash can, but, you know, often they have flowers and

12 plants out because it's a funeral home.

13            So I just happened to notice it and

14 decided to give it to the Library and keep it for the

15 Library.  So I -- the funeral home is maybe half a

16 block from the Library.  So I just continued walking.

17 We went, you know, I said, I'll go put this on the

18 desk, which is what I did.  I took it inside and put

19 it on my desk.

20     Q.    So you had a key to the front door of the

21 Library?

22     A.    A key and the alarm code.

23     Q.    You had to have both to enter the Library?

24     A.    Yes.

25     Q.    And did Mr. Leggett enter the Library with

64

1   you?

2        A.   Yes.

3        Q.   Did you have any discussion about going

4   into the Library other than your saying, I'm going to

5   put this in the Library?

6        A.   No, I just said, I'm going to drop this

7   off on my desk, or something to that effect.

8        Q.   And you put it on your desk?

9        A.   Yes.

10       Q.   Where was your desk in relation to the

11  front door?

12       A.   It was -- well, Bev had her own office

13  which was right next to the main office which the

14  rest of us shared.  So my desk is in the middle of

15  the office.

16       Q.   What happened then?

17       A.   Then I went to the kitchen to get a Pepsi

18  'cause I thought a soda or something might be

19  helpful.

20       Q.   Do you have any idea what time it was by

21  this point?

22       A.   I know the bar wasn't closed when we left

23  it.

24       Q.   The Crystal Palace?

25       A.   Either one, 'cause they're right across

1 the street from each other.

2     Q.   What happened then?

3     A.   I was standing at the sink opening a

4 Pepsi, and he just kind of came up behind me out of

5 nowhere and said something to the effect of, you

6 know, for me to suck his dick, is what he said, which

7 I was surprised.

8            I said, no, I don't think so, and was

9 leaving the kitchen and he was like -- kind of like

10 hugging me from behind.  He wasn't using a lot of

11 force, but he had his arms around me and I was

12 walking away from him.

13            And I -- directly in front of the door

14 to the kitchen there's a library table with chairs

15 around it that patrons use.  And he pushed me over

16 the chairs onto the table.  And I couldn't really get

17 off of it because my back was on the chair which was

18 above the level of the table.

19            And, you know, I told him no, and he

20 just pretended like I didn't say anything and took my

21 pants off.  And I didn't know what to do because I'd

22 never been in a situation where you said, no, and

23 someone didn't respond to you saying no.

24            And so I was, you know, I didn't say

25 anything else right then.  And, then, he pulled me

1  down onto the floor next to the chairs and, you know,

2  proceeded to rape me.

3                   And I, maybe for several minutes, just

4  was frozen and was trying to figure out what to do.

5  And finally I bolted up and went around the table and

6  crawled away around the table, and he followed me and

7  knocked over a lot of literature that was on the

8  information rack.

9                   I wasn't looking behind me but I could

10 hear him because of all the stuff falling over.  And

11 I continued just going around the table trying to get

12 back over by the kitchen where the ramp is to go to

13 the rest of the Library.  And he followed me and

14 continued -- he caught me and continued.

15                  And at that point I was crying.  I was

16 telling him to stop, told him no, what are you doing,

17 you're raping me, stop it.

18                  And he just acted like I wasn't there

19 or pretended not to hear me.  And I threw up and was

20 just laying there crying.  And he still didn't stop.

21 I threw up again, and, then, he finally got up.

22                  And I stayed there for maybe a couple

23 of minutes or a minute.  I don't really know.  I went

24 to the bathroom.  He followed me to the bathroom.  I

25 was getting sick in the bathroom.

76

1  that was really the only private area in the Library

2  except the bathroom, and that was the nearest spot.

3  I went in the closet and she followed me.

4      Q.   You say she brought it up.  What

5  specifically, as best you can remember, did she say?

6      A.   She said that she heard that they weren't

7  going to prosecute.

8      Q.   Do you recall anything else that she said?

9      A.   Not in her office, no.

10      Q.   And you got upset and walked away.  She

11  followed you?

12      A.   Yes.

13      Q.   Then tell me what happened and all the

14  conversation you can recall?

15      A.   She came in the closet and -- I don't

16  remember the whole conversation but, basically, she

17  started talking about something that happened to her

18  when she was a child, and, you know, similar events.

19      And that's all I really remember

20  because I was just upset and crying.

21      Q.   Other than that conversation with Ms.

22  Hirt, was there any other time that you discussed the

23  incident or Mr. Leggett with Ms. Hirt after December

24  20th, 2002?

25      A.   I remember having -- I remember a comment

78

1   how he was, or something to that effect.

2        Q.    Was this at the same time you had this

3   other conversation with Ms. Hirt?

4        A.    No, I don't remember.  It was -- I mean, I

5   don't remember when, you know, just conversations we

6   had.  I remember that they happened.

7        Q.    Do you remember any other times when --

8        A.    She put some literature on my desk about

9   some program through work for counseling or

10  something.

11       Q.    Any other times you remember discussing

12  with Ms. Hirt about the December 20th, 2002 incident

13  or Mr. Leggett?

14       A.    Yes, he came to the Library to do work

15  outside the Library.  I didn't know he was out there.

16  They were sandblasting the sidewalk or something, and

17  Bev asked me to go -- specifically asked me to go do

18  the book drop, which is located right -- like two

19  feet from where he was working.

20                    And I went to the door before I even

21  saw that he was there.  I asked Bev, did she know he

22  was out there, and she said, yes, she knew it.

23                    So she already knew ahead of time he

24  was out there.  And I said, well, I can't go out

25  there.  I'm not going to go out there.  And she, you

79

1    know, said, fine, she would do it, and that, you

2    know, it's not like he's going to attack you or

3    something, is what she said.  Those were her exact

4    words.  I remember very clearly.

5                    And, you know, I was angry that he was

6    there, and her just acting like it's no big deal or

7    that I should just get over myself was her attitude.

8         Q.    Did she do it though?

9         A.    She did go out and do it.

10        Q.    Any other time that you recall now where

11   you discussed Mr. Leggett or the incident of December

12   20th with Ms. Hirt?

13        A.    No, Bev and I weren't very close so I

14   would not have discussed all the details with her.

