IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,               *
                                       *
        Plaintiff,                     *        CIVIL ACTION
                                       *        NO. 04-1286(JJF)
v.                                     *
                                       *
TOWN OF SMYRNA, DAVID S.               *
HUGG, III, individually and           *
in his official capacity as           *
Town Manager;                         *
BEVERLY A. HIRT, individually          *
and in her official capacity           *
as Director of the Smyrna             *
Public Library; and                    *
HARVEY LEGGETT; individually           *
and in his official capacity           *
as Supervisor of Streets/              *
Foreman of Public Works,              *
                                       *
        Defendants.                    *

---

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

SCHMITTINGER AND RODRIGUEZ, P.A
BY:  WILLIAM D. FLETCHER, JR. (I.D. #362)
     NOEL E. PRIMOS (I.D. #3124)
     ADAM C. GERBER (I.D. #4653)
     414 South State Street
     P.O. Box 497
     Dover, Delaware 19903-0497
     (302) 674-0140
     Attorneys for Plaintiff

Dated: 3/2/06

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................... iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS............ 1

SUMMARY OF ARGUMENT............................................ 2

STATEMENT OF FACTS............................................. 4

ARGUMENT..................................................... 19

I.    SUMMARY JUDGMENT STANDARD............................ 19

II.   LEGGETT WAS ACTING UNDER COLOR OF STATE LAW
      WHEN HE VIOLATED PLAINTIFF'S RIGHTS PROTECTED
      BY 42 U.S.C. § 1983................................. 19

III.  PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF
      HOSTILE ENVIRONMENT SEXUAL HARASSMENT UNDER
      TITLE VII.......................................... 22
      A.   Plaintiff Suffered Intentional Discrimination
           Based On Her Sex Through The Town's Failure
           To Investigate Plaintiff's Claims That She
           Was Raped By Leggett.......................... 23
      B.   The Discrimination Against Plaintiff Was
           Pervasive..................................... 25
      C.   The Discrimination Detrimentally Affected
           Plaintiff..................................... 25
      D.   The Discrimination Plaintiff Suffered Would
           Detrimentally Affect a Reasonable Person....... 26
      E.   There Is Respondeat Superior Liability......... 26

IV.   PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF
      DISPARATE TREATMENT SEXUAL DISCRIMINATION........... 27

V.    PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF
      RETALIATION........................................ 32
      A.   Plaintiff Engaged In a Protected Activity...... 32
      B.   The Town Retaliated Against Plaintiff.......... 33
      C.   There Is a Causal Link Between Plaintiff's
           Complaints And The Town's Actions.............. 34

VI.   PLAINTIFF HAS PRESENTED A PRIMA FACIE CASE OF
      REVERSE RACE DISCRIMINATION UNDER
      42 U.S.C. § 1981................................... 35

VII.  THE TOWN VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS
      BY REFUSING TO PERMIT HER TO FILE ANY GRIEVANCE
      AGAINST IT AND BY FAILING TO INVESTIGATE HER
      CLAIMS AGAINST LEGGETT............................. 36

VIII. PLAINTIFF HAS ESTABLISHED A STATE LAW CLAIM FOR
      BREACH OF THE COVENANT OF GOOD FAITH AND FAIR
      DEALING.......................................... 39

CONCLUSION...................................................... 40

## TABLE OF AUTHORITIES

PAGE

**CASES**

Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999)................. 20

Andrews v. City of Philadelphia,
      895 F.2d 1469 (3d Cir. 1990)........................... 22

Barber v. CSX Distribution Services,
      68 F.3d 694 (3d Cir. 1995)......................... 32, 33

Bishop v. Wood,
      426 U.S. 341 (1976).................................... 19

Blackshear v. City of Wilmington,
      15 F.Supp. 2d 417 (D.Del. 1998)....................... 28

Bouton v. BMW of North America,
      29 F.3d 103 (3d Cir. 1994)......................... 37, 38

Burch v. WDAS AM/FM,
      2002 U.S. Dist. LEXIS 12290 (E.D.Pa.)................. 35

Celotex Corp. v. Catrett,
      477 U.S. 317 (1986)................................... 19
Cifarelli v. Village of Babylon,
      93 F.3d 47 (2d Cir. 1996)............................. 19

E.I. Dupont de Nemours & Co. v. Pressman,
      679 A.2d 436 (Del. 1996).............................. 39

Faragher v. City of Boca Raton,
      524 U.S. 775 (1998)................................ 26-27

Furnco Const. Corp. v. Waters,
      438 U.S. 567 (1978)................................... 36

Hazen v. Modern Food Services,
      2004 U.S. App. LEXIS 21467 (3d Cir. 2004)............. 32

Iadimarco v. Runyon,
      190 F.3d 151 (3d Cir. 1999)........................... 36

Josey v. John R. Hollingsworth Corp.,
      996 F.2d 632 (3d Cir. 1993)........................... 28

Messina v. E.I. Dupont de Nemours & Co,
      308 F.Supp. 2d 491 (D.Del. 2004).................. 28-29

Munford v. James T. Barnes & Co.,
      441 F.Supp.459 (6th Cir. 1977)....................... 38

Murphy v. Chicago Transit Authority,
    638 F.Supp. 464 (N.D. Ill. 1986)......................... 20

Oncale v. Sundowner Offshore Services,
    523 U.S. 75 (1998)...................................... 24

Price v. Delaware Department of Correction,
    40 F.Supp. 2d 544 (D. Del. 1999)........................ 32

Radue v. Kimberly-Clark Corp.,
    219 F.3d 612 (7th Cir. 2000)............................ 28

Sanchez v. City of Miami,
    720 F.Supp. 974 (S.D. Fla. 1989)........................ 39

Schwapp v. Town of Avon,
    118 F.3d 106 (2d Cir. 1997)............................. 23

Sumner v. United States Postal Services,
    899 F.2d 203 (2d Cir. 1990)............................. 32

United States v. Diebold,
    369 U.S. 654 (1962)..................................... 19

Zelinski v. Pennsylvania State Police,
    2004 U.S. App. LEXIS 16576 (3d Cir. 2004)............... 33

**STATUTES**

42 U.S.C. § 1981.............................................  1

42 U.S.C. § 1983.......................................... 1, 19

42 U.S.C. § 2000e, et seq................................. 1, 22

**RULES**

Fed. R. Civ. P. 56(c)...................................... 19

**OTHER AUTHORITIES**

Restatement (Second) of Agency, § 219(2)(b).................. 38

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On September 21, 2004, Plaintiff Kari (Smith) Priller, ("Plaintiff"), filed a Complaint against the Town of Smyrna, ("the Town"), Beverly Hirt, David S. Hugg, III, ("Hugg"), and Harvey Leggett ("Leggett"). Plaintiff asserts that the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, 42 U.S.C. § 1983, and 42 U.S.C. § 1981. Plaintiff also alleges a state law claim for breach of the implied covenant of good faith and fair dealing. Defendants filed an Answer on October 3, 2004.

Defendants have moved for summary judgment on all claims. Plaintiff files this Answering Brief in Opposition to Defendants' Motion for Summary Judgment because genuine issues of material fact still exist in this case.

1

## SUMMARY OF ARGUMENT

Summary judgment should be denied because there are genuine issues of material fact with regard to Plaintiff's claims, and those claims should be submitted to a jury.

1.   Leggett was acting under color of state law in helping make the determination that Plaintiff should be terminated. Leggett's meeting behind closed doors with Hirt after the incident was the only such meeting Leggett and Hirt had ever had.   The meeting must have, therefore, concerned Plaintiff's claims that Leggett raped her.

2.   Plaintiff has established a prima facie case of hostile environment sexual harassment based on Defendant Town's refusal to investigate or respond in any way to Plaintiff's claims, the hostile treatment of Plaintiff that ensued after her complaints, and ultimately, Plaintiff's unlawful termination.

3.   Plaintiff has established a prima facie case of disparate treatment.   Plaintiff was forced to go through all the steps of her probation whereas Leggett was not even given a three-month evaluation.   Further, the Town of Smyrna's justification for its termination of Plaintiff is merely a pretext for discrimination.   Plaintiff was terminated at the end of her probationary period, ostensibly, for missing one day of work when her car broke down in Virginia.   Leggett's probation ended, however, in full employment status, despite the fact that he was convicted of a DUI during this time and lost both his regular driver's license and CDL, both of which were essential to his job duties as a Town foreman.

