**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

KARI M. (SMITH) PRILLER,

Plaintiff,

v.

TOWN OF SMYRNA, DAVID S. HUGG, III, individually and in his official capacity as Town Manager; BEVERLY A. HIRT, individually and in her official capacity as Director of the Smyrna Public Library; and HARVEY LEGGETT; individually and in his official capacity as Supervisor of Streets/ Foreman of Public Works,

Defendants.

CIVIL ACTION
NO. 04-1286(JJF)

---

**APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

SCHMITTINGER & RODRIGUEZ, P.A.
BY: WILLIAM D. FLETCHER, JR. (#362)
NOEL E. PRIMOS (#3124)
ADAM C. GERBER (#4653)
414 S. State Street
P.O. Box 497
Dover, DE 19901
(302) 674-0140
Attorneys for Plaintiff

Dated: 3/2/06

# TABLE OF CONTENTS


| | PAGE |
|---|---|
| PORTIONS OF DEPOSITION OF KARI (SMITH) PRILLER, DATED JULY 25, 2005 | B1 |
| PORTIONS OF DEPOSITION OF HARVEY LEGGETT, DATED MARCH 22, 2005 | B53 |
| PORTIONS OF DEPOSITION OF HARVEY LEGGETT, DATED AUGUST 30, 2005 | B59 |
| PORTIONS OF DEPOSITION OF BEVERLY ANN HIRT, DATED AUGUST 30, 2005 | B68 |
| PORTIONS OF DEPOSITION OF DAVID S. HUGG, III, DATED AUGUST 30, 2005 | B98 |
| PORTIONS OF DEPOSITION OF JOSEPH HEEGER, DATED MARCH 22, 2005 | B116 |
| PORTIONS OF DEPOSITION OF BETTY PORTER, DATED DECEMBER 8, 2005 | B120 |
| PORTIONS OF DEPOSITION OF NANCY CONLIN, DATED DECEMBER 8, 2005 | B126 |
| LETTER FROM BEVERLY HIRT TO SABRINA CORNING DATED NOVEMBER 5, 2002 | B130 |
| AFFIDAVIT OF KARI PRILLER | B131 |
| POLICE REPORT | B134 |
| PORTIONS OF KENT GENERAL HOSPITAL MEDICAL RECORDS DATED DECEMBER 20, 2002 | B136 |
| LETTER FROM DAVID HUGG TO HARVEY LEGGETT DATED DECEMBER 20, 2002 | B144 |
| LETTER FROM DAVID HUGG TO HARVEY LEGGETT DATED JANUARY 2, 2003 | B145 |
| DISCIPLINE ACTION WRITE-UP DATED JANUARY 6, 2002 [Should be 2003] | B146 |
| HAND-WRITTEN NOTES BY BEVERLY HIRT | B149 |
| PORTIONS OF TOWN OF SMYRNA PERSONNEL POLICY | B154 |
| EMPLOYEE PROGRESS REPORT, DATED MAY 12, 2003 | B161 |
| PORTIONS OF TOWN OF SMYRNA EMPLOYEE HANDBOOK | B164 |

APPLICATION FOR LEAVE,
DATED JUNE 16, 2003.................................. B170

PLAINTIFF'S TERMINATION LETTER,
DATED JULY 7, 2003.................................. B171

LETTER FROM KARI SMITH TO DAVID HUGG,
DATED JULY 18, 2003.................................. B172

LETTER FROM DAVID HUGG TO KARI SMITH,
DATED JULY 18, 2003.................................. B173

LETTER FROM KARI SMITH TO DAVID HUGG,
DATED JULY 30, 2003.................................. B174

LETTER FROM DAVID HUGG TO KARI SMITH,
DATED JULY 30, 2003.................................. B175

EEOC POLICY MANUAL.................................. B176

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,
Plaintiff,
v.
TOWN OF SMYRNA, DAVID S. HUGG, III, individually and in his official capacity as Town Manager; BEVERLY A. HIRT, individually and in her official capacity as Director of the Smyrna Public Library; and HARVEY LEGGETT, individually and in his official capacity as Supervisor of Streets/Foreman of Public Works,
Defendants.

: C.A. No.: 04-1286-JJF

COPY

Deposition of KARI M. PRILLER, taken pursuant to notice before Tanya M. Congo, a Notary Public and Certified Professional Reporter, at the offices of Akin & Herron, P.A. 1220 North Market Street, Suite 300, Wilmington, Delaware, on Monday, July 25, 2005, beginning at approximately 12:15 p.m., there being present:

APPEARANCES:

SCHMITTINGER & RODRIGUEZ, P.A.
414 South State Street
Dover, Delaware 19901
BY: NOEL E. PRIMOS, ESQUIRE
Attorney for Plaintiff

AKIN & HERRON, P.A.
1220 North Market Street, Suite 300
Wilmington, Delaware 19801
BY: BRUCE C. HERRON, ESQUIRE
Attorney for Defendants

Q. So that would have been some time between March of 2001 and July of 2002?
A. Right.
Q. And, then, in July of 2002 you assumed a new position?
A. Yes.
Q. And became a full-time employee?
A. Right. Although the position didn't really change. It added more hours in the same position.
Q. Did the title change?
A. They did change the title. I'm not sure if they did right when I was changed to full time.
Q. So your initial title was Clerk?
A. Clerk III.
Q. Clerk III.
A. And they changed the title to Children's Program Coordinator. It was the same exact job. They changed the name and added more hours.
Q. But your duties then didn't change?
A. No.
Q. When you received the full-time position, did you receive any additional employee handbook or personnel manual?
A. No, I may have gotten a new one, but it's

programs weren't that involved.