15        Q.    Did you ever have any discussions with Mr.

16   Hugg regarding the incident, or Mr. Leggett?

17        A.    Yes, after that incident I just explained

18   happened, I called him up and made an appointment

19   directly with him to talk to him about the whole

20   thing, Bev, him being out there.  And I don't think I

21   told him at the time what it was about, but that's

22   what it was, regarding that.

23                    And it was for the next day.  So I

24   went the next day and talked to him about it.

25        Q.    Tell me what you recall about that

80

1  discussion?

2        ' A.    Well, I started with, it really bothered

3  me that Harvey was so close to the Library where I

4  needed to be working.  And he was like interrupting

5  my work by being there.  And that he should not be

6  there.

7                    And, you know, I discussed with him

8  just how hard it was anyway seeing the Town trucks,

9  seeing him around town driving, not being able to go

10  to any Town functions because he would be there.

11  Like we had the Town picnic coming up, and I couldn't

12  go because, you know, he could be there.

13                    So I discussed that with him.  I

14  discussed what Bev did, what she said.  I said, I

15  couldn't handle him being there.

16                    And I finally asked him about what the

17  process for filing a sexual harassment claim.  And he

18  made copies of the relevant sections from the

19  Personnel Handbook which is a larger version of the

20  Employee Handbook and it had everything spelled out

21  because it's not really gone into detail in the plain

22  handbook.

23                    And he told me that I would need a

24  lawyer; that I would have to go in front of the Town

25  Council and explain my case, or make my case.

81

1          So basically made it sound very bad,

2   you know.  And he didn't offer me any type of

3   paperwork to fill out or, you know, wasn't helpful in

4   any way.

5          And when I got back from our meeting,

6   I called a lawyer, and it was $250.00, and I was

7   making $20,000.  I lived alone with my child.  So I

8   didn't make a claim because I didn't have a lawyer.

9      Q.   He gave you a copy of the Town's sexual

10  harassment policy?

11     A.   Yes.

12     Q.   Did Mr. Hugg say anything during that

13  meeting about Mr. Leggett's job duties --

14     A.   Yes.

15     Q.   -- and interaction with the Library?

16     A.   He said that he was the only one who knew

17  how to sandblast.  That was basically the only thing

18  he had to say about it.  Just that he wasn't -- I

19  mean, he reiterated that he wasn't allowed in the

20  Library when I was there, but that really wasn't

21  helpful because that wasn't my problem.

22     Q.   After December 20th, 2002, did Mr. Leggett

23  continue to do the recycling duties he did before for

24  the Library?

25     A.   No, in fact he may have not even been

82

1  doing them anymore before that happened because he

2  was promoted and -- I mean, I remember other people

3  coming to do the recycling at times. I don't

4  remember if it was because of that.

5       Q.    Other than the incident that we've

6  discussed, did you ever see him in the Library at any

7  other time after December 20th, 2002, him being Mr.

8  Leggett?

9       A.    Not when I was there. I saw him working

10 sometimes when I wasn't working. I would drive by

11 the Library and he would be working there.

12      Q.    Awhile ago I mentioned Priller Exhibit 6,

13 which is an Employee Progress Report dated January

14 4th, 2003. Have you seen that document before?

15      A.    Yes.

16      Q.    That's your signature on the second page;

17 is that correct?

18      A.    Yes.

19      Q.    And did you discuss the matters raised in

20 the Progress Report with Ms. Hirt?

21      A.    She didn't usually go over the various

22 items in the report.

23      Q.    You said she did usually go over the --

24      A.    She didn't. I mean, we didn't usually

25 discuss it or anything. She just asked, you know,

83

1  had I looked at it or whatever.

2          She would go over the other areas

3  briefly.  I mean, she wouldn't just like read the

4  whole thing out, but --

5      Q.    This is a three-page document.  Your

6  signature's on the second page there.  Do you

7  remember if the third page was attached and whether

8  you saw that?

9      A.    Yes, it was.

10     Q.    So you saw that before you signed it?

11     A.    Yes.

12     Q.    And it's your recollection that you sat

13 down with Ms. Hirt and discussed the third page?

14     A.    Yes.  Again, I mean briefly.  We didn't go

15 over every point.  In fact, probably, with this one

16 the main thing that she went over was the so-called

17 safety issues and about the probation being extended,

18 because all the rest of this is basically the same as

19 my last one.

20     Q.    Let me ask you, I want to know what you

21 remember.  It says, employee's weakest points.  It

22 says, Ms. Smith still has difficulty with following

23 through directions given by her supervisor.

24          Do you remember a discussion with Ms.

25 Hirt about that at the time?

84

1      A.    Not particularly.

2      Q.    Well, is that yes or no?

3      A.    I don't remember her saying anything about

4  following directions.

5      Q.    And the second sentence is, on occasion

6  she has demonstrated her stubbornness to follow

7  through these directives, but only at her own -- I

8  guess that's convenience.  Did you have that

9  discussion about that?

10      A.    No, that's just a repeat from the

11  previous.

12      Q.    How about the third sentence which is, she

13  has continually shown difficulty distinguishing

14  between high and low priorities and sometimes has to

15  be reminded to complete assigned tasks?

16      A.    Again, the same as -- this is like she

17  kept this on her computer and added this other stuff

18  here.  She -- the only part that I can see is

19  different -- the only other part that's different is

20  the safety issues still remain and the priority

21  issues, although on the last one it didn't say

22  anything about safety issues that I know of.  She

23  must have, you know, the last sentence I know was

24  added.

25      Q.    But do you know what she was referring to,

102

1  action taken, refers to?

2      A.    Well, the last request that it be -- this

3  be removed from my file.

4      Q.    So that's what you think it refers to?

5      A.    Yes.  They did not remove it from my file,

6  yes.

7                  MR. HERRON:  Priller 12.

8                  (Whereupon, the document was marked as

9  Exhibit Priller No. 12 for identification.)

10 BY MR. HERRON:

11     Q.    Let's go to Priller 12.  This is an

12 Application for Leave dated 6/16/03.  Is that your

13 signature on there?

14     A.    Yes, it is.

15     Q.    And did you fill this application out and

16 sign it, or at least the top half of it?

17     A.    Yes, I filled out the top half.

18     Q.    Did you have a discussion with Ms. Hirt

19 about this leave application on or about June 16th,

20 '03?