4.   Plaintiff has established a prima facie case of

2

retaliation based on Hirt's reaction to Plaintiff's complaints and Plaintiff's meeting with Town Manager Dave Hugg.

5.    Plaintiff has established a prima facie case of reverse race discrimination based on the fact that she was treated less favorably than Leggett, a black male with respect to the conditions of their probation.

6.    The town violated Plaintiff's due process rights by refusing to permit her to file any grievance against it and by failing to investigate her claims against Leggett.

7.    Plaintiff has established a state law claim for breach of the covenant of good faith and fair dealing based on Hirt's untrue statements to Hugg that resulted in Plaintiff's termination.

## STATEMENT OF FACTS

### Plaintiff's Work History

Plaintiff, a Caucasian female, was hired as a Library Clerk by Defendant Town of Smyrna Library Director, Beverly A. Hirt. (Deposition of Beverly A. Hirt, 17)(B69).  Plaintiff began her employment with the Town of Smyrna in March, 2001. (Deposition of Beverly Hirt, 36)(B71).

Plaintiff performed her job well and, in July, 2002, was promoted to full-time Children's Program Coordinator for the Town of Smyrna Public Library.  (Priller Dep., 16)(B2).  Hirt, Plaintiff's supervisor, promoted Plaintiff to a new full-time position because Hirt valued Plaintiff's work in the library. (Hirt Dep., 21)(B70).  As Children's Program Coordinator, Plaintiff's responsibilities were to work the circulation desk and to plan and organize Story Time and the summer reading program for the children members of the library.  (Letter from Beverly A. Hirt to Sabrina Corning, dated November 5, 2002)(B130).  Plaintiff's co-workers in the library, such as Betty Porter, recognized that Plaintiff's performance as the children's program coordinator was excellent because the program "grew by leaps and bounds" once Plaintiff took it over.  (Deposition of Betty Porter, 11-12)(B121-22).  Another of Plaintiff's co-workers, Nancy Conlin, stated, "the kids loved her, and she was always coordinated and always ready to go." (Deposition of Nancy Conlin, 13)(B128).  Hirt never praised Plaintiff's outstanding performance, however, even though Plaintiff "deserved a pat on the back."  (Porter Dep., 12)(B122). Conlin also agreed that Hirt never gave Plaintiff the recognition she deserved.  (Conlin Dep., 14)(B129).  As Porter testified, Hirt

4

had difficulty dealing with younger women, especially those in the children's coordinator position.    (Porter Dep., 15)(B123).

### The Rape

Harvey Leggett was hired by Defendant Town in 1988. (Deposition of Harvey Leggett, dated August 30, 2005, at 5)(B59). Leggett became the Public Works Foreman for the Town of Smyrna in 2002.    Id.    Prior to December 20, 2002, Plaintiff and Leggett had some brief interactions at work when Leggett came into the library for work-related tasks.    (Priller Dep., 53-54)(B3-4).    At some point in the middle of December 2002, Plaintiff asked Leggett to help her move.    (Priller Dep., 55-56)(B5-6).    Plaintiff offered to pay Leggett for his help.    (Priller Dep., 56)(B6).

A few days before December 20, 2002, Leggett asked Plaintiff to go "have a drink." (Priller Dep., 58)(B8).    Plaintiff told Hirt and Betty Porter about Leggett's invitation to go for a drink. (Hirt Dep., 54)(B82).    Hirt warned Plaintiff not to go out with Leggett because Hirt had previously been sexually harassed by Leggett.    (Hirt Dep., 54-55)(B82-83).    On a previous occasion, Leggett had come into Hirt's office in the library while inebriated and had made several inappropriate comments to her, including asking what she wore at night.    (Hirt Dep., 55)(B83). Hirt had never reported this conduct to anyone at the Town.    (Hirt Dep., 57)(B85).

Plaintiff and Leggett arranged to meet at an Italian restaurant on December 19, 2002.    (Priller Dep., 58-59)(B8-9). Plaintiff and Leggett met at the restaurant after work on December 19, 2002.    (Priller Dep., 58)(B8).    After approximately 30-45 minutes at the restaurant, Plaintiff and Leggett went to a pool

hall to play pool. (Priller Dep., 60)(B10). Plaintiff and
Leggett drove separately to the pool hall. Id. After Plaintiff
and Leggett played several games of pool at the pool hall,
Plaintiff decided she wanted to go on a walk before driving.
(Priller Dep., 61-62)(B11-12). As Plaintiff and Leggett were
walking down Main Street, Plaintiff noticed a large plant sitting
on the curb. (Priller Dep., 62-63)(B12-13). Plaintiff decided to
take the plant to add it to the numerous other plants in the
library. (Priller Dep., 63)(B13). Leggett and Plaintiff then
walked to the library. During this walk, there was no physical
contact between Plaintiff and Defendant Leggett. (Affidavit of
Kari Priller, at 2)(B132). Plaintiff used her key and alarm code
to enter the library. (Priller Dep., 63)(B13). Leggett followed
Plaintiff into the library even though not invited to do so by
Plaintiff. (Priller Dep., 63-64)(B13-14). Plaintiff placed the
plant on her desk in the library and then went to the kitchen to
get a soda. (Priller Dep., 64)(B14).

As Plaintiff was exiting the kitchen, Leggett approached her
from behind and put his arms around Plaintiff to restrain her.
(Priller Dep. 65)(B15). Plaintiff attempted to escape but
Defendant Leggett pushed her over onto a table near the entrance
to the kitchen. Id. Plaintiff told Leggett "no" but Leggett kept
forcing himself on Plaintiff. Id. Leggett took off Plaintiff's
pants and forced her down to the floor next to the table.
(Priller Dep., 65-66)(B15-16). There, Defendant Leggett raped
Plaintiff. (Priller Dep., 66)(B16). During the first few minutes
of the assault, Plaintiff was frozen and could not figure out what
to do. Id. As soon as she was able to move again, Plaintiff

6

bolted up and ran around the table in an attempt to escape Leggett. Id. Leggett chased Plaintiff around the table until he caught her. Id. Leggett then raped Plaintiff a second time. Id.

Plaintiff repeatedly told Leggett "no" and cried, and yelled at Leggett to stop. Id. During the second assault, Plaintiff vomited twice on the floor of the library. (Priller Dep., 66)(B16). Hirt stated that she noticed that someone had been sick in the library when she arrived the next day because she had to clean up the carpet and the wall. (Hirt Dep., 43)(B75).

When Plaintiff was able to escape from Leggett, she immediately called her boyfriend to come pick her up from the library. (Priller Dep., 67)(B17). Plaintiff's boyfriend picked her up and then he called the Town of Smyrna Police Department (a department of Defendant Town). (Priller Dep., 67-68)(B17-18). Plaintiff filed a formal charge of rape against Leggett with the Town of Smyrna Police Department. (Police Report)(B135).

## Defendant Town's Reaction To Defendant Leggett's Sexual Assault of Plaintiff

Defendant Hirt was notified of this incident on the afternoon of December 20, 2002 by Chief Baldwin of Defendant's Police Department. (Hirt Dep., 40)(B72). Plaintiff also made Hirt aware of the incident via e-mail on either the 21st or 22nd of December, 2002. (Hirt Dep., 48-49)(B76-77). Defendant's Police department also informed Defendant's Town Manager Dave Hugg about the incident on December 20, 2002. (See Letter from Hugg to Leggett, dated December 20, 2002)(B144). Later, on December 20, 2002, Hirt, Hugg and Heeger all met to discuss what discipline to give to Plaintiff and to Leggett. (Hirt Dep., 84)(B94).

Plaintiff returned to work on Monday, December 23, 2002.

(Priller Dep., 74)(B19).   Hirt admitted in her deposition that she conducted no independent investigation into the incident between Plaintiff and Leggett.   (Hirt Dep., 59)(B87).   Hirt stated that she talked to Detective Graham and to police officer Will Bordley. (Hirt Dep., 60; 72-73)(B88; 92-93).   This was the extent of Hirt's investigation into Plaintiff's claims that she was raped by her co-worker, Leggett.