The next year I created more intricate programs and bigger events. So I had a lot more to do. So I'm assuming it was.

Q. So I just want to make it clear. So it's your recollection that sometime during the Summer of '02 you were told that you weren't allowed to access the Library after hours for safety reasons?

A. No, I was told I was not allowed to work after hours for safety reasons. It didn't say anything about accessing. In fact, I was the person on call for the alarm company. If the alarm went off, I was to go to the Library and turn the alarm off in the middle of the night or whenever it went off.

Q. But you were told in the Summer of '02 you weren't allowed to work in the Library after hours --

A. Right.

Q. -- for safety reasons, correct?

A. Right.

MR. HERRON: We'll take a short break.

(Recess)

BY MR. HERRON:

Q. Ms. Priller, before December 20th of 2002, did you know Harvey Leggett?

A. Before September -- December 20th you mean?

Q. December, yes.

A. Yes.

Q. How long had you known him?

A. I assume when I -- he worked in Public Works and so one of their job duties was to come and get our recycling from the Library, and that was generally how I met him and knew him. They'd come on Fridays for the recycling.

He helped with some of the programs that were outdoors, that sort of thing.

Q. That was my next question. So you had some contact with him at work before December of 2002?

A. Briefly. I would say we were acquaintances.

Q. And there were two main occasions where his job duties seemed to intersect with yours, and one was when they come to get the recycling from the Library?

A. Uh-huh. That was one that was, you know, a regular time. Others, you know, any time -- they were in Public Works, so any time we had a problem, you know, plumbing or any type, you know, like

repairs that would be made in the Library, it may have been him or it may have been somebody else from Public Works.

So they came on occasion as needed, and regularly to pick up the recycling.

Q. Before December 20th, 2002 had you ever seen him outside of work?

A. No.

Q. Tell me what happened on December 20th, 2002, leading up to the incident?

A. Beginning at what time?

Q. Well, did you work that day?

A. Yes.

Q. What were your hours?

A. It was a Thursday night, I believe. So I was working till 8:30.

Q. Did you have any discussions with Mr. Leggett that day before 8:30?

A. I don't know if while I was at work I talked to him.

Q. So you don't recall?

A. I don't recall.

Q. Do you recall whether you had any discussions with him at work in the week before the incident?

A. I had asked if he would help me move. And I'm pretty sure I brought that up at work because that's the only time I ever saw him. And I asked him if he would be interested to help me move, and I was going to pay him to help me.

So I don't know when that was that we talked about it, but --

Q. Do you have any idea when it was in connection with December 20th?

It was before December 20th, obviously, but do you know how long before?

A. Not really. I can't exactly say.

Q. What was his response?

A. Sure.

Q. What happened after you left work? Or did you leave work at 8:30?

A. Yes, I went home, changed out of my business clothes.

Q. Where did you live at that time?

A. I lived in Smyrna at a different address.

Q. What was the address that you lived at?

A. I can't remember the numbers. It was East Cook Avenue, but I don't remember the numbers for it. It was in Smyrna.

Q. So you went home after work?

A. Right. Went home, changed.

Q. What did you do then?

A. And we, at some point, had decided to meet at Bella Via, the Italian food place in Smyrna.

Q. When you say, we, who are you referring to?

A. Harvey and I.

Q. So when did you decide that?

A. I don't recall. But I do know that I had a phone conversation with him, but I don't remember except it was before he, you know.

Q. Was it that day?

A. To discuss going out. No, I don't think it was -- it was further ahead of time than that. It was when he asked if I would like to go have a drink.

I believe he asked me that at work. And, then, later we discussed it over the phone.

Q. Do you recall what day he asked you to go have a drink?

A. No.

Q. Was it within a week before December 20th?

A. It was fairly closer. I don't know the definite time, but it was pretty close to the date.

Q. And, then, when did you make definite plans, if you did, to meet him that night?



B 7

A. We made plans over the phone, and that's all I -- you know, I don't know how far ahead of time it was. Just that I remember he wanted to go to Wilmington or something, and I said, no.

But, basically, we just ended up deciding, why not go out after work on Thursday and go have a beer, and discuss the move.

Q. And was that discussion -- you said that was a phone call?

A. Right.

Q. Was that when you were at home?

A. Yes, I was at home then.

Q. And did you make definite arrangements to meet somewhere on that Thursday night?

A. Yes, we made arrangements to meet at Bella Via.

Q. Did you, in fact, meet him at Bella Via?

A. Yes.

Q. Do you remember what time that was?

A. I would say probably around 9:30, if I left work, went home, changed and, then, went there. Nine, 9:30.

Q. Is that an Italian restaurant slash bar?

A. It was not a bar, but they served beers. It's just a restaurant that served beer.

Q. What happened then?

A. We had a pitcher, a small pitcher of beer that we shared, and, you know, we talked about getting the truck and where to get it from.