21     A.    Did I have a discussion with her then?

22     Q.    Yes.

23     A.    I gave it to her and, yes, we talked about

24 -- well, first, before I filled it out, we talked

25 about leave.  I wanted to go to Virginia for my son's

103

1  birthday, you know, take him there for his birthday.

2           So what I was basically asking for was

3  like a long weekend.  And she talked about the

4  program that I had scheduled Tuesday or Thursday

5  night, whatever it was for 6:00 to 8:00 p.m.  And she

6  said that -- because I told her that, you know, Nancy

7  could do it.  And she said, no, Nancy's on vacation.

8           I said, okay.  Well -- and, then, she

9  had another issue with the fact that she was on

10  vacation, Beverly was.  So even though she was going

11  to go on vacation, she still approved this as long as

12  I came to do the program.  And that was fine, so I

13  turned this in.

14           Then --

15      Q.    Let me stop you for one second.

16      A.    Okay.

17      Q.    And ask you, when you had the discussion,

18  the initial discussion with Ms. Hirt regarding a

19  leave, did you tell her that the reason you wanted

20  the leave was that you wanted to go to Virginia?

21      A.    I probably brought it up, but I don't know

22  if I did say that, just that I requested the time

23  off.  But that was the purpose of the time off.

24      Q.    You don't recall that you told Ms. Hirt

25  that, the purpose?

104

1    A.    No, I don't know if I specifically said I

2  was going to Virginia.

3    Q.    But you do recall you had discussion with

4  her and she brought up the reading program on July

5  1st?

6    A.    Right, 6:00 to 8:00 p.m.

7    Q.    And you told her, at that point, that you

8  would return to conduct the reading program?

9    A.    Right.  I think we did talk about Virginia

10  because when we talked about this, I said that --

11  because I wanted to leave this day, 6/30, and I said

12  -- I said, that's fine.  Instead I'll just leave

13  right after that early in the morning.  And that's

14  fine.

15          And I also said that I needed to bring

16  my son because I didn't have a babysitter for him

17  that night, which is why it says down here, no

18  babysitter.

19    Q.    So you did specifically discuss you would

20  bring your son in to the Library during the Summer

21  Reading Program?

22    A.    Right, during the event.

23    Q.    During the event.  Okay.  And you think

24  that you told Ms. Hirt you were going to Virginia,

25  but you're not sure?

 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,           )
        Plaintiff,                 )
                                   )
              v.                   ) C.A. No.
                                   ) 04-1286 (JJF)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
 individually and in his official  )
capacity as Town Manager;          )
BEVERLY A. HIRT, individually and  )
in her official capacity as        )
Director of the Smyrna Public      )
Library; and HARVEY LEGGETT,       )
individually and in his official   )
capacity as Supervisor of          )
Streets/Foreman of Public Works,   )
        Defendants.                )

            Deposition of **HARVEY LEGGETT**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street Plaza, Smyrna, Delaware, on Tuesday, August 30,
2005, beginning at 11:20 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        AKIN & HERRON
        BY:  BRUCE C. HERRON, ESQUIRE
        PO Box 25047
        Wilmington, Delaware  19801
        Attorney for Defendant.

    **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

A-70

5

1        A.    No.

2        Q.    Okay.  Mr. Leggett, how long have you been

3   employed by the Town of Smyrna?

4        A.    I would say about 17 years.

5        Q.    When did you become the public works foreman

6   for the Town of Smyrna?

7        A.    I can't remember.  You probably have that in

8   the records.  I know it's been a lot of stuff, and I

9   can't give you the exact date.  I don't know.  So you

10  got to --

11       Q.    Was it in the year of 2002?

12       A.    Somewhere around in there; like I said, you

13  would have to, you know --

14       Q.    Is that your current position with the Town?

15  Public works foreman?

16       A.    Yes.

17       Q.    When you were placed into that position, did

18  it involve a pay raise?

19       A.    Yes.

20       Q.    Did it involve a change from an hourly rate

21  of pay to a salaried type of pay?  Do you receive a

22  salary?

23       A.    No.

24       Q.    You are still an hourly employee?

A-71

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,          )
  Plaintiff,                     )
             )
     v.                   ) C.A. No.
            ) 04-1286 (JJF)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
 individually and in his official  )
capacity as Town Manager;          )
BEVERLY A. HIRT, individually and  )
in her official capacity as        )
Director of the Smyrna Public      )
Library; and HARVEY LEGGETT,       )
individually and in his official   )
capacity as Supervisor of          )
Streets/Foreman of Public Works,   )
   Defendants.               )

    Deposition of **DAVID S. HUGG, III**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street Plaza, Smyrna, Delaware, on Tuesday, August 30,
2005, beginning at 9:35 a.m.

APPEARANCES:

   SCHMITTINGER & RODRIGUEZ
   BY:  NOEL E. PRIMOS, ESQUIRE
   414 South State Street
   Dover, Delaware  19901
   Attorney for Plaintiff.

   AKIN & HERRON
   BY:  BRUCE C. HERRON, ESQUIRE
   PO Box 25047
   Wilmington, Delaware  19801
   Attorney for Defendant.

  **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

    **ANTHONY REPORTING**
     **PO Box 234**
  **Dover, Delaware  19903**
    **(302) 674-8884**

A-72

1    appropriate law enforcement agencies.  Our

2    responsibility is to deal with the violations of town

3    policy and whatever action we need to take relative to

4    that.

5        Q.   Now, you indicated that Mr. Leggett was

6    placed on administrative leave.  You thought it was

7    about two weeks, but you are not sure?

8        A.   I mean I can go back to the file.  I don't

9    have the file.

10       Q.   I am just trying to determine your

11   recollection at this point.

12       A.   Yes.

13       Q.   At some point did that period of leave end?

14       A.   That period of leave ended on --

15       Q.   And what was the reason that it ended?

16       A.   Primarily, because the attorney general

17   declined to file whatever the -- I don't know what the

18   proper legal term is -- but to charge Mr. Leggett with a

19   criminal action.  So the next appropriate step was to

20   bring him back to work and put appropriate conditions,

21   limitations, what have you, on his action.

22       Q.   And specifically, was any discipline imposed

23   on Mr. Leggett as a result of the incident?