Hugg did not conduct any further investigation into the incident either.   In fact, when Hugg and Leggett's immediate supervisor, Joseph Heeger, met with Leggett, Hugg instructed Leggett not to discuss the incident with him.   (Hugg Dep., 22)(B102).[1]   Hugg, Hirt and Heeger also failed to review Plaintiff's medical records from Kent General Hospital which show trauma to Plaintiff's vaginal region, or the rape kit in the AG's possession.   (See Medical Records)(B136-43).   Neither did they review the police evidence statements given by Plaintiff and Defendant Leggett.

On January 2, 2003, the Attorney General's office informed Defendant Town that it would not prosecute Leggett in connection with this incident.   (Hugg Dep., 27-28)(B104-05).   Leggett was instructed to have no contact with Plaintiff.   (Letter from Hugg to Leggett, dated January 2, 2003)(B145).   Leggett was placed on probation for six months commencing on or about January 4, 2003. Id.   According to Hugg, Leggett had acted inappropriately by being

---

[1]     Though the Smyrna Police Department did conduct an investigation of the rape, the Police Department had no involvement with the consideration of the appropriate discipline to be meted out to Leggett and/or Plaintiff.   Nor was the discipline ultimately imposed upon Leggett and Plaintiff based upon the information actually gleaned from that investigation.

on town property other than his assigned work station after work hours, **not** by raping Plaintiff in the Town's public library. (Hugg Dep., 28)(B105). It is clear, however, that the Town took into consideration the rape, because Hugg ordered Leggett not to have any contact with Plaintiff and to avoid being on the premises of the library at any time. (Letter from Hugg to Leggett, dated January 2, 2003)(B145). However, while it obviously recognized that unacceptable employee conduct occurred at the library, Defendant Town chose not to investigate the incident or mete out any real discipline to its employee, Leggett. This action was in complete disregard of the existing Town Personnel Policy regarding sexual harassment, which stated that, "The Town Manager, or a designated representative shall investigate all alleged violations of this policy in a timely and confidential manner. . . ." (See Town Personnel Policy, § 20.3.2)(B159).

On January 6, 2003, Hirt also placed Plaintiff on a six-month probation in connection with the incident--exactly the same discipline as Leggett received, despite Plaintiff's complaints that Leggett raped her. (See Evaluation of Kari Smith, dated January 6, 2003)(B146). The stated reason for Plaintiff's probation was that she entered the library after hours. The write-up states that

Kari Smith returned to the Library after closing when told previously that for employee safety reason employees other than the Director will not be allowed to work late or come into the library after hours to work on weekdays or on the weekend. On December 20, 2002 Kari had opened and entered the library thus breaking the safety policy the Director had set in action based on the Town Manager's directives. (Discipline Action Write-up)(B147).

Plaintiff, however, contests that she was not allowed to go into the library after hours. Plaintiff testified that Hirt had

9

allowed her to enter the library after hours with her family and to drop things off for the Summer Reading Program. (Priller Dep., 91)(B27). Prior to December 20, 2002, Plaintiff had dropped off items at the library approximately two or three times after hours. Id. Furthermore, Town Manager Hugg stated in his deposition that, unless an employee is instructed by his department head not to be in his building after hours, there is nothing inappropriate with going into one's own workplace building after hours to retrieve something. (Hugg Dep., at 30)(B).

At some point within a month of the incident, Defendant Leggett came into the library when Plaintiff was not there and met with Defendant Hirt behind closed doors in her office for approximately an hour. (Porter Dep., 29-30)(B124-25). This was the first time Leggett had ever met with Hirt privately. (Porter Dep., 30)(B125). Because Hirt had no supervisory or social relationship with Defendant Leggett in any way, a reasonable inference to draw from these facts was that Hirt and Leggett discussed the December 20th library incident at this meeting. Hirt would have had no reason to have such a long conversation with Leggett except about the incident. It can also be inferred that, at this meeting, Hirt and Leggett discussed Plaintiff's complaints about Leggett and what the Town's response should be.

Although Leggett was not supposed to have had any contact with Plaintiff, on March 10, 2003, Plaintiff saw Leggett doing work outside the library. (Priller Dep., 78-79)(B23-24). Hirt asked Plaintiff to go pick up books from the book drop, which was within a few feet of where Leggett was working. (Priller Dep., 78)(B23). Plaintiff became upset at the prospect of having to be

10

so close to Leggett and she told Hirt of her fears. Id. Hirt's only response to Plaintiff's complaints was to state, "It's not like he's going to attack you or something." Id.

After Hirt failed to respond to Plaintiff's complaints, Plaintiff met with the Town Manager, Dave Hugg, on March 11, 2003 to complain about Leggett's presence near the library. (Priller Dep., 80)(B25). Hugg, however, made excuses for Leggett's presence at the library and claimed that Leggett was the only one who knew how to sandblast. (Priller Dep., 81)(B26). At the meeting Plaintiff also inquired about how to file a sexual harassment claim. (Priller Dep., 79-80)(B24-25). Hugg gave Plaintiff copies of the pertinent sections of the Town Personnel Policy but discouraged her from filing a claim. (Priller Dep., 80-81)(B25-26). Hugg also advised Plaintiff that she would need a lawyer. (Priller Dep., 80)(B25). Hugg did not offer Plaintiff any paperwork to fill out or otherwise offer any assistance in filing a claim. (Priller Dep., 81)(B26).

Hirt became angry that Plaintiff met with Hugg rather than Hirt about Leggett's presence outside the library. A hand-written note Hirt placed in Plaintiff's personnel file reveals Hirt's displeasure concerning Plaintiff's meeting with Hugg. The note states that Plaintiff had "broken the chain of command by going to my boss and not to me directly." (Hirt Note, dated March 12, 2003)(B153). Plaintiff, however, did follow the chain of command as outlined in Defendant Town's Personnel Policy which states that, "Each employee who believes that he or she is or has been the subject of sexual harassment shall report the alleged act to his/her supervisor and to the Town Manager as promptly as

11

reasonably possible under the circumstances. . . ." (Personnel
Policy, Section 20.3)(B158).    In accusing Plaintiff of breaking
the chain of command, Hirt had apparently forgotten that Plaintiff
had told Hirt that she was bothered by Leggett's presence outside
the library on March 10, 2003.    (Priller Dep., 78-79)(B23-24).
Yet Hirt took no positive action in response, telling Plaintiff
only that, "It's not like he's going to attack you or something."
(Priller Dep., 79)(B24).    Only after Hirt's failure to respond did
Plaintiff schedule a meeting to meet with Defendant Hugg on March
11, 2003.    In further contradiction of Hirt's false claims that
Plaintiff "broke the chain of command", Town Manager Hugg
testified that he has an "open door" policy whereby any employee
can come talk to him about town policies.    (Hugg Dep., 44-
45)(B113-114).    Hugg stated, further, that it is not a violation
of town policy for an employee to talk directly to him.    Id.
Moreover, the Town's own Personnel Policy, § 20.3.2, dealing with
sexual harassment, provides that "The Town Manager, or a
designated representative shall investigate all alleged violations
of this policy in a timely and confidential manner. . . ."
Therefore, it would not have been a violation of the Town policy
even if Plaintiff had gone directly to Hugg with her claims of
sexual harassment without first reporting to Hirt.

On May 12, 2003, Hirt conducted Plaintiff's three-month
evaluation due to Plaintiff's probationary status. (Priller Dep.,
at 94-95)(B30-31).    This evaluation was required by Defendant
Town's Personnel Policy, § 4.2.    (Town Personnel Policy, at
14)(B155).    In this evaluation, it is clear that Hirt is
retaliating against Plaintiff for Plaintiff's conversation with

Hugg on March 11th.    Hirt's evaluation lists Plaintiff's March
meeting with Hugg as a primary negative complaint about Plaintiff
even though the meeting complied with the Town Policy.    In
addition, attached to the evaluation is an "Employee Progress
Report" dated April 6, 2003.    (B163).    This report states that

> On March 11, 2003, Kari did not follow the proper chain of
> command and went to my Supervisor about a problem before
> informing or discussing to [sic] me about the nature of her
> complaint.    I did find out from my supervisor that she made
> the complaint based on a misunderstanding, which did lead to
> two weeks of her silence, leading to a hostile work
> environment.