I made a point of telling him that we were out as friends.

Q. I'm sorry.

A. I made a point of letting him know that we were only out as friends.

Q. Did he suggest otherwise, or --

A. No, but I just wanted to make sure because, you know, when he asked about going to Wilmington, you know, it made me think that perhaps he, you know, wanted it to be more than that. I don't know.

I knew that he wanted to go out. So I just -- he's the one that offered and I wanted to make sure that it's clear what was the purpose of us being there.

Q. Did you have dinner there or anything to eat?

A. When I generally had to work till 8:30 at the Library, I'd have dinner at the Library. It's kind of like a lunch hour but it's dinner hour.

Q. How much did you have to drink?

A. We drank the small pitcher of beer together and it maybe filled two Pilsner glasses, you know, one each, one for him and one for me.

Q. How long did you stay at the restaurant?

A. I would say maybe thirty, forty-five minutes.

Q. What happened then?

A. I wanted us to go play pool. So we went to a place he knew that had a pool table in town. And I don't know what the name of the place was at the time because it keeps changing names, but it was an Irish pub. I think now it's an Irish pub, too. It's on the corner of Market, South Market Plaza and Commerce Streets.

So we each drove separately there and we met again there.

Q. What time was that, approximately?

A. Maybe 10:00, 10:30.

Q. What happened then?

A. We played pool several times. We had a couple of beers each. I don't remember anything else special happening, just that we played pool and had some beers, talked.

And the only other thing that I remember that's unrelated is that a bat was in the

bar and they had to capture it. But that has nothing to do with anything. It's just that I remember it happening.

Q. How long did you stay there?

A. I'm not sure. We just played. I mean, I wasn't on any kind of time constraint, so I wasn't really paying attention to what time it was and I don't usually wear a watch, and I didn't have a cell phone at the time. So I don't generally check the time unless I had to be somewhere.

Q. Did you see anyone else you knew there?

A. No, but he did.

Q. Who did he see, did he tell you?

A. No, I don't know who they were. I just knew that he knew people at the bar.

Q. Did you see anybody else at the restaurant that you knew?

A. No, he knew the waiters and waitresses there, but other than that -- I mean, I'd recognize them because I've eaten there before, but I didn't know anybody.

Q. What happened after you stayed at the pool hall for awhile?

A. Well, I realized that I shouldn't drive. And I said that I should take a walk and just walk

around and maybe get some fresh air, you know. So I suggested we walk down Main Street, just walk, you know, up and around. We walked around the block that we were on. We walked over across to the Crystal Palace. And I think I actually went in there to use the bathroom, 'cause I know what it looks like inside.

Q. That's a bar?

A. That's another bar, yes, more for like kids, you know, not teenagers, but younger people.

And, then, we headed down Main Street. We were just walking and talking.

Q. Did you have any more beer --

A. No. No.

Q. -- at the Crystal Palace? So by that point you had three or four beers or how many?

A. Yeah, probably three, four.

Q. And Mr. Leggett had the same, or do you remember how many he had?

A. I think it was approximately the same.

Q. So you were walking down Main Street?

A. Uh-huh.

Q. What happened then?

A. Well, we were walking passed Faries Funeral Home, and there was a large plant on the curb

for pick up. And it was like a palm, you know, about four feet high. And so I -- at the time I didn't know it was an artificial plant. I thought it was real because it had such thick leaves. But -- so I decided to pick it up and take it to the Library to give to the Library 'cause they had a lot of plants in the Library.

So I --

Q. It was out in the trash?

A. Sitting on the curb. It wasn't like in a trash can, but, you know, often they have flowers and plants out because it's a funeral home.

So I just happened to notice it and decided to give it to the Library and keep it for the Library. So I -- the funeral home is maybe half a block from the Library. So I just continued walking. We went, you know, I said, I'll go put this on the desk, which is what I did. I took it inside and put it on my desk.

Q. So you had a key to the front door of the Library?

A. A key and the alarm code.

Q. You had to have both to enter the Library?

A. Yes.

Q. And did Mr. Leggett enter the Library with

you?

A. Yes.

Q. Did you have any discussion about going into the Library other than your saying, I'm going to put this in the Library?

A. No, I just said, I'm going to drop this off on my desk, or something to that effect.

Q. And you put it on your desk?

A. Yes.

Q. Where was your desk in relation to the front door?

A. It was -- well, Bev had her own office which was right next to the main office which the rest of us shared. So my desk is in the middle of the office.

Q. What happened then?

A. Then I went to the kitchen to get a Pepsi 'cause I thought a soda or something might be helpful.

Q. Do you have any idea what time it was by this point?

A. I know the bar wasn't closed when we left it.

Q. The Crystal Palace?

A. Either one, 'cause they're right across

the street from each other.