24       A.   Let's see.  Again, without looking at the

A-73

1   specific file, if I recall correctly, we relieved him of

2   his foreman responsibility.  We put him on a

3   probationary status.  We restricted his work locations,

4   things of that nature.

5        Q.    Okay.  Since these actions were taken with

6   respect to Mr. Leggett, it was obviously determined that

7   he had admitted some misconduct, correct?

8        A.    Clearly, being in the library after -- he is

9   not authorized to be in the library, other than in the

10  conduct of his normal business, which would be to do

11  maintenance or whatever at any time.  And he had been in

12  the library after hours, which for whatever reason, was

13  inappropriate.

14       Q.    Did Mr. Leggett admit that he had been in

15  the library after hours?

16       A.    Sure.  He did not deny that he had been in

17  the building.  He was straightforward about it.

18       Q.    And why was that misconduct?  Why did that

19  constitute misconduct, just to be in the library after

20  hours, for Mr. Leggett?

21       A.    He had no reason to be in the library after

22  hours.

23       Q.    Had he ever been instructed that he was not

24  to be in the library after hours?

A-74

1        Q.    And I think you said that also, part of the

2    discipline was there were restrictions placed on

3    Mr. Leggett's movements?

4        A.    Correct.

5        Q.    What specifically were those restrictions?

6        A.    Basically, they were to have no contact with

7    Ms. Smith, to not be at the library for any reason

8    unless specifically directed so by the town manager or

9    his director, his public works director, to essentially

10   not be anywhere in the vicinity of the library or

11   Ms. Smith.

12       Q.    The person who was acting as foreman, would

13   that person be able to direct him whether he could be in

14   the vicinity of Ms. Smith?

15       A.    The direction was that it was the director

16   of public works.

17       Q.    So it would have to come from him?

18       A.    Yeah.

19       Q.    Other than what you have mentioned, the

20   probation and relieving him of his foreman

21   responsibilities and the restrictions on his

22   whereabouts, was any other type of discipline imposed on

23   Mr. Leggett?

24       A.    I would have to look at the file.  I don't

A-75

# TOWN OF SMYRNA



# PERSONNEL POLICY

A-76

## 4. Performance Evaluations

### 4.1 Policy.

The purpose of the performance evaluation is to manage the performance of employees. Objectives of the performance evaluation process are to measure the effectiveness of the work force in meeting established goals and objectives, provide feedback to the employee on job performance, assess employee recruitment practices, provide a basis for personnel decisions and maintain written documentation of employee's work records.

### 4.2 Procedure.

#### 4.2.1 Authority and Responsibility.

The Town Manager is responsible for administering the personnel policy, including overseeing the evaluation process, developing evaluation procedures, initiating employee evaluations, maintaining the Town's official personnel files and submitting reports to the Business Office for payroll changes. The employee's immediate supervisor is responsible for assigning work, monitoring work performance and recommending the appropriate personnel action based upon the results of the evaluation.

#### 4.2.2 Probationary Period Evaluations.

The probationary period evaluations occur at three (3) months, six (6) months, and twelve (12) months of employment. They serve the following purposes:

    a) to enable the supervisor to clarify job responsibilities and advise the employee of problem areas where improvements are needed

    b) to enable the employer to assess the employee's work potential and whether the employee meets the minimum job requirements

    c) to serve as the final screening method in the employee recruitment process

### 4.2.3 Probationary Period Dismissal.

Department supervisors may recommend dismissal of an unsatisfactory employee at any time during the probationary period. Department supervisors shall specifically recommend the retention or dismissal of the employee based on the supervisor's evaluation of the employee's performance during the probationary period. The department supervisor shall indicate the following in writing to the Town Manager:

a) that the employee's supervisor has discussed the new employee's progress (accomplishments, strengths and weaknesses) with the new employee

b) whether the new employee is performing satisfactory work

c) whether the probationary period should be extended provided, however, that no employee shall remain in a probationary status for more than one (1) year from the date of employment

d) whether the employee should be retained in the present position or should be released, transferred or demoted.

### 4.2.4 Annual Evaluation.

a) Each regular employee will be evaluated at least once annually shortly before their review date.

b) This evaluation, to be a constructive part of the total Personnel Policy, will be reviewed by the employee and the evaluator. Any disagreements regarding this evaluation should be taken to the Town Manager for further discussion. Any continuing and unresolved personnel problems will be reviewed by the Town Manager who may change the rating on the evaluation. The Town Manager's decision is final, and not grievable.

### 4.2.5 Evaluation Forms.

All Town employees will be evaluated on forms developed by the Town Manager and approved by the Mayor and Town Council.

**20. Sexual Harassment.**

   **20.1 Policy.**

Sexual harassment is a form of employee misconduct which undermines the integrity of the employment relationship. Each employee of the Town of Smyrna, regardless of gender, is entitled to a working environment which is free from intimidation and sexual harassment. The Town shall not tolerate any form of sexual harassment by any employee of either gender.

   **20.2 Prohibited Practices.**

Sexual harassment does not refer to behavior or occasional compliments of a socially acceptable nature. It refers to behavior that is not welcome, that is personally offensive, that fails to respect the rights of others, that debilitates morale and that, therefore, interferes with the work effectiveness of its victims and their co-workers. The following practices are prohibited:

   20.2.1 Making an unwelcome sexual advance, a request for sexual favors, or other verbal or physical conduct of a sexual nature a condition of employment for any applicant.

   20.2.2 Making the submission to or the rejection of such conduct the basis for an employment decision affecting an applicant or employee.

   20.2.3 Creating an intimidating, hostile or offensive working environment by such conduct.

   20.2.4 Sexual harassment may be manifested in different ways. One of these is the demand for sexual favors. Other forms of sexual harassment which are also prohibited include:

      a) Verbal

         • sexual innuendos

         • suggestive comments

         • jokes of a sexual nature

- sexual propositions

- threats

b) Non-Verbal

- sexually suggestive objects or pictures

- graphic comments

- suggestive or insulting sounds

- leering

- whistling

- obscene gestures

c) Physical

- unwanted physical contact such as touching, brushing the body

- coerced sexual intercourse

- assault

Sexual harassment may be overt or subtle. Some behavior which may be appropriate in a social setting may not be appropriate or permitted in the workplace. Regardless of the form it takes, verbal or physical, sexual harassment can be insulting and demeaning to the recipient and will not be tolerated. Each employee will be expected to comply with this policy and take appropriate measures o ensure that any inappropriate conduct does not occur.