(Progress Report, dated April 6, 2003)(B163).

### The Inconsistent Conditions of Leggett's "Probation"

During Plaintiff's probation, Harvey Leggett was also on
"probation."    The alleged reasons for Plaintiff's termination pale
in comparison to the serious misconduct by Leggett during his
supposed probation.    Despite this misconduct, however, Leggett was
not terminated.    On March 13, 2003, Leggett was convicted of
driving while under the influence and his license was revoked.
(Hugg Dep., at 39-40)(B108-09).    As a foreman in the Public Works
department, Leggett was required to drive a town pickup to various
job sites in order to supervise other employees.    (Leggett Dep.,
dated August 30, 2005, at 14-15)(B61-62).    Furthermore, Defendant
Town's Employee handbook specifically states that "Each employee
who operates any Town-Owned vehicle must have a valid driver's
license and be of insurable status."    (Employee Handbook, at
6)(B167).    The Handbook also required Leggett, as a foreman, to
have a CDL.    Id.    When Leggett was convicted of driving under the
influence he lost both his regular driver's license and his CDL.
(Leggett Dep., dated March 22, 2005, at 38-39)(B54).    After

Leggett's license was revoked, other employees were forced to chauffeur him around to individual work sites. (Leggett Dep., dated March 22, 2005, at 41)(B55). Yet, despite the fact that Defendant Leggett lost his license only two days after Plaintiff had met with Hugg about bringing sexual harassment claims against Leggett, the Town did not take any action against Leggett.

Despite the fact that he could not perform one of his essential job duties, Leggett was not disciplined for losing his license even though he was on probationary status. Both Hirt and Hugg were aware that Leggett had a drinking problem. In fact, Hirt had even seen Leggett drunk in the library on one occasion, as noted supra. (Hirt Dep., 50-52)(B78-80). Hugg was also aware of Leggett's drinking problem and had discussed the problem with Leggett. (Hugg Dep., 56)(B115).

Ultimately, Leggett incurred no new discipline as a result of his rape of Plaintiff. He suffered no loss of pay related to the incident. (Leggett Dep., dated August 30, 2005, at 24)(B63). He returned to work with exactly the same duties and assignments as he had before the incident. (Deposition of Harvey Leggett, dated August 30, 2005, at 26-27)(B65-66). Leggett confirmed that, other than being "suspended" for two weeks with pay and being told to stay away from Plaintiff, he suffered no other negative or adverse consequences from the rape of Plaintiff in Defendant's library. (Leggett Dep., dated March 22, 2005, at 51-52)(B56-57). In addition, Defendant Hugg met with Leggett before imposing the probation on Leggett, whereas there is no evidence that Hugg had a similar meeting with Plaintiff. (Hugg Dep., 22)(B102). Furthermore, while Plaintiff received a three-month evaluation

14

during her probation as required by the Personnel Policy, § 4.2.2, there is no evidence that Leggett received any evaluation even though he, too, was supposedly on probation.

Later, in September, 2003, Leggett was charged with possession of a controlled substance. (Leggett Dep., dated March 22, 2005, at 54-55)(B57). Even though this misconduct was also "off-duty" as was the DUI for which Defendant Leggett received no discipline whatsoever, Defendant Town nonetheless chose to place Leggett on probation for six months for the charge of possession. (Leggett Dep., dated March 22, 2005, at 62)(B58).

### The Town's Justification For Plaintiff's Termination

Plaintiff was terminated on July 7, 2003.    (See letter from Hirt to Plaintiff, dated July 7, 2003)(B171).    The reasons given by Hirt for the termination were that Plaintiff:

1)   Falsified information on a vacation slip;
2)   Was absent without approved leave; and
3)   Failed to get a supervisor's approval to have another employee cover for Plaintiff.

Id.

Hirt stated in her letter that these three incidents amounted to violation of Plaintiff's probation--requiring termination.    Id. These allegations by Hirt, however, are untrue and were created as a pretext to justify Plaintiff's unlawful termination.

The subject of these three justifications for Plaintiff's termination is an alleged falsification on Plaintiff's Application for Leave dated June 16, 2003. (Application for Leave, dated June 16, 2003)(B170).    Plaintiff explained that she discussed this leave with Hirt before turning in the form.    (Priller Dep. 102-03)(B38-39).    Plaintiff had requested a long weekend to go to Virginia to be with her family for her son's birthday. Id.    Hirt

15

initially had some concerns with permitting Plaintiff to take vacation at that time because Conlin was also scheduled to take vacation during that time period. (Priller Dep., 103)(B39). Hirt nonetheless approved this vacation time as long as Priller was present to lead the Reading Program on July 1st. (Priller Dep., 103-04)(B39-40). After submitting the application for leave on June 16th, Plaintiff learned later that day that Conlin had postponed her vacation and would be available to lead the Reading Program on July 1st. (Priller Dep., 105-06)(B41-42). Plaintiff immediately notified Hirt that Conlin would be covering the Reading Program, and Hirt gave her consent to this change. (Priller Dep., 107-08)(B43-44).

As Plaintiff stated in her deposition, the employees were not required to be overly formal about absences if they could arrange for someone to fill in for them on that shift. (Priller Dep., 117)(B45). As a general rule, the employees would find someone to fill in for a particular time they needed to be absent from the office and then would notify Hirt of the plan. (Priller Dep., 117-18)(B45-46).

Plaintiff was unable to return to work as scheduled on July 3rd, however, because her car broke down and was going to require $1,800 worth of work to fix it. (Priller Dep., 121)(B49). Plaintiff made several calls to the library and reached Hirt on July 2nd to inform Hirt of Plaintiff's car troubles. Id.

Because of the excessive cost of repairing her vehicle, Plaintiff was forced to abandon that vehicle and search for a new car. (Priller Dep., 122)(B50). Plaintiff returned to Delaware on Monday, July 7, 2003 and reported to work promptly at 9:00 am.

16

Because the library was closed on Friday, July 4th, and Plaintiff did not work on weekends, she had missed only one day of scheduled work--Thursday, July 3, as a result of her unexpected car trouble.

When Plaintiff returned to work, Hirt approached Plaintiff and stated she wanted to meet to conduct Plaintiff's six-month evaluation immediately. (Priller Dep., 123)(B51). Rather than conducting an evaluation, however, Hirt terminated Plaintiff's employment. (Priller Dep., 124)(B52).

### Hirt's False Statements to Hugg

Hirt met with Hugg in the first week of July to discuss terminating Plaintiff. (Hirt Dep., 145)(B95). During this meeting, Hirt made false statements about Plaintiff's vacation request. Specifically, Hirt stated that Plaintiff had falsified her vacation slip and had not come back for the Children's Program on July 1st despite promising to do so. (Hirt Dep., 146)(B96). As indicated supra, however, Plaintiff had told Hirt on June 16 that Nancy Conlin was available to fill in for Plaintiff, and Hirt had agreed to this change. (Priller Dep., 107-08)(B43-44).

### Plaintiff's Attempts to File a Grievance

Plaintiff attempted to file a grievance based on her termination by Hirt. (Letter from Plaintiff to Hugg, dated July 18, 2003)(B172). Hugg, however, told Plaintiff that she had no recourse because she had been terminated at the end of her probationary period. (See letters from Hugg to Plaintiff, dated July 18, 2003 and July 30, 2003)(B173; B175). The Employee Handbook Plaintiff been given, however, contained no such rule prohibiting probationary employees from filing grievances. (Priller Dep., 98)(B34)(Employee Handbook, at 15-16)(B168-69).

17

## Leggett's Lies About His Involvement With Plaintiff

When questioned under oath about his involvement with Plaintiff, Defendant Leggett lied and testified that he had not had a sexual relationship with Plaintiff. (See Deposition of Harvey Leggett, dated March 22, 2005, 48)(B56). However, he admitted to his supervisor, Joseph Heeger, shortly after the incident, that he did have sexual intercourse with Plaintiff. (Deposition of Joseph Heeger, dated March 22, 2005, at 107)(B118). Leggett also stated to the Smyrna Police that he had consensual oral sex with Plaintiff, though he claimed that when he began to penetrate, Plaintiff said "no", and he stopped. (Police report)(B135). However, the medical records show vaginal injury as a result of Leggett's rape of Plaintiff. (Medical Records)(B143).