Q. What happened then?

A. I was standing at the sink opening a Pepsi, and he just kind of came up behind me out of nowhere and said something to the effect of, you know, for me to suck his dick, is what he said, which I was surprised.

I said, no, I don't think so, and was leaving the kitchen and he was like -- kind of like hugging me from behind. He wasn't using a lot of force, but he had his arms around me and I was walking away from him.

And I -- directly in front of the door to the kitchen there's a library table with chairs around it that patrons use. And he pushed me over the chairs onto the table. And I couldn't really get off of it because my back was on the chair which was above the level of the table.

And, you know, I told him no, and he just pretended like I didn't say anything and took my pants off. And I didn't know what to do because I'd never been in a situation where you said, no, and someone didn't respond to you saying no.

And so I was, you know, I didn't say anything else right then. And, then, he pulled me



B 15

down onto the floor next to the chairs and, you know, proceeded to rape me.

And I, maybe for several minutes, just was frozen and was trying to figure out what to do. And finally I bolted up and went around the table and crawled away around the table, and he followed me and knocked over a lot of literature that was on the information rack.

I wasn't looking behind me but I could hear him because of all the stuff falling over. And I continued just going around the table trying to get back over by the kitchen where the ramp is to go to the rest of the Library. And he followed me and continued -- he caught me and continued.

And at that point I was crying. I was telling him to stop, told him no, what are you doing, you're raping me, stop it.

And he just acted like I wasn't there or pretended not to hear me. And I threw up and was just laying there crying. And he still didn't stop. I threw up again, and, then, he finally got up.

And I stayed there for maybe a couple of minutes or a minute. I don't really know. I went to the bathroom. He followed me to the bathroom. I was getting sick in the bathroom.

He started saying how I better not go around saying that he tried to rape me or tell anybody or -- I couldn't hear all he said because I was yelling at him to leave and get away from me, to get the hell out. That's what I kept telling him, get the hell out and to get away from me, which he did.

And after I composed myself somewhat I went back into the area where the table was and found my pants, put them back on, tried to clean up the mess he created. Put the chairs back up that had fallen over. Tried to clean up the vomit on the floor.

And, then, I called Eric, who I was living with at that time to come and get me, but I didn't say why. I just said, come and get me.

Q. Do you want to take a break?

A. No. Okay. So I told Eric to come and get me. I left the Library, walked up, and I started walking down the street toward the lake.

Q. Where was Mr. Leggett?

A. He had left.

Q. Do you know at what point he left?

A. Know what?

Q. Did he leave before you called Eric, do



B 17

you know?

A. Yes, he left, as far as I know, when I was in the bathroom.

And I started walking toward the direction that Eric would be coming from which was towards Lake Como. And I saw Harvey drive down the street. And I was walking and I got up to the corner, and I don't remember the street name, but it's the street he lives on, I know that. And he turned the corner right in front of me.

Then, as soon as I saw his car, I stopped and turned around and walked the other direction.

Eric finally came and caught up with me while I was walking back toward the Library.

When I was in the car I told him what happened, and he wanted to call the police. I didn't want to call the police. And we went home and he kept saying he was going to call the police, and he did.

Q. So there were two separate assaults; is that correct?

There was the first time --

A. In the Library?

Q. Yes, in the Library?

Q. This happened on Thursday night. When was the next time that you were back at work after this incident?

A. I believe Monday. I got a doctor's note for the next day. Well, for the 20th because the incident happened in the wee hours.

Q. You were scheduled to work Friday?

A. Friday.

Q. So that would have been the next Monday that you came into work?

A. Yes.

Q. Did you report or discuss the incident with anyone at work?

A. No.

Q. At any time did you discuss the incident with Ms. Hirt?

A. I don't know if I got into details but, yes.

Q. Tell me when as far as you can remember when you first discussed it?

A. I don't know. That was a confusing difficult time. It was not a good time.

Q. Now, I think you said earlier that you recall coming from the meeting with Mr. Gary and going to work; is that correct?

A. Yes, I think I took a break before I went back to work and went home. It took me maybe 30 minutes to, again, compose myself, and clean, you know, my face, get ready to go back to work.

Q. Do you remember if that was in January?

A. I don't remember, but I assume it was January.

Q. Was it shortly after the December 20th, '02 incident?

A. Relatively speaking, yes. I really don't know. It was before March and after December is all I can tell you.

Q. And tell me specifically what you remember about the conversation with Ms. Hirt?

A. Well, I walked into work. She had some computers for me to put together. We had received computers from some Microsoft grant or something. So we had like eight computers that had to be set up.

And I was setting one up in her office. And we were in there together in her office. And that's when she brought it up. And as soon as she brought it up, it made me upset and I walked out of her office. I stood up. I didn't say anything. Stood up, walked out, walked into the main office. I walked into the closet of the main office because

that was really the only private area in the Library except the bathroom, and that was the nearest spot. I went in the closet and she followed me.

Q. You say she brought it up. What specifically, as best you can remember, did she say?

A. She said that she heard that they weren't going to prosecute.

Q. Do you recall anything else that she said?

A. Not in her office, no.

Q. And you got upset and walked away. She followed you?

A. Yes.

Q. Then tell me what happened and all the conversation you can recall?

A. She came in the closet and -- I don't remember the whole conversation but, basically, she started talking about something that happened to her when she was a child, and, you know, similar events.