**20.3 Complaint Procedure.**

20.3.1  Complaint. (Amended 11/2/98)

Each employee who believes that he or she is or has been the subject of sexual harassment shall report the alleged act to his/her supervisor and to the Town Manager as promptly as reasonably possible under the circumstances; provided, however,

that, if the complaint involves the supervisor, it shall be filed
with the next higher level of supervision and, if it involves the
Town Manager, it shall be filed with the Mayor who shall present
the matter to the Town Council in Executive Session.

### 20.3.2 Investigation.

The Town Manager or a designated representative shall investigate
all alleged violations of this policy in a timely and confidential
manner. Information concerning the complaint will not be released
by the Town to any third party or to any Town employee who is not
involved with the investigation of the complaint. Each employee is
prohibited from discussing the complaint outside the investigation
process other than with legal counsel. The purpose of this
provision is to protect the confidentiality of the complainant, to
encourage the reporting of any incidents of sexual harassment, and
to protect the reputation of any employee wrongfully charged with
sexual harassment. The investigation of the complaint will normally
include conferring with the parties involved and any named or
apparent witnesses. Each employee shall be guaranteed the right to
a fair and impartial hearing. Each employee shall be protected from
coercion, intimidation, retaliation, interference or discrimination
for filing a complaint or providing information during the
investigation.

### 20.4 Disciplinary Action.

Each employee who violates this policy may be subject to
appropriate disciplinary action up to and including termination of
employment. Disciplinary action shall depend upon the severity of
the incident.

Provided, however, that any performance evaluation conducted and/or Section 4.2.2 shall not be grievable.

### 39.2.2 Grievance Procedure.

When an employee has a grievance, the following successive steps are to be taken. The number of days for each step should be considered the maximum number of working days unless otherwise provided and every effort should be made to expedite the process. Time limits at any step, however, may be extended by mutual consent. All documents used in this procedure must be dated and signed by the respondent and recipient. The procedure for the presentation, consideration and disposition of employee grievances is as follows:

a) An employee, who has completed the probationary period may, within ten (10) working days of the cause of a grievance, present the grievance in writing to his or her department supervisor. The supervisor shall, within five (5) working days of receiving an employee's written grievance, meet and discuss the grievance with the employee and then reply in writing to the employee within five (5) working days of their meeting. The grievance and the answer shall be reported to the Town Manager.

b) In the event the immediate supervisor's decision is not satisfactory to the employee, the employee may, within five (5) working days of receiving the supervisor's written reply, present an appeal in writing to the Town Manager. The Town Manager shall confer with the employee and the department supervisor about the grievance within five (5) working days after the appeal is presented and shall render a written decision to the employee within ten (10) working days.

c) The Town Manager's decision shall be final unless an appeal is filed with the Mayor and Town Council within ten (10) working days. A hearing shall be scheduled within thirty (30) working days of the appeal being submitted to the Mayor and Town Council. The Mayor and Town Council will render a written decision to the employee within ten (10) working days.

39.2.3 Nothing in the grievance procedure shall be construed to modify the rights of the Town of Smyrna to justly hire, transfer, reward, demote or dismiss employees or to determine the methods, means and personnel affecting the efficient operation of the Town's business.

A-82

Town of Smyrna
Smyrna Public Library

## Report of Employee Counseling

Date:  August 27, 2002

Supervisor:  Beverly A. Hirt-Library Director

Employee:  Kari Smith

This report is submitted to document that on (date and time)  *Aug. 27-02  3:30 pm*,

I conducted a counseling session with the above captioned employee. The following matter was discussed:  Excessive absenteeism / tardiness / new full time requirements / breaks

Briefly describe the purpose for this action: To bring to the employee's attention that misuse of time off

and excessive break-time is not permitted. Excessive tardiness and absenteeism are grounds for

displinary action. Full time status began 7-4-02 with a probation period of 6 months., any additional

time off can be requested after 1-4-03.

This counseling session resulted in a determination that the following actions on the part of the employee will be sufficient to correct the deficiency for which counseled.

Under the full time status an employee must work 6 months before any leave time is accrued unless the

Part-time position had accrued compensation time not taken prior to getting full-time status. Breaks are

limited to (2) 15 minutes per day. One in the morning and one in the afternoon with a ½ hour lunch in

between, unless opening, then an hour lunch may be taken. Tardiness affects everyone in the workplace,

emergency situations must be called in and reported to the supervisor at least ½ hour before required

scheduled work time.

I have read and fully understand the requirements for correction as outlined above.

Employee signature                                    8.27.02
                                                         Date

A-83

12/16/02

These items were not while the Director was at Town Hall in a staff meeting.

The newspapers were not separated, stamped, and placed in the paper rack.

The newspapers were not sorted and put away.

The book drop was not emptied. Therefore, the currier had to wait until they were all checked-in.

The children's room was not set up and the computer was not set to childproof.

The flag was not hung outside.

No check-in books were put away.

What I did notice upon returning was

A patron complained that Kari was on the phone.

Yahoo Messenger to hitman was on the screen and was started at 9:14 am.

A-84

MARK G. SCHAEFFER, MAYOR



*Doc*
*" 12-02- letter*
*Suspending*
*D Leggett with*
*pay w*

,TTORNEY

# Town of Smyrna

### DAVID S. HUGG III, TOWN MANAGER

December 20, 2002

Mr. Harvey R. Leggett
103 Frazier Street
Smyrna, Delaware 19977

Dear Mr. Leggett:

I have been advised by Smyrna Police Department of allegations against you for actions that may be of a criminal nature. Pursuant to the provisions of Section 38.2.6 of the Town of Smyrna Personnel Policy, I hereby suspend you with pay effective this date. Such suspension shall continue until such time as charges are brought or you are cleared, after which your status will be reviewed.