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate only where there is no genuine issue as to any material fact.    Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of identifying evidence it believes demonstrates the absence of a genuine issue of material fact.    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).    For purposes of a summary judgment motion, the Court must view the facts in the light most favorable to the non-moving party.    United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).    The non-moving party's version of the facts must be accepted, and all disputed facts resolved in her favor.    Bishop v. Wood, 426 U.S. 341 (1976). The Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

Plaintiff has raised several genuine issues of material fact that remain unresolved at this stage of the case.    Plaintiff will address Defendant's arguments in the order they were presented in Defendant's Brief.

### II.    LEGGETT WAS ACTING UNDER COLOR OF STATE LAW WHEN HE VIOLATED PLAINTIFF'S RIGHTS PROTECTED BY 42 U.S.C. § 1983.

Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any right, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Interestingly, Defendants do not request summary judgment on Plaintiff's Section 1983 claims against her supervisor, Hirt, or the Town Manager, Hugg. It is clear that these individuals were acting under color of state law in their decision to terminate Plaintiff unlawfully. There is also evidence, however, permitting a reasonable inference that Leggett participated in the discrimination against Plaintiff, culminating in her wrongful termination by Defendants.

Defendants cite Murphy v. Chicago Transit Authority, 638 F.Supp. 464, 466-68 (N.D. Ill 1986) for the proposition that co-workers cannot be liable under Section 1983 where their harassment of the plaintiff has no relation to their employment duties and powers. (Opening Brief at 16). Defendants contend that Leggett's rape of Plaintiff had no connection to his duties with the Town. Id. This is erroneous, however, because Leggett's and Plaintiff's only interactions until the night of the rape were through their work in the library. (Priller Dep., 53-54)(B3-4). The fact that Leggett was not "on-duty" at the time, does not necessarily preclude him from acting "under color" of state law. See generally Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999).

In addition, the rape occurred on Town property and at Plaintiff's work site while Plaintiff was engaged in work-related activities similar to what she had done previously at the library. Certainly the Defendant cannot contend that an employee's rape of another employee does not constitute sexual harassment which is actionable under § 1983. Defendant Town attempts to separate out the rape from Plaintiff's and Leggett's entering of the library

20

after hours.    However, both actions are so intertwined with Leggett's and Plaintiff's employment status that they cannot be separated out.    The Town cannot choose to discipline for one violation while ignoring the other.

Furthermore, the focus of Plaintiff's complaints of discrimination is not simply the rape alone, but also Defendants' response to Plaintiff's complaints about the rape.    Leggett's later meeting with Hirt behind closed doors at the library was under color of state law because it was connected to his position as a Town employee.    Betty Porter, one of Plaintiff's co-workers, testified that Hirt and Leggett met in Hirt's office for almost an hour soon after the incident between Plaintiff and Leggett. (Porter Dep., 29-30)(B124-25).    The only reasonable inference to be drawn from the fact that Hirt and Leggett met for almost an hour behind closed doors is that Hirt and Leggett were discussing the incident despite Hirt's testimony that she never discussed the rape incident with Leggett.    (Hirt Dep., 69)(B89).    Hirt had never met with Leggett before in this fashion and there is no evidence that she met with him again.    Hirt and Leggett worked in different departments, and there would have been no legitimate reason for them to meet in this fashion.

Construing the facts in a light favorable to Plaintiff, the only reasonable inference about this meeting is that Hirt and Leggett were discussing the incident and what action to take against Plaintiff in connection with the incident.    Therefore, there is sufficient evidence in the record to preclude summary judgment on Plaintiff's Section 1983 claims against Leggett.

In addition, Defendant Leggett's actions themselves may be

21

considered a violation of Plaintiff's civil rights in that they were motivated by her gender and deprived her of her rights to employment. Leggett's rape was clearly motivated by Plaintiff's gender. Further, Leggett later agreed to work outside the library when he knew Plaintiff would be there in March, 2003. Leggett was clearly aware of the no-contact order, yet he agreed to work outside the library in the course of his duties with the Town. It was also at this time that Hirt directed Plaintiff to retrieve books from the book-drop only a few feet away from where Leggett was working. (Priller Dep., 78)(B23). Leggett was, apparently, a willing participant in this violation of Hugg's no-contact order.

## III. PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT SEXUAL HARASSMENT UNDER TITLE VII.

Plaintiff has established each element necessary for a prima facie case of hostile environment discrimination. In order to establish a prima facie case of hostile work environment sexual harassment, plaintiff must demonstrate that each of the following five elements exist: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) there is respondeat superior liability. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). As demonstrated below, Plaintiff can establish these elements, and her allegations of a sexually hostile work environment must be allowed to go to a jury.

A court should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the

employer's intent is in question." Schwapp v. Town of Avon, 118 F.2d 106, 110 (2d Cir. 1997). Because direct evidence of discrimination is rarely found, record evidence must be carefully scrutinized for circumstantial proof that, if believed, would show discrimination. Id.

## A. Plaintiff Suffered Intentional Discrimination Based on Her Sex Through The Town's Failure To Investigate Plaintiff's Claims That She Was Raped by Leggett.

Plaintiff suffered intentional discrimination by the Town of Smyrna in its treatment of Plaintiff after her rape by Leggett. The Town of Smyrna, through Hirt and Hugg, discriminated against Plaintiff because she was a female. As detailed, supra, Plaintiff notified Defendant Town that she was raped by Leggett. Despite these complaints, however, Defendant Town failed to investigate Plaintiff's claims. Further, the Town placed Plaintiff on probation and evaluated Plaintiff after three months. The Town also created a hostile environment by, among other things, allowing Leggett to work near the library in March and then making excuses for Leggett's presence near the library. Moreover, as if Plaintiff's work environment were not hostile enough with Leggett working right outside the building, Defendant Hirt attempted to exacerbate the situation by ordering Plaintiff to go to the book drop only two feet away from where Leggett was working. (Priller Dep., 78)(B23). Plaintiff became very upset by Hirt's command and was unable to go outside near Leggett. (Priller Dep., 79)(B24).

Defendant Town chose to ignore Plaintiff's claims that she was raped despite the presence of substantial evidence which gave credibility to Plaintiff's complaints such as the vomit on the floor and Leggett's own admission to his supervisor, Heeger, that

23

he and Plaintiff had engaged in sexual intercourse. (Deposition of Joseph Heeger, dated March 22, 2005, at 107)(B118). The Town also failed to review the medical records which show injury to Plaintiff's vaginal region, (Medical Records)(B143) and Leggett's statement to the police, in which Leggett admitted to having sex with Plaintiff. (Police Report)(B135). Despite this evidence, Defendant Town took absolutely no action to investigate Plaintiff's claims that she was raped. Rather, Defendant Town simply placed Plaintiff and Leggett on the same level of probation for inappropriately entering the Town library after hours.

The Town's actions, or rather failure to take action regarding Plaintiff's complaints, was obviously based on Plaintiff's sex because Defendant Town treated Leggett differently. Leggett was, theoretically, also placed on probation, but, as he testified, the conditions of his employment really did not change. (Leggett Dep., dated March 22, 2005, at 51-52)(B56-57). Further, there is no evidence that Leggett was required to undergo a three-month evaluation.

The fact that Hirt was also a woman does not negate Plaintiff's claims for discrimination based on her sex. The United States Supreme Court has held that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." Oncale v. Sundowner Offshore Services, 523 U.S. 75, 79 (1998) Plaintiff was discriminated against based on her sex by both Hugg and Hirt, neither of whom made an effort to investigate Plaintiff's complaints while, at the same time, not disciplining

24

Leggett.