And that's all I really remember because I was just upset and crying.

Q. Other than that conversation with Ms. Hirt, was there any other time that you discussed the incident or Mr. Leggett with Ms. Hirt after December 20th, 2002?

A. I remember having -- I remember a comment

she made after the prior conversation, her saying, kind of like, I told you so, because when Harvey had asked me about drinks, I asked Bev and Betty what they thought about that, about me going to have drinks with him.

And Bev told me of a time when Harvey had been in her office, you know, maybe on a Saturday, I'm not sure, and he had like liquor on his breath, is what she told me.

And that he said she had a nice ass, were her words. And that she told him to get out, leave, stay away from her. And for that reason that I should not go anywhere with him.

And Betty's reaction was, how it would look in Smyrna because interracial -- like we would be perceived as an interracial, you know, a couple, just if people see us out together, and that might not be good.

But I'm from a big city and there's a lot of interracial couples and I wasn't a couple with him so I really didn't care about that.

Q. Did she specifically say, I told you so? Do you remember what words she used?

A. There was something very similar to that. I told you that would happen, or I told you that's

how he was, or something to that effect.

Q. Was this at the same time you had this other conversation with Ms. Hirt?

A. No, I don't remember. It was -- I mean, I don't remember when, you know, just conversations we had. I remember that they happened.

Q. Do you remember any other times when --

A. She put some literature on my desk about some program through work for counseling or something.

Q. Any other times you remember discussing with Ms. Hirt about the December 20th, 2002 incident or Mr. Leggett?

A. Yes, he came to the Library to do work outside the Library. I didn't know he was out there. They were sandblasting the sidewalk or something, and Bev asked me to go -- specifically asked me to go do the book drop, which is located right -- like two feet from where he was working.

And I went to the door before I even saw that he was there. I asked Bev, did she know he was out there, and she said, yes, she knew it.

So she already knew ahead of time he was out there. And I said, well, I can't go out there. I'm not going to go out there. And she, you

know, said, fine, she would do it, and that, you know, it's not like he's going to attack you or something, is what she said. Those were her exact words. I remember very clearly.

And, you know, I was angry that he was there, and her just acting like it's no big deal or that I should just get over myself was her attitude.

Q. Did she do it though?

A. She did go out and do it.

Q. Any other time that you recall now where you discussed Mr. Leggett or the incident of December 20th with Ms. Hirt?

A. No, Bev and I weren't very close so I would not have discussed all the details with her.

Q. Did you ever have any discussions with Mr. Hugg regarding the incident, or Mr. Leggett?

A. Yes, after that incident I just explained happened, I called him up and made an appointment directly with him to talk to him about the whole thing, Bev, him being out there. And I don't think I told him at the time what it was about, but that's what it was, regarding that.

And it was for the next day. So I went the next day and talked to him about it.

Q. Tell me what you recall about that

discussion?

A. Well, I started with, it really bothered me that Harvey was so close to the Library where I needed to be working. And he was like interrupting my work by being there. And that he should not be there.

And, you know, I discussed with him just how hard it was anyway seeing the Town trucks, seeing him around town driving, not being able to go to any Town functions because he would be there. Like we had the Town picnic coming up, and I couldn't go because, you know, he could be there.

So I discussed that with him. I discussed what Bev did, what she said. I said, I couldn't handle him being there.

And I finally asked him about what the process for filing a sexual harassment claim. And he made copies of the relevant sections from the Personnel Handbook which is a larger version of the Employee Handbook and it had everything spelled out because it's not really gone into detail in the plain handbook.

And he told me that I would need a lawyer; that I would have to go in front of the Town Council and explain my case, or make my case.

So basically made it sound very bad, you know. And he didn't offer me any type of paperwork to fill out or, you know, wasn't helpful in any way.

And when I got back from our meeting, I called a lawyer, and it was $250.00, and I was making $20,000. I lived alone with my child. So I didn't make a claim because I didn't have a lawyer.

Q. He gave you a copy of the Town's sexual harassment policy?

A. Yes.

Q. Did Mr. Hugg say anything during that meeting about Mr. Leggett's job duties --

A. Yes.

Q. -- and interaction with the Library?

A. He said that he was the only one who knew how to sandblast. That was basically the only thing he had to say about it. Just that he wasn't -- I mean, he reiterated that he wasn't allowed in the Library when I was there, but that really wasn't helpful because that wasn't my problem.

Q. After December 20th, 2002, did Mr. Leggett continue to do the recycling duties he did before for the Library?

A. No, in fact he may have not even been

A. I would agree with that portion of what it says here, yes, where it says work late because that's specifically what she said about it.

Q. But I take it from your answer you dispute the portion of it where it says, work late or come into the Library after hours?

A. Yes.

Q. Why do you dispute that portion of it?

A. Because she allowed me to do that and never said at any time that we couldn't come in and drop something off. And as I said, she allowed me to go in there with my family. And for the Summer Reading sometimes I dropped things off at the Library.