Sincerely,

David S. Hugg III
Town Manager

Cc:     Joseph P. Heeger, Public Works Director

A-85

RODERICK H. BURRITT • A. TEMPLE CARTER III • D. SUE HENSLEY • WILLIAM W. HILL • NELSON MESICK • LEONARD I. RIPPA
27 SOUTH MARKET STREET PLAZA • P.O. BOX 307 • SMYRNA, DELAWARE 19977

BUSINESS OFFICE/BILLING 302-653-9231     MANAGER'S OFFICE 302-653-3483     PERMITS/INSPECTIONS 302-653-3486
Fax 302-653-3492                    Fax 302-653-3492                    Fax 302-659-4169

*Doc*
*1-2-03 letter*
*reinstating*
*Leggett with*
*conditions*

January 2, 2003

Mr. Harvey R. Leggett
103 Frazier Street
Smyrna, DE 19977

Dear Harvey:

Per our conversation today, I am reinstating you as of Monday, January 6, 2003 under the following conditions:

- Your time on administrative leave will be charged as vacation and/or sick leave effective January 6.

- You are to have no contact with Kari Smith at any time.

- You are to avoid being on the premises of the Library/Opera House at any time, whether on town duty or not. Should your job duties involve any activities at the Library/Opera House you must consult your supervisor prior to responding.

Should your situation change we reserve the right to review and modify these understandings as appropriate. Reinstatement does not waive other disciplinary action when or as deemed appropriate once your current status has been resolved.

Sincerely,



David S. Hugg III
Town Manager

Cc:    Joseph P. Heeger
       Chief Richard Baldwin

A-86

# EMPLOYEE PROGRESS REPORT

DATE: 01/04/03

EMPLOYEE: Kari M Smith                JOB CLASSIFICATION: Children's Program Coordinator

THIS REPORT IS MADE OUT FOR (CHECK ONE):   ( ) 90 DAYS        ( ) PROMOTION      ( ) ANNUAL
                                           (x) 6 MONTHS       ( ) TRANSFER       ( ) EXIT

This rating sheet provides a practical method through which the ability of the individual can be judged with a reasonable degree of accuracy and uniformity. Indicate your opinion of this employee by placing an " X " in the block by the phrase which seems to fit the person best. Please follow these instructions carefully:

1. Use your own independent judgement.
2. Disregard your general impression of the person and concentrate on one factor at a time.
3. When rating an employee, call to mind instances that are typical of his work and way of acting.

Do not be influenced y UNUSUAL SITUATIONS that are not typical.
4. Make your rating with the utmost care and thought. Be sure that it represents a fair are square opinion. DON'T ALLOW PERSONAL FEELINGS TO GOVERN YOUR RATING.

## I. ATTENDANCE

**1. Punctuality**
- a. ( ) Always on time
- b. ( ) Occasionally late
- c. (X) Requires occasional reminding
- d. ( ) Often tardy - job apparently of secondary importance
- e. ( ) Always tardy

**2. Dependability**
- a. ( ) Perfect record since last rating
- b. ( ) Rarely absent
- c. (X) Frequently absent - but for cause
- d. ( ) Poor record - requires counseling
- e. ( ) Unsatisfactory - work suffers

**3. Notification**
- a. ( ) Always on time
- b. (X) Notifies but usually too late to get substitute
- c. ( ) Occasionally late or absent without notification
- d. ( ) Requires inquiry as to why late or absent
- e. ( ) Often fails to notify

## II. PERSONAL QUALIFICATIONS

**1. Appearance**
- a. ( ) Neat and in good taste
- b. (X) Neat but occasionally not in good taste
- c. ( ) Untidy
- d. ( ) Unsuitable for job

**2. Personality**
- a. ( ) Exceptionally pleasing - a decided asset
- b. (X) Makes good impression - wears well
- c. ( ) Makes good first impression only; doesn't wear well
- d. ( ) Makes fair impression only
- e. ( ) Creates unfavorable impression

**3. Tact and Courtesy**
- a. ( ) Shows exceptional tact and courtesy
- b. ( ) Tactful and considerate of others
- c. (X) Occasionally untactful and inconsiderate
- d. ( ) Attains goal but arouses antagonism
- e. ( ) Often breeds trouble

## III. CAPACITY

**1. Ability to learn**
- a. ( ) Learns with exceptional rapidity
- b. ( ) Grasps instruction readily
- c. (X) Average ability to learn new things
- d. ( ) Somewhat slow in learning
- e. ( ) Limited in learning new duties

**2. Initiative**
- a. ( ) Always finds extra work to do
- b. (X) Pushes work through on own initiative
- c. ( ) Normal supervision required - not a self starter
- d. ( ) Needs considerable supervision
- e. ( ) Must always be told what to do

**3. Judgement**
- a. ( ) Outstanding ability to reach sound and logical conclusions
- b. ( ) Action generally based on good reasoning
- c. ( ) Average judgement
- d. (X) Usually makes decisions without considering all alternatives
- e. ( ) Conclusions often faulty

A-87

| Date of last written evaluation _____ | Number days absent during past _____ months | Number days late during past _____ months |
|---|---|---|

## EMPLOYEE PROGRESS REPORT

### IV. ATTITUDE TOWARD JOB

1. Interest
   a. ( ) Shows intense enthusiasm and
       interest in all work
   b. (X) Show interest; enthusiasm is not
       sustained
   c. ( ) Passive acceptance; rarely shows
       enthusiasm
   d. ( ) Shows little or no interest
   e. ( ) Dislikes work

2. Cooperation
   a. ( ) Goes all out to cooperate with
       associates and management
   b. ( ) Promotes cooperation and good will
   c. (X) Moderately successful in cooperating
       with others
   d. ( ) Cooperates reluctantly and
       sometimes causes dissension
   e. ( ) Uncooperative. Often breeds trouble

3. Responsibility
   a. ( ) Seeks additional responsibilities
   b. (X) Willingly accepts additional responsibilities
   c. ( ) Reluctant to accept additional responsibilities
   d. ( ) Avoids responsibility
   e. ( ) Cannot be depended upon

### V. JOB PERFORMANCE

1. Accuracy
   a. ( ) Rarely makes mistakes
   b. ( ) Above average
   c. (X) Average
   d. ( ) Below average
   e. ( ) Highly inaccurate

2. Neatness
   a. ( ) Takes pride in appearance of work
       Has "sense" of neatness
   b. (X) Usually turns out neat work
   c. ( ) Apparently lacks "sense" of neatness
       Requires reminding
   d. ( ) Too often sacrifices neatness for
       quantity
   e. ( ) Majority of work must be done over