**B.    The Discrimination Against Plaintiff Was Pervasive.**

The discrimination Plaintiff suffered was pervasive.    After
Plaintiff complained of the alleged rape by Leggett, Hirt began
placing a number of complaint letters in Plaintiff's file.    Hirt
also extended Plaintiff's probationary period for six additional
months, based solely on Plaintiff's entrance to the library after
hours.    Hugg, however, who is responsible for the town buildings
(Hugg Dep., 13)(B100), stated that it was not improper for an
employee to enter buildings after hours to retrieve something.
(Hugg Dep., 30)(B107).    Moreover, Plaintiff had to deal with the
Town's refusal to investigate the sexual assault or to impose any
discipline upon Leggett as a constant feature of her employment.
Further, Leggett's continued employment with the Town and her own
unfair treatment were constant reminders to Plaintiff of the
hostile environment in which she was forced to work.

**C.    The Discrimination Detrimentally Affected Plaintiff.**

The hostile environment created by the Town's inaction made
it very difficult for Plaintiff to function productively in her
job.    (Affidavit of Kari Priller, at 3)(B133).    For example, when
Leggett was instructed to perform some work outside the library
during a time when Plaintiff was also scheduled to work, Plaintiff
became very upset.    (Priller Dep., 78)(B23).    Plaintiff told Hirt
of the fear and anxiety this was causing Plaintiff.    Id.    However,
rather than make an attempt to remove Plaintiff from the
situation, Hirt simply told Plaintiff, "It's not like he's going
to attack you or something." (Priller Dep., 79)(B24).

This environment, particularly Hirt's comment about Leggett

25

not attacking Plaintiff, bothered Plaintiff so much that she scheduled a meeting with the Town Manager, Hugg, to discuss the possibility of filing a sexual harassment claim. (Priller Dep., 80)(B25). During the meeting, though, Hugg made excuses for Leggett's presence outside the library and attempted to discourage Plaintiff from filing a claim. (Priller Dep., 79-81)(B24-26).

At the same meeting with Hugg, Plaintiff also discussed other ways in which Leggett's presence in town had affected her. Plaintiff told Hugg how difficult it was for Plaintiff to see Leggett driving around town and not being able to go to any town functions knowing that Leggett might also be there. (Priller Dep., 80)(B25). Plaintiff mentioned specifically to Hugg how she felt she could not attend the Town's upcoming picnic because she was afraid she might see Leggett there. Id.

### D.    The Discrimination Plaintiff Suffered Would Detrimentally Affect a Reasonable Person.

The Town's utter failure to respond to Plaintiff's complaints that she was raped by a co-worker would detrimentally affect a reasonable person. Having one's complaints of rape completely ignored and then being subjected to excessive discipline and criticism at work would detrimentally affect a reasonable person, as would watching one's rapist go about his business as usual with no disciplinary action.

### E.    There Is Respondeat Superior Liability.

The United States Supreme Court extended the boundaries of what conduct may be considered "in the course of" an employee's work duties in Faragher v. City of Boca Raton, 524 U.S. 775 (1998). The Supreme Court made clear that the actions of an employee's supervisor may be imputed to the employer. In Boca

26

Raton, the petitioner, a lifeguard for the City of Boca Raton, claimed two of her supervisors had created a sexually hostile environment.    The Supreme Court held that the plaintiff had a valid claim against the city for the actions of her supervisor, subject to an affirmative defense of the reasonableness of the employer's conduct.    Id. at 809-810.    The Supreme Court rejected an "active-use" test for cases of hostile environment based on vicarious liability, holding that, "We think plaintiffs and defendants alike would be poorly served by an active-use rule." Id. at 805.    As a consequence, the proper test for liability of an employer for the actions of a supervisor is only that of "passive or implicit" misuse of supervisory authority.    Id. at 804.    Under this test, an employer can show as an affirmative defense to liability,

> that the employer had exercised reasonable care to avoid harassment and eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided.

Id. at 805.

In the present case, Hirt and Hugg were both Plaintiff's superiors.    Hirt was Plaintiff's direct supervisor and Hugg was the Town Manager.    Their discriminatory actions against Plaintiff in their roles as Plaintiff's superiors directly implicate the Town.    The Town is liable on the basis of respondeat superior.

## IV.    PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISPARATE TREATMENT SEXUAL DISCRIMINATION.

In an apparent attempt to minimize Plaintiff's claim, Defendant does not deal with what is perhaps Plaintiff's strongest cause of action--her claim of disparate treatment--until page twenty six.    In order to establish a prima facie case of disparate

27

treatment, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was discharged; and (4) other employees not in a protected class were treated more favorably than the plaintiff.    Blackshear v. City of Wilmington, 15 F.Supp. 2d 417, 424 (D.Del. 1998)(quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993)).

Plaintiff has established a prima facie case of unlawful termination because Leggett was treated more favorably than Plaintiff was for the same violation.    Defendants do not dispute that Plaintiff was a member of protected classifications based on her race and sex.    Nor do they dispute that Plaintiff was qualified for her position and was discharged.

Plaintiff and Leggett were also similarly situated.    To show that employees are similarly situated, a plaintiff must show that the employees were

> subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

Messina v. E.I. Dupont de Nemours & Co., 308 F.Supp. 2d 491, 497 (D. Del. 2004)(quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

Leggett and Plaintiff are uniquely similarly situated in this case because they were both involved in exactly the same incident. It is undisputed that Plaintiff and Leggett both entered the library after hours on December 20, 2002.    Moreover, Leggett and Plaintiff were subject to exactly the same rules under Defendant Town's Personnel Policy.    Further, Hugg was involved in both decisions to place Leggett and Plaintiff on probation.    In Messina, the plaintiff argued that he was treated differently than

another employee for committing the same violation of the company rules. While the Court in Messina found that the employees were not similarly situated, it did so because the alleged violations of the rules occurred nearly a year apart and because, in the interim, the employer had adopted more stringent rules that applied to the second incident, not the first. Messina, 308 F.Supp. 2d at 497. In the present case, Plaintiff and Leggett were subject to identical rules under the Town's employee handbook. The act giving rise to the discriminatory treatment occurred at precisely the same time, i.e., when they both entered the library after hours. There is nothing to distinguish the Town's treatment of Leggett and Plaintiff or to explain why Plaintiff was subjected to a hostile environment and to full probationary treatment while Leggett's "probation" was a sham.

As Hugg admitted, it was inappropriate for Leggett to be in the library building after hours. (Hugg Dep., 28)(B105). Leggett's entrance into the library was clearly improper because he did not have a work station in the library, and his regular duties did not involve being inside the library building, as did Plaintiff's. However, rather than make a good faith investigation into Plaintiff's complaints that Leggett raped her, the Town chose to ignore significant evidence substantiating Plaintiff's claims, and disciplined Plaintiff and Leggett as if they had committed the same offense of entering the library after hours and nothing more.

While the Town may have officially placed both Leggett and Plaintiff on probation for entering the library, Leggett suffered no actual adverse consequences for his entrance into the library (Leggett Dep., dated March 22, 2005, at 52)(B57), and despite

29

being convicted of a DUI and losing his license during his "probation," he was not disciplined. By contrast, Plaintiff was criticized at work, given a three-month evaluation, and eventually terminated. This disparity in treatment is sufficient to show that Leggett, a black male, was treated more favorably than Plaintiff, a white female, on the basis of race and sex. Of note, Defendant Town did choose to discipline Leggett later, in September 2003, for being charged with possession of a controlled substance (in a non-work-related incident), by placing him back on probation. This probation was imposed, however, after Plaintiff had already been terminated. (Leggett Dep., dated March 22, 2005, at 62)(B58).

Further, the reasons stated by the Town of Smyrna for Plaintiff's termination are merely a pretext for discrimination. Plaintiff's termination letter, prepared by Hirt, states that Plaintiff:

1) Falsified information on a vacation slip;
2) Was absent without approved leave; and
3) Failed to get a supervisor's approval to have another employee cover for Plaintiff.
(Plaintiff's Termination Letter, dated July 7, 2003)(B171).

These charges by Hirt are false and were created by Hirt as a pretext to justify her discriminatory termination of Plaintiff in retaliation for Plaintiff's complaints to Hugg. Hirt cannot have believed, as she claims, that "plaintiff lied to her and falsified a vacation slip." (Opening Brief at 21). Plaintiff testified unequivocally that she told Hirt that she was going to be on vacation and that Nancy Conlin was going to fill in for Plaintiff. (Priller Dep., 105-08)(B41-44). Plaintiff verbally notified Hirt of this change and Hirt approved. (Priller Dep., 107-08)(B43-44).