Q. Did you drop things off at the Library after hours?

A. Yes.

Q. How often did you do that?

A. Two or three times.

Q. Was Ms. Hirt aware of that to your knowledge?

A. She must have -- well, as far as I know because they have a thing where -- like for the Summer Reading Program, for instance, in 2002 for the Summer Reading Program I made a -- it was like for

the carnival and it had like balloon darts. And I made like the back for that out of wood.

And I made something else out of wood, too, that year -- you know, that kind of stuff, where it's big and I just wanted to put it there and have it there already ready to go. I don't remember anything other than those two, things that I would drop off, but I don't remember there ever being any kind of policy about not going in and dropping things off at the Library or anything to that affect.

My understanding of the not working part was that she wasn't there to see me work, you know, and I was there alone for hours late at night.

Q. Well, she had told you that for safety reasons you weren't permitted to work late after hours in the Library; is that correct?

A. Did she say that; is that what you're asking?

Q. Yes.

A. Yes.

Q. Priller 8, which is a March 3rd, 2003 memo, have you seen that memo before?

A. Yes, not with the note at the bottom though.

Q. Is that Ms. Hirt's writing?

A. I haven't seen -- yes, that's her writing. I haven't seen this particular copy of it, but I've seen the memo, itself.

Q. You've seen the memorandum except for the handwriting at the bottom?

A. Correct.

Q. Do you know why were your hours changed?

A. What was the date of this?

Q. March 3rd, 2003.

A. I don't remember why it was changed to -- unless possibly I was still working evenings, and they changed it to make me work days. But I think that they had already done that. I'm not sure though, 'cause before I was working a split schedule. I was working late on Tuesdays and Thursdays and during the day on Monday, Wednesday, Friday. And that may have been this was where they changed it to all of day shift, 9:00 to 5:00, that job.

Q. Do you recall any discussion with Ms. Hirt about this change in your scheduled hours?

A. No, again, she would just give me the memo. Here's a memo, that's it.

Q. But here it says, told her I was sorry for the mistake. Do you know what she's referring to there?

A. The -- well, it points to the two fifteen-minute breaks.

Q. But she says breaks are ten minutes. Do you recall anything about that?

A. Right. Later she did tell me that they were ten minutes. But there was a long period of time when we thought breaks were fifteen minutes long, 'cause there was another memo somewhere that was earlier that said fifteen minutes on it also that was not changed. This is like a year before or something.

I don't remember what the exact memo was, but I did receive it.

MR. HERRON: Let's mark this Priller 9.

(Whereupon, the document was marked as Exhibit Priller No. 9 for identification.)

BY MR. HERRON:

Q. Have you seen this document marked as Priller 9 which is titled Employee Progress Report and is dated May 12th, '03?

A. Yes.

Q. And that's your signature on the second page of the document?

A. Yes.

Q. The last one is three pages. When you signed it, was the third page attached?

A. Yes.

Q. Do you recall having a discussion with Ms. Hirt about the matters raised in this document?

A. I don't know if we discussed -- again, the first paragraph is basically the same as the last evaluation except for she has on that I refinished the conference table.

The second paragraph discussing this chain of command, I don't know if we discussed this when she gave this to me or not. But I know I was mad because I shouldn't have had -- it wasn't a proper chain of command, you know.

I had a problem with her and I went to her supervisor about a problem I had with her. So --

Q. Is this March 11, 2003 incident the incident that you've already testified to regarding Mr. Leggett --

A. Yes.

Q. -- being close to the Library?

A. Yes. And my problem with how she handled the situation. So part of it involved her and that is why I didn't go to her.

And actually I did go to her about the

problem with Harvey. I said, I'm having a problem with this. She said, you know, I'm sorry, you have to, basically, you know, he's not going to attack you. I'll go out and do the book drop.

So to me, that was a discussion I had with her about it. It wasn't resolved, I went to her boss.

Q. Do you know what she's referring to when she refers here in the second paragraph of page 3, she made the complaint based on a misunderstanding which did lead to two weeks of her silence?

A. Just that I wasn't very chatty with her after that, you know. I was upset about it and, you know, of course I didn't want to be friendly with her when I was upset about something she did. I didn't go out of my way to be hostile to her. I just didn't talk to her, you know, unless she had something -- unless she asked me a question, I would answer her.

Q. After you met with Mr. Hugg, did Ms. Hirt ever discuss you going to Mr. Hugg with that incident?

A. I don't believe so until this. I don't think there was anything mentioned about it.

Q. When you say, until this, you mean until --

A. Until she wrote it on here.

Q. And when she wrote --

A. I don't remember there being a discussion about it with her.

Q. Do you remember a discussion with her on May 12th of '03 --

A. When this was stated?

Q. Yes.

A. No, I don't. I don't specifically remember us going over this, you know, besides just going over the evaluation overall.

Q. Do you remember anything about what she said or what you said during the counseling session regarding this evaluation?

A. No, but as I said before, generally if I was upset about what I read in terms of the evaluation, I did not say anything. I would just not say anything and read it and, you know, go back in my office. I didn't really discuss it with her because I would be upset about it.