3. Quantity
   a. ( ) Unusually high output - meets
       emergency demands well
   b. ( ) Consistently turns out more than
       average
   c. (X) Finishes allotted amount
   d. ( ) Does just enough to get by
   e. ( ) Amount of work done is inadequate

How long has this person been under your supervision ?  _____ YEARS _____ MONTHS

What do you consider his (or her) STRONGEST POINTS ? _____

_____

What do you consider his (or her) WEAKEST POINTS ? _____

_____

What steps are being taken to correct this (or these) weaknesses ? _____

_____

Give a brief appraisal of employee's potentialities: _____

_____

_____

Has this report been discussed with the employee ?    Yes (X)    No ( )
If not, why? _____

_Signature - Department Head or Supervisor_     _Title_     _Employee Signature_

A-88

**Attachment to Kari Smith's evaluation:**

EMPLOYEE'S STRONGEST POINTS:
Ms. Smith is very good as Children's Coordinator working with the children. She has demonstrated her knowledge and skills in the areas of creativity and imagination and an overall desire to work with children. During her last 6 months, she has demonstrated her knowledge in both operational and technical computer skills, including computer applications on the Internet.

EMPLOYEE'S WEAKEST POINTS:
Ms. Smith still has difficulties with following through directions given by her supervisor. On occasion, she has demonstrated her stubbornness to follow through these directives but only at her own convince. She has continually shown difficulties distinguishing between high and low priorities and sometimes has to be reminded to complete assigned tasks. Safety issues still remain a potential priority issue. She must be aware there are consequences from carelessness and accidents can be prevented especially when the public and children are involved.

Steps being taken to correct this:
Review and counseling on this day of 1/06/03. The length of Ms Smith's probation is extended to include 6 month, ending 7/06/03. At which during this time any misconduct, stubbornness, or insubordination from Ms. Smith will result in her termination from this position.

EMPLOYEE'S POTENTIALITIES:
Ms. Smith has great potentials of becoming an excellent Children's Coordinator. She has the ability to grow and learn with the library.

Note:
Time called in and taken "off" during the 6-month probation period

Part time status 3/22/01
Full time status 7/04/02

Excessive "Time off" taken during probation period:
7/29/02
8/5/02
8/12/02
8/26/02

Warning notice was issued on 8/27/02 for taking excessive time off
10/4/02
11/4/02
12/2/02
12/20/02

A-89

TOWN OF SMYRNA
APPLICATION FOR LEAVE

E#1

NAME  Smith          Kari          M      I.D. # _____
      Last          First         Middle

DEPARTMENT  Library

I hereby request:

___✓___ Vacation Leave              _____ Personal Day

_____ Sick Leave                 _____ Compensatory Time

_____ Leave Without Pay          _____ Other (specify)

                                   _____

From:                              To:

Date: 6·30·03  Time: 9:00 AM      Date: 7·2·03  Time: 5:00 pm
     (except 6-8 pm 7-1-03)

Total Hours: 22                    _kari M Smith_
                                   Employee Signature
Total Days: 2 3/4
                                   6·16·03
                                   Date

-------------------OFFICIAL ACTION ON APPLICATION-----------------

Is Physician's Certification Required?    _____ Yes    __✓__ No

If "yes", is Certification Attached?      _____ Yes    __✓__ No

Application Approved?                      __✓__ Yes    _____ No

                                   Beverly O'Wirt
                                   Supervisor Signature

                                   6·16·03
                                   Date

REMARKS: No Babysitter _____

_____

_____

A-90

# Smyrna Public Library

### 107 South Main Street
### Smyrna, Delaware 19977

---

### Phone 653-4579

July 7, 2003

Kari M. Smith
Children's Program Coordinator
Smyrna Public Library

Dear Kari:

We regret to inform you that your employment with the Town of Smyrna, Smyrna Public Library is terminated effective today, July 7, 2003 and will not be renewed beyond this date for the following reason[s]:     Misconduct
1. Falsifying information on a vacation slip
2. Absent without approved leave
3. Failed to get supervisors approval to have another employee cover your scheduled program

On January 4, 2003, you were placed on extended probation for an additional 6 months for not following work policy. At that time, I indicated that any misconduct, stubbornness, or insubordination on your part would result in your termination. This subject had been discussed several times before, and you have received two previous evaluations counseling you about this type of behavior. I expected an immediate and sustained improvement of your work performance. During the first month of your extended probation, I did note some improvement; however, it has not continued. Within the past three months, most of the problems cited in the written evaluations and counseling memos have reoccurred.

On Monday, July 16th I approved your vacation slip to take 2 ¾ days because you did not have a babysitter. I did mention at first that you could not because another employee had scheduled a vacation during that time. You said ok. Later that day you approached me stating that the other employee had cancelled her scheduled vacation and that the library would have enough coverage so you could have the requested time off. I also brought up the point that you had a Summer Reading Program scheduled from 6:00-8:00 pm. You stated you would return to work to do the program since you were not going anywhere and questioned if it was okay to bring your son with you since you did not have a babysitter. I approved your request and turned in your slip. On Tuesday, July 1st while reviewing payroll I found out that you did not work your scheduled time and in fact you had pre-arranged for another employee 2 weeks prior to work your schedule because you would be out of town. You did not get my approval to do this. Therefore, due to continued unacceptable performance, your employment is terminated. For information regarding pay, please contact the Payroll Department at 653-9231. Please return any company property (keys, computer discs, program information etc.) that are in your possession.

Given your qualifications and proven abilities, I am confident that you will be able to find another position. I personally wish you success in your future endeavors.

Sincerely,

Beverly A. Hirt
Director-Smyrna Public Library

cc: Dave Hugg, Town Manager

A-91

Kari Smith

Home Phone 302-659-0509

4.2.3 Proposition

therefore the
provisions of

39.2.2 don't
apply

July 18, 2003

David S. Hugg, III
Town Manager
Smyrna Town Hall
27 South Market Street Plaza
Smyrna, DE 19977

Mr. Hugg,

I am filing a grievance against my former supervisor, Beverly Hirt, for misrepresentation and wrongful termination of my employment. I am requesting a meeting with you to discuss the inappropriate disciplinary action taken against me. I have reviewed the employee handbook and the omission I am accused of is not serious enough to warrant termination. This situation requires your review. Please contact me at your earliest opportunity to schedule a meeting. Thank you for your time and consideration in this matter.