30

Moreover, other employees had been permitted to leave and use vacation time without having to give written notice. (Priller Dep., 117-18)(B45-46).

Furthermore, Plaintiff's alleged infractions that caused Hirt "dissatisfaction" (OB, at 21), are insignificant when compared to Leggett's misconduct during his probationary period. Defendants attempt to claim that there "were documented problems of dishonesty and deficiency in plaintiff's work performance" and that there "is no such evidence with respect to Mr. Leggett. (OB, at 18). Defendants have, somehow, managed to overlook the fact that Leggett admitted that, during this probationary period between January and July of 2003, he had both his regular license and CDL revoked because he was convicted of driving under the influence. (Leggett Dep., dated March 22, 2005, at 38-39)(B54). Leggett's loss of his licenses during this period prevented him from performing major job duties as a foreman, which included driving to and from specific work sites and driving other commercial vehicles. (Leggett Dep., dated March 22, 2005, at 40)(B55). Because of the DUI, Leggett had to have other employees of the town chauffeur him around to various job sites. Id.

Despite the total loss of his ability to perform an essential duty of his job during his probation, Leggett was not disciplined in any way. (Leggett Dep., dated March 22, 2005, at 51-52)(B56- 57). Neither did Leggett receive a three-month evaluation as Plaintiff did and as required by the Town's policies and procedures. This disparate treatment establishes that Plaintiff was treated differently than Leggett, a black male.

31

V.    **PLAINTIFF HAS ESTABLISHED A <u>PRIMA</u> <u>FACIE</u> CASE OF RETALIATION.**

In order to establish a *prima facie* case for retaliation, Plaintiff must show that: 1) she engaged in a protected activity; 2) she suffered adverse employment actions; and (3) a causal link exists between the employment actions and the exercise of the protected activity.    <u>Price v. Delaware Department of Correction</u>, 40 F.Supp. 2d 544, 552 (D. Del. 1999).

A.    **Plaintiff Engaged In a Protected Activity.**

Plaintiff engaged in at least two protected activities in this case. The first was filing a complaint with the police of a sexual assault by her co-worker, Leggett. The second was her attempt to file a sexual harassment claim, which was discouraged by Hugg in his meeting with Plaintiff on March 11, 2003.

The Third Circuit in <u>Barber v. CSX Distribution Services</u>, 68 F.3d 694 (3d Cir. 1995), although holding that, in that case, the plaintiff's vague letter to his employer did not rise to the level of a protected complaint, nonetheless stated that it does <u>not</u> "require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct'. . . ." Protected activities may also include "informal protests of discriminatory employment practices, including making complaints to management . . . ." <u>Id</u>. at 702 (quoting <u>Sumner v. United States Postal Services</u>, 899 F.2d 203, 209 (2d Cir. 1990)). The Third Circuit has also held that even informal complaints of discrimination made to "co-workers rather than management constitute protected activity for the purposes of establishing a <u>prima facie</u> case of retaliation." <u>Hazen v. Modern Food Services</u>, 2004 U.S. App. LEXIS 21467 (3d Cir. 2004), at *4 (internal

citations omitted).

The Third Circuit also held, in <u>Zelinski v. Pennsylvania State Police</u>, 2004 U.S. App. LEXIS 16576 (3d Cir. 2004), that merely telling a superior about two incidents involving sexual harassment constituted a protected activity even though the plaintiff in that case never filed a formal complaint. <u>Id</u>. at *13-14. The <u>Zelinski</u> court noted that, in determining whether or not the plaintiff has engaged in protected activity, the court must "analyze the message conveyed, rather than the 'medium of conveyance.'" <u>Id</u>. (quoting <u>Barber</u>, 68 F.3d at 702). The Third Circuit also concluded, in <u>Zelinski</u>, that "a reasonable jury could conclude that this conversation fell within the ambit of a protected activity." <u>Id</u>. at *14. Plaintiff engaged in a protected activity by filing a formal complaint with the Smyrna police. In addition, Plaintiff's complaints to Hugg and Hirt of sexual harassment "fell within the ambit of protected activity." <u>Zelinski</u>, 2004 U.S. App. LEXIS 16576 at *14.

**B. The Town Retaliated Against Plaintiff.**

The record provides ample evidence of the retaliation Plaintiff suffered at the hands of the Town. Her pretextual termination alone, which the Town claims was based on her absence when her car broke down in Virginia, is sufficient evidence of retaliation to clear the low threshold for the purposes of this summary judgment motion.

Hirt's hand-written note dated March 12, 2003 also betrays a retaliatory intent. The note, which Hirt placed in Plaintiff's personnel file, demonstrates that Hirt was angry with Plaintiff for meeting with Hugg. The note states that Plaintiff "broke the

chain of command" when she set up a meeting with Hugg to discuss filing a sexual harassment claim.  (Hirt Note, dated March 12, 2003)(B153).  Hirt also issued written discipline to Plaintiff for breaking the chain of command by meeting with Hugg and cited the meeting with Hugg as a primary negative factor in her May 12, 2003 evaluation of Plaintiff.  (See May 12, 2003 evaluation)(B161-63). Hugg himself, however, stated that he has an "open door" policy and that it was not improper for an employee to go directly to him rather than her supervisor.  (Hugg Dep., 44-45)(B113-14).

Perhaps the strongest evidence of retaliation, however, is Hirt's falsification of evidence in order to secure Plaintiff's termination.    Hirt  claimed  in  the  termination  letter  that Plaintiff "falsified information" in her vacation leave form. (Termination Letter, dated July 7, 2003)(B171).  As the record shows, though, Hirt's own representations about Plaintiff were falsifications--falsifications that Hirt relayed to Hugg when she met with him to discuss terminating Plaintiff.  Plaintiff had found another employee, Nancy Conlin, to cover the children's program about which Hirt was concerned.  (Priller Dep., 107)(B43). Plaintiff had then informed Hirt of this change, and Hirt had approved the change.   (Priller Dep., 107-08)(B43-44).   However, Hirt  then  lied  to  Hugg  when  she  consulted  with  him  about Plaintiff's  termination,  claiming  that  Plaintiff  had  never informed her that Conlin would be substituting for her, that she had lied on her vacation request form, and that she was AWOL. (Hirt Dep., 146-47)(B96-97).

### C.  There Is a Causal Link Between Plaintiff's Complaints And The Town's Actions.

Evidence  of  a  causal  connection  between  the  employee's

34

protected activity and the adverse employment action may be shown by close temporal proximity between the two actions. See Burch v. WDAS AM/FM, 2002 U.S. Dist. LEXIS 12290 (E.D.Pa.), at *32.  As Plaintiff's personnel file shows, Hirt began making complaints about Plaintiff the day after Plaintiff met with Hugg about filing a sexual harassment claim. (See note written by Hirt, dated March 12, 2003)(B153).  These negative sentiments were incorporated into an Employee Progress Report less than a month later, and ultimately constituted the primary negative assessment in Plaintiff's evaluation one month after that. (Employee Progress Report, dated April 6, 2003)(B163).

Moreover, Plaintiff was treated differently than Leggett almost from the moment the Town received her complaints about the sexual assault. Among other things, Plaintiff was placed on the same probation as Leggett, who had raped her; she was given a three-month evaluation when Leggett was not; and her employment was terminated based on false accusations by Hirt, whereas Leggett's probation ended in permanent employment status despite losing his license as the result of a DUI.

## VI. PLAINTIFF HAS PRESENTED A PRIMA FACIE CASE OF REVERSE RACE DISCRIMINATION UNDER 42 U.S.C. § 1981.

Plaintiff has presented sufficient facts to permit a reasonable fact-finder to infer that the Town's actions in terminating her employment were based on a discriminatory animus. The fact that Defendant Town terminated Plaintiff's employment while not taking similar action against Leggett, who had raped Plaintiff, is sufficient evidence to permit a reasonable fact-finder to conclude that the Town's actions were based on Plaintiff's race.