Q. Do you know what she means here in the second paragraph where she says, on two other occasions the dress code policy was not followed during program nights?

A. I don't know except for maybe I dressed

down for some program we were having that was, you know, messy or, you know, required a lot of motion, I guess, a lot of stuff that was like physical activity.

Q. Were you, in fact, given a copy of the grievance policy?

I'm referring to the second last paragraph there.

A. I don't know, but the grievance policy is in the Employee Handbook. So perhaps she gave me a copy of that, or we just went over it again or something.

Q. At this point in May of '03, how many employees did the Library have?

A. I believe full time four besides the Director.

Q. Who were they?

A. Betty Porter, Anne Lane and Nancy Conlin.

Q. How many of those worked full time?

A. None except for my position.

Q. The others were all clerks?

A. Yes.

Q. And I take it you don't recall whether or not you were given an opportunity to make any written comments regarding this Employee Progress Report?

A. Not that I know of.

MR. HERRON: Priller 10.

(Whereupon, the document was marked as Exhibit Priller No. 10 for identification.)

BY MR. HERRON:

Q. What's been marked as Priller 10 is a Report of Employee Counseling dated May 30th, 2003. Have you ever seen this document before?

A. Yes.

Q. Do you recall a discussion with Ms. Hirt about the incident referred to in this document?

A. Do I remember her talking about it after it happened?

Q. Well, tell me what you recall about it?

A. What I recall is that she got in trouble with her boss, and basically passed the buck down to me and -- because we had I think two programs scheduled that overlapped with Parks and Rec, the Town's Parks and Recs programs.

And I guess her boss said something to her about it, you know, like it's not acceptable.

Q. Who was her boss?

A. Well, actually, I think the person that was in charge of Parks and Rec was the Assistant Town Manager, Kimberly Schlicking, and I believe it was

Kim that spoke to her about it. But possibly Dave Hugg also. So, you know, the Assistant Town Manager and Town Manager. I don't know.

MR. HERRON: Priller 11.

(Whereupon, the document was marked as Exhibit Priller No. 11 for identification.)

BY MR. HERRON:

Q. Let me show you Priller 11. It's related to Priller 10. Priller 11 is a May 30th, 2003 memo from you to Beverly Hirt; is that correct?

A. Yes.

Q. And it's a memo that you wrote around that time?

A. Yes.

Q. And it contains your comments and your explanation regarding the incident which is the subject of Priller 10; is that correct?

A. Right.

Q. And do you recall ever having a discussion with Ms. Hirt before this regarding scheduling programs on Thursday nights?

A. No, other than as it states here that on a particular Thursday evening that I wanted to schedule an event the previous year, all she said was that I couldn't have a program that night because Parks and

Rec had a program.

It wasn't brought out that, you know, you need to make that you don't ever schedule programs on Thursday nights in the Summer because Parks and Rec has programs. It was never put that way.

So all I knew was that one Thursday night I wasn't allowed to have a program, and so I changed it to a Tuesday. And nothing else was ever mentioned of it.

Q. Were you ever told that before scheduling programs you needed to check with Parks and Rec to see if they had any programs on the same night?

A. There was nobody that I ever had to check with ahead of time to schedule programs except for our own calendar in the Library and our own things that were going on.

Q. The handwritten note at the bottom of Priller 11, is that Ms. Hirt's handwriting?

A. Yes, as far as I know.

Q. Did you ever see that writing before today?

A. No, I wrote this and just gave it as a memo and that's the last I heard of it.

Q. Do you have any idea what the phrase, no

action taken, refers to?

A. Well, the last request that it be -- this be removed from my file.

Q. So that's what you think it refers to?

A. Yes. They did not remove it from my file, yes.

MR. HERRON: Priller 12.

(Whereupon, the document was marked as Exhibit Priller No. 12 for identification.)

BY MR. HERRON:

Q. Let's go to Priller 12. This is an Application for Leave dated 6/16/03. Is that your signature on there?

A. Yes, it is.

Q. And did you fill this application out and sign it, or at least the top half of it?

A. Yes, I filled out the top half.

Q. Did you have a discussion with Ms. Hirt about this leave application on or about June 16th, '03?

A. Did I have a discussion with her then?

Q. Yes.

A. I gave it to her and, yes, we talked about -- well, first, before I filled it out, we talked about leave. I wanted to go to Virginia for my son's

birthday, you know, take him there for his birthday.

So what I was basically asking for was like a long weekend. And she talked about the program that I had scheduled Tuesday or Thursday night, whatever it was for 6:00 to 8:00 p.m. And she said that -- because I told her that, you know, Nancy could do it. And she said, no, Nancy's on vacation.

I said, okay. Well -- and, then, she had another issue with the fact that she was on vacation, Beverly was. So even though she was going to go on vacation, she still approved this as long as I came to do the program. And that was fine, so I turned this in.

Then --

Q. Let me stop you for one second.

A. Okay.

Q. And ask you, when you had the discussion, the initial discussion with Ms. Hirt regarding a leave, did you tell her that the reason you wanted the leave was that you wanted to go to Virginia?