Sincerely,

Kari M. Smith

A-92

MARK G. SCHAEFFER, MAYOR



JOHN TERENCE JAYWORK, ATTORNEY

# Town of Smyrna

DAVID S. HUGG III, TOWN MANAGER

July 18, 2003

Ms. Kari Smith
97 Skyline Locust Drive
Smyrna, DE  19977

Dear Ms. Smith:

In response to your letter of July 18, 2003 filing a grievance, your employment with the Town of Smyrna was terminated at the end of your probationary period in accordance with 4.2.3 of the Smyrna Personnel Policy.

Therefore, the provisions of 39.2.2 dealing with grievance procedures do not apply to this situation.

Sincerely,

TOWN OF SMYRNA

David S. Hugg III
Town Manager

DSH/ccm

A-93

RODERICK H. BURRITT • A. TEMPLE CARTER III • D. SUE HENSLEY • WILLIAM W. HILL • NELSON MESICK • LEONARD I. RIPPA
27 SOUTH MARKET PLAZA • P.O. BOX 307 • SMYRNA, DELAWARE 19977

Kari Smith

97 Skyline Locust Drive
Smyrna, DE 19977

Home Phone 302-659-0509

July 30, 2003

David S. Hugg, III
Town Manager
Smyrna Town Hall
27 South Market Street Plaza
Smyrna, DE 19977

TOWN OF SMYRNA

JUL 3 0 2003

RECEIVED

Mr. Hugg,

I appeal your decision to disallow my grievance as stated in your letter dated July 18, 2003.

Sincerely,

Kari M. Smith

A-94



MARK G. SCHAEFFER, MAYOR                                    JOHN TERENCE JAYWORK, ATTORNEY

# Town of Smyrna

### DAVID S. HUGG III, TOWN MANAGER

July 30, 2003

Ms. Kari Smith
97 Skyline Locust Drive
Smyrna, DE  19977

Dear Ms. Smith:

Please accept this letter as my response to your letter of July 30, 2003, stating that you wish to appeal my decision dated July 18, 2003.

As I stated in my previous letter, your employment with the Town was terminated at the end of your probationary period in accordance with the provisions of Section 4.2.3 (copy attached) of the Town of Smyrna Personnel Policy.  Section 39.2.2 Grievance Procedure a) (copy attached) clearly states that the grievance procedure is available to employees who have completed their probationary period.  Since your employment did not continue beyond your probationary period, I stand by my original decision that the grievance procedure does not apply.

Sincerely,

TOWN OF SMYRNA

David S. Hugg III
Town Manager

DSH/ccm

A-95

RODERICK H. BURRITT  ·  A. TEMPLE CARTER III  ·  D. SUE HENSLEY  ·  WILLIAM W. HILL  ·  NELSON MESICK  ·  LEONARD I. RIPPA
27 SOUTH MARKET STREET PLAZA · P.O. BOX 307 · SMYRNA, DELAWARE 19977

| BUSINESS OFFICE/BILLING 302-653-9231 | MANAGER'S OFFICE  302-653-3483 | PERMITS/INSPECTIONS  302-653-3486 |
| Fax 302-653-3492 | Fax 302-653-3492 | Fax 302-659-4169 |

### 4.2.3 Probationary Period Dismissal.

Department supervisors may recommend dismissal of an unsatisfactory employee at any time during the probationary period. Department supervisors shall specifically recommend the retention or dismissal of the employee based on the supervisor's evaluation of the employee's performance during the probationary period. The department supervisor shall indicate the following in writing to the Town Manager:

a) that the employee's supervisor has discussed the new employee's progress (accomplishments, strengths and weaknesses) with the new employee

b) whether the new employee is performing satisfactory work

c) whether the probationary period should be extended provided, however, that no employee shall remain in a probationary status for more than one (1) year from the date of employment

d) whether the employee should be retained in the present position or should be released, transferred or demoted.

### 4.2.4 Annual Evaluation.

a) Each regular employee will be evaluated at least once annually shortly before their review date.

b) This evaluation, to be a constructive part of the total Personnel Policy, will be reviewed by the employee and the evaluator. Any disagreements regarding this evaluation should be taken to the Town Manager for further discussion. Any continuing and unresolved personnel problems will be reviewed by the Town Manager who may change the rating on the evaluation. The Town Manager's decision is final, and not grievable.

### 4.2.5 Evaluation Forms.

All Town employees will be evaluated on forms developed by the Town Manager and approved by the Mayor and Town Council.

A-96

Provided, however, that any performance evaluation conducted and/or Section 4.2.2 shall not be grievable.

39.2.2 Grievance Procedure.

When an employee has a grievance, the following successive steps are to be taken. The number of days for each step should be considered the maximum number of working days unless otherwise provided and every effort should be made to expedite the process. Time limits at any step, however, may be extended by mutual consent. All documents used in this procedure must be dated and signed by the respondent and recipient. The procedure for the presentation, consideration and disposition of employee grievances is as follows:

a) An employee, who has completed the probationary period may, within ten (10) working days of the cause of a grievance, present the grievance in writing to his or her department supervisor. The supervisor shall, within five (5) working days of receiving an employee's written grievance, meet and discuss the grievance with the employee and then reply in writing to the employee within five (5) working days of their meeting. The grievance and the answer shall be reported to the Town Manager.

b) In the event the immediate supervisor's decision is not satisfactory to the employee, the employee may, within five (5) working days of receiving the supervisor's written reply, present an appeal in writing to the Town Manager. The Town Manager shall confer with the employee and the department supervisor about the grievance within five (5) working days after the appeal is presented and shall render a written decision to the employee within ten (10) working days.

c) The Town Manager's decision shall be final unless an appeal is filed with the Mayor and Town Council within ten (10) working days. A hearing shall be scheduled within thirty (30) working days of the appeal being submitted to the Mayor and Town Council. The Mayor and Town Council will render a written decision to the employee within ten (10) working days.

39.2.3 Nothing in the grievance procedure shall be construed to modify the rights of the Town of Smyrna to justly hire, transfer, reward, demote or dismiss employees or to determine the methods, means and personnel affecting the efficient operation of the Town's business.

A-97