35

Defendant argues that, under the Third Circuit's holding in Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999), that Plaintiff's claims of reverse discrimination must fail.   The standard in reverse discrimination cases, as set out by the Third Circuit in Iadimarco, is that "in the absence of direct evidence of discrimination" a plaintiff may show:

> sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff "less favorably than others because of [his] race, color, religion, sex, or national origin."

Id. at 163, citing Furnco Const. Corp v. Waters, 438 U.S. 567, 577 (1978).

As shown above, Plaintiff was placed on probation, given negative evaluations, evaluated at three months and eventually terminated, whereas Leggett, a black male, suffered no adverse consequences except being suspended with pay for a few days and told not go to near Plaintiff.   A reasonable fact-finder could conclude that Plaintiff was treated less favorably than Leggett based on her race.

**VII.    THE TOWN VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS BY REFUSING TO PERMIT HER TO FILE ANY GRIEVANCE AGAINST IT AND BY FAILING TO INVESTIGATE HER CLAIMS AGAINST LEGGETT.**

The Town of Smyrna violated Plaintiff's due process rights by failing to conduct any investigation, much less a reasonable investigation, into Plaintiff's complaints that Leggett raped her on town property.   When an employee is raped at her work site by another employee, the employer cannot simply choose to ignore her claims.   As Hugg admitted in his deposition, he (Hugg) was responsible for the Town buildings.   (Hugg Dep., 13)(B100). Furthermore, Defendant Town's own internal policy on sexual

36

harassment <u>requires</u> an investigation of all claims of sexual harassment, with no limitation as to whether the harassment occurred on or off-duty.  The Personnel Policy, § 20.3.2 provides, with respect to incidents of alleged sexual harassment:

> The Town Manager or a designated representative shall investigate all alleged violations of this policy in a timely and confidential manner. . . The purpose of this provision is to protect the confidentiality of the complainant, to encourage the reporting of any incidents of sexual harassment, and to protect the reputation of any employee wrongfully charged with sexual harassment.  The investigation of the complaint will normally include conferring with the parties involved and any named or apparent witnesses.  Each employee shall be guaranteed the right to a fair and impartial hearing.  Each employee shall be protected from coercion, intimidation, retaliation, interference or discrimination for filing a complaint or providing information during the investigation.

There is no evidence on the record to indicate that Defendant Town conducted any such investigation into Plaintiff's complaints that Defendant Leggett raped her.  By failing to do so, the Town violated its own internal policy and federal law.

The fact that the Town police conducted a criminal investigation of Plaintiff's claims that Leggett raped her does not relieve the Town of its duty to investigate Plaintiff's allegations of sexual harassment.  An employer has a duty to create a sexual harassment policy <u>and</u> conduct an investigation under that policy.  The EEOC guidelines state that "when an employer receives a complaint or otherwise learns of alleged sexual harassment in the workplace, the employer should investigate promptly and thoroughly."  <u>EEOC Policy on Current Issues of Sexual Harassment</u>, dated 3/19/90 (B176).  The Third Circuit has also held that, if the harassment is reported to the employer, "[f]ailure to investigate and remediate will result in employer liability."  <u>Bouton v. BMW of North America</u>, 29 F.3d 103,

107 (3d Cir. 1994).    See also Munford v. James T. Barnes & Co.,
441 F.Supp. 459, 466 (6th Cir. 1977)(holding that "an employer may
be liable for the discriminatory acts of its agents or supervisory
personnel if it fails to investigate complaints of such
discrimination").    The Restatement (Second) of Agency, §
219(2)(b) also provides that an employer may be liable for its own
negligence or recklessness.    The Bouton court clarified that "in a
harassment case, this is typically negligent failure to discipline
or fire, or failure to take remedial action upon notice of
harassment.    Bouton, 29 F.3d 103, at 106.

       The Town failed to take proper action in response to
Plaintiff's complaints of sexual harassment.    Plaintiff met with
Hugg on March 11, 2003 to discuss filing a complaint of sexual
harassment against Leggett.    (Priller Dep., 79-80)(B24-25).
However, neither Hugg nor Hirt conducted any investigation in
response to Plaintiff's complaints, either before or after this
meeting.    Instead, Hirt and Hugg relied solely on the Smyrna
Police's criminal investigation of the incident.    Hirt admitted
that she did not conduct an investigation but, instead "let the
police handle that." (Hirt Dep., 59)(B87).    Hugg actively avoided
talking about the issue with Leggett at all, telling Leggett not
to discuss the issue with him.    (Hugg Dep., 22)(B102).    This
failure to investigate Plaintiff's complaints of sexual harassment
by Leggett was a violation of the Town's internal policy, the EEOC
guidelines, and federal law.

       The Town obviously took into consideration the rape, because
it's meager and inadequate solution was to order Leggett not to
have any contact with Plaintiff and to avoid being on the premises

of the library at any time.    (Letter from Hugg to Leggett, dated January 2, 2003)(B145).    It is apparent, therefore, that Defendant Town recognized that a rape occurred; however, the Town chose not to take any real action or investigate the incident, as was required by law and its own Personnel Policy.

Defendants also violated Plaintiff's due process rights by failing to provide her any grievance procedure.    When Plaintiff attempted to file a grievance against Hirt, Hugg informed Plaintiff by letter that no such procedure was available to her because she was a "probationary employee." (See letters from Hugg to Plaintiff, dated July 18, 2003 and July 30, 2003)(B173; B175). However, the Employee Handbook Plaintiff was given contained no such rule prohibiting probationary employees from filing grievance procedures.    (Priller Dep., 98)(B34)(Employee Handbook, at 15-16)(B168-69).    The existence of a theoretical grievance procedure is insufficient to insulate an employer from liability if no action is actually taken under the policy.    See <u>Sanchez v. City of Miami</u>, 720 F.Supp. 974 (S.D.Fla. 1989).    Defendants are, therefore, liable for failing to provide Plaintiff with an effective grievance procedure to contest her unlawful termination.

**VIII.    PLAINTIFF HAS ESTABLISHED A STATE LAW CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.**

Plaintiff's claims for breach of the covenant of good faith and fair dealing parallel almost exactly the scenario in <u>E.I. Dupont de Nemours & Co. v. Pressman</u>, 679 A.2d 436 (Del. 1996).    In <u>Pressman</u>, the plaintiff's supervisor had made false accusations against the plaintiff, resulting in the plaintiff's termination. The Delaware Supreme Court held that the supervisor's actions were

a breach of the implied covenant of good faith and fair dealing. Id.

In the present case Plaintiff's supervisor, Hirt, made false accusations about Plaintiff that resulted in Plaintiff's termination. Namely, Hirt lied and stated that Plaintiff had falsified her vacation form dated June 16, 2003, when Hirt actually had knowledge that Nancy Conlin was going to fill in for Plaintiff. (Priller Dep.,107-08)(B43-44). Hirt's representations to Hugg that Plaintiff had lied on her vacation form were, themselves, false statements that led to Plaintiff's termination. Hirt's statements were an act of deceit and misrepresentation intended to convince Hugg to terminate Plaintiff. As such, these statements establish a prima facie case of breach of the implied covenant of good faith and fair dealing.

**CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment should be denied.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
WILLIAM D. FLETCHER, JR. (#362)
NOEL E. PRIMOS (#3124)
ADAM C. GERBER (#4658)
414 S. State Street
P.O. Box 497
Dover, DE 19901
(302) 674-0140
Attorneys for Plaintiff

DATED: 3/2/06

## CERTIFICATE OF SERVICE

I hereby certify that I have caused copies of the following:

### PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to be served upon:    BRUCE C. HERRON
                      Akin & Herron, P.A.
                      1220 N. Market Street, Suite 300
                      P.O. Box 25047
                      Wilmington, DE 19899

via electronic service and by mailing, postage prepaid, to the addresses shown above, on _____March 2, 2006_____.

                          SCHMITTINGER & RODRIGUEZ, P.A.

                          BY: _____
                          WILLIAM D. FLETCHER, JR.
                          Bar I.D. #362
                          NOEL E. PRIMOS
                          Bar I.D. #3124
                          ADAM C. GERBER
                          Bar. I.D. #4653
                          414 S. State Street
                          P.O. Box 497
                          Dover, DE   19901
                          (302) 674-0140
                          Attorneys for Plaintiff

DATED: 3/2/06