A. I probably brought it up, but I don't know if I did say that, just that I requested the time off. But that was the purpose of the time off.

Q. You don't recall that you told Ms. Hirt that, the purpose?

A. No, I don't know if I specifically said I was going to Virginia.

Q. But you do recall you had discussion with her and she brought up the reading program on July 1st?

A. Right, 6:00 to 8:00 p.m.

Q. And you told her, at that point, that you would return to conduct the reading program?

A. Right. I think we did talk about Virginia because when we talked about this, I said that -- because I wanted to leave this day, 6/30, and I said -- I said, that's fine. Instead I'll just leave right after that early in the morning. And that's fine.

And I also said that I needed to bring my son because I didn't have a babysitter for him that night, which is why it says down here, no babysitter.

Q. So you did specifically discuss you would bring your son in to the Library during the Summer Reading Program?

A. Right, during the event.

Q. During the event. Okay. And you think that you told Ms. Hirt you were going to Virginia, but you're not sure?

A. No, I remember just chatting about it in the office. I don't know if I specifically went and said, I'm going to Virginia.

Q. Who ended up conducting the reading program on July 1st?

A. Nancy did.

Q. Tell me how that came to be?

A. Well, after I gave this to Bev, Nancy came in. I heard her -- she went straight to Bev's office. I told her --

Q. Nancy went straight to Bev's office?

A. When she came in this day, she went to Bev's office and said, my vacation is canceled. I heard her talking about it, because I was thinking, oh, great, that's wonderful, you know.

Q. On June 16th?

A. Right. When I requested this.

Q. You spoke with Ms. Hirt first and she signed this. And, then, later that day Nancy --

A. Nancy.

Q. -- came in and went into Ms. Hirt's office?

A. Right.

Q. Go on.

A. And said to her -- you know, I heard her

talking about how her vacation was canceled, why it was canceled. And so -- because one of the problems Bev was having with giving me this whole amount of time off was the fact that so many people were off, and I can remember discussing with her, well, we have this volunteer this day, and Betty and me will be here these hours. So everything is covered that needs to be covered.

So I remember when Nancy said -- you know, I heard say that, I thought, oh, that's great because then there's not so much of an issue about if there's -- everything's covered. And that now she -- if she's willing, she could do this program for me and I won't have to do it. And, then, I can leave on the 30th, which I discussed with her when she came in the office, our office.

Q. When you say, discussed with her, you mean --

A. Nancy. I mean, I had asked her previous to this if she would ever be willing to do a program. I had never asked her to do a specific program. But she was more than willing to do a program. And so when this came up I asked her if she would do this program.

Q. You asked her on that same day, June 16th?

A. Yes.

Q. Did you inform Ms. Hirt?

A. Yes, I popped my head into her office and said, hey, don't worry it. Everything's great now, you know, Nancy's off, she's going to cover this and everything's covered, so we're good.

So I did not give this back and change it. She had it right there.

Q. Tell me what you said when you popped your head in her office?

A. I said what I just said; that everything was fine now. Nancy could cover it. Nancy would be there for all these other days when Bev wouldn't be there. So, you know, it was better because, you know, Bev would feel better now because everything was covered.

Q. Did you say Nancy would cover the --

A. Yes.

Q. -- Summer Reading Program, or just --

A. Yes.

Q. -- say cover it?

A. No, I said that Nancy could do this program, you know, that she can do this now. So everything's fine.

Q. And what did Ms. Hirt say?

A. It was fine. That's all she -- you know, I don't know exactly what she said, but it was in the affirmative, like okay, great, fine, whatever, you know.

Q. Do you have any idea how much time went by between the time that you discussed this with Ms. Hirt and the time that you popped in and told her everything was fine?

A. I don't know, but I think -- I would think it was earlier in the day at some point. And Nancy came in at 4:00, I think, that day. And so it would be right around when Bev was going to leave at 5:00. And I gave this to her at some other point in the day. I don't know. Before Nancy got there, I know that.

I mean, I know that hadn't gone to Town Hall yet because it was the same day.

Q. When was your son's birthday?

A. June 27th, but we were celebrating it that weekend.

Q. So when you initially requested the leave, it was your intention to return when?

A. On the 3rd, most likely, 'cause the vacation went all the way through the 2nd at 5:00 p.m. And, then, I was going to return on the July

A. Yes, every Friday morning for the whole year.

Q. And was it part of your job duties that you would conduct those?

A. Right.

Q. The whole time you were employed there?

A. Yes.

Q. If you couldn't work or another employee couldn't work on a particular day, I believe your Interrogatory Answers indicate that you would cover each other's absences?

A. Right. We just kind of worked our hours around -- you know, Betty would come in and say she had a doctor's appointment such and such a time. So either we'd switch hours or, you know, make up her hours another time if we didn't need to switch.

And a lot of times if we had to switch, we'd just -- you know, I need these two hours off in the middle of the afternoon and you have evenings. So I'll come in and do them for you, you know.

Q. Was that discussed with Ms. Hirt?

A. Not that I was aware of. I mean, except for us to just say -- after we had discussed it and decided what to do, just say, hey, Bev, here's what