118

1  we're doing.  That's all I remember of it.  We didn't

2  ever ask ahead of time until we decided what to do,

3  or ask her to change the schedule beforehand.

4      Q.   How often did that happen?

5      A.   I don't know.  It wasn't very often.  It

6  was usually due to a doctor's appointment or

7  something.  It wasn't all the time.

8      Q.   Going back to June of 2003, do you recall

9  that Ms. Hirt was on vacation, I believe it was the

10  week before 4th of July, between June 23rd and June

11  30th?

12      A.   Right, I think we missed each other by a

13  day or our vacations overlapped by a day.

14      Q.   Before Ms. Hirt left for vacation, do you

15  recall having a discussion with her about the key to

16  the payroll deposit box?

17      A.   Yes, it was -- well, no, it wasn't payroll

18  deposit box.  It was our money box or our cash

19  drawer, you know, for buying.  And she usually kept

20  it hidden in her office somewhere.  So she said --

21  since she wasn't going to be there I had it on my key

22  ring to use in the mornings to count the money, to

23  use in the evenings to put the money away.

24          So, yes, I did.

25      Q.   Do you know when that discussion occurred

B 46

119

1  before June 23rd?

2       A.   No, I just know that, you know, we went

3  over what was -- how things were going to change

4  while she was on vacation, and how things would be a

5  little different, you know, I'd be using the key, and

6  Nancy would be doing this, that kind of stuff.

7       Q.   Did you tell Ms. Hirt that you would drop

8  the key off to her early on Monday, June 30th?

9       A.   I told her that I would leave it or drop

10 it off or something to that effect.  I don't know

11 what the date was though, so before I left.  I know

12 it was before I was to go away and be on vacation.

13      Q.   Did you do that?

14      A.   No, I forgot.

15      Q.   Where was the key?

16      A.   It was still on my key ring when I left

17 for Virginia.  And when I got there, I realized that

18 I had it.

19      Q.   When did you leave for Virginia?  June

20 30th was a Monday.

21      A.   I'm assuming it was the 30th.

22      Q.   You're assuming or --

23      A.   This was a Monday you said?

24      Q.   I believe June 30th was Monday because --

25      A.   So possibly I left either Saturday or

120

1    Friday night or something.

2        Q.    You weren't scheduled to work Saturday or

3    Sunday, the 28th or 29th, correct, or is that

4    incorrect?

5        A.    No.  No.  Yeah, we didn't have Saturday or

6    Sunday closings or I wasn't scheduled to work then.

7        Q.    So you may have left --

8        A.    Friday after work or Saturday morning.

9        Q.    And once you realized you had the key, did

10   you do anything?

11       A.    There really wasn't much to be done

12   because I wasn't -- I didn't know what to do with it.

13       Q.    But you don't recall specifically telling

14   her you would drop the key off on Monday, June 30th?

15            Your recollection is --

16       A.    I recall telling her I would drop it off,

17   but I don't recall if I said then or not.

18       Q.    Your leave as approved by Ms. Hirt

19   concluded on July 2nd?

20       A.    Yes.

21       Q.    And that was a Wednesday, I believe at

22   5:00 p.m.

23       A.    Yes.

24       Q.    Did you return to work on July 3rd?

25       A.    No, I called her on Tuesday or Wednesday

121

1  to let her know that -- well, no.  Actually I

2  remember.  I called first the day of the program.  I

3  called before the program to make sure Nancy had

4  everything she needed.  I called after the program to

5  make sure it went well.

6           And I also told them that my car was

7  broken down, and that I was going to call back in the

8  morning and let her know, 'cause I asked if she was

9  there at that time that I called.  She wasn't.  So I

10 said, I'll give her a call in the morning and let her

11 know the car's broken down and I have no way to get

12 back.

13     Q.   So when you called on the 1st two times,

14 you didn't speak to Ms. Hirt?

15     A.   No, I just spoke to Nancy.

16     Q.   And, then, did you speak to Ms. Hirt on

17 the 2nd?

18     A.   Yes.

19     Q.   Tell me what you recall you said?

20     A.   I said that my car was broken down and

21 required $1800.00 worth of work to be done to it and

22 that I'm -- the best course of action was for me to

23 get a new car.

24           So I was going with my mother -- my

25 mom took off work, my sister took off work and we

B 49

122

1   went to try to go get me a car.  And we were all day

2   trying to get a car, and weren't able to.

3                   And I called her at another point, I

4   don't know what day.  I called her and let her know

5   that I definitely would be back Monday, 'cause even

6   if my parents had to drive me -- my mother and my

7   sister had to drive me back home if I was not able to

8   get a car.  Either way, I'd be there Monday.

9        Q.   What did she say?

10       A.   As far as I know, it was okay.  She didn't

11   mention anything about the program.  She didn't

12   mention anything about the key.  She didn't mention

13   anything about that she was going to fire me.  She

14   didn't mention anything.

15       Q.   When did your car break down, or when did

16   you have a problem with it?

17       A.   I don't know except I was in Virginia.  It

18   was the brakes I was having trouble with, and once

19   they brought it in for that, they realized there were

20   other problems with it that needed to be addressed.

21       Q.   What kind --

22       A.   The car was -- it was like an '86 Bronco,

23   too, so it wasn't worth fixing.  That's why we

24   decided to get a different car, a newer car instead.

25       Q.   Who went with you on the trip to Virginia?

B 50

123

1    A.    Who drove down all the way to Virginia

2    with' me?

3    Q.    Yes.

4    A.    I believe it was just my son and myself.

5    Q.    And, then, you stayed with your parents?

6    A.    No, with my sister.

7    Q.    Your sister.  When did you return to

8    Delaware?

9    A.    Monday, the -- whatever date that was,

10   7th, 6th.

11   Q.    When were you scheduled to work that day?

12   A.    Every day was 9:00 to 5:00.

13   Q.    Did you go to work at 9 o'clock?

14   A.    Yes.

15   Q.    Tell me what happened then?

16   A.    Immediately when I arrived there someone

17   from Town Hall was over there.  One of the guys that

18   works in the Town, like the Business Office.  And Bev

19   said she wanted to go ahead and do my six-month

20   evaluation or whatever immediately.

21          So, you know, I thought it was odd

22   that he was there and he went in to do the

23   evaluation.  Like he was with us while we did the

24   evaluation.

25          Basically it wasn't an evaluation.  It

B 51

124

1  was just her saying I was fired.

2       Q.    Do you know who the guy was?

3       A.    I don't remember his name, but there are

4  only a couple guys that work in the Town Hall

5  Business Office, and it wasn't the computer guy.  He

6  had something to do with accounting or something like

7  that.

8                 MR. HERRON:  This is Priller 13.

9                 (Whereupon, the document was marked as

10 Exhibit Priller No. 13 for identification.)

11 BY MR. HERRON:

12      Q.    This is a July 7, 2003 letter to you from

13 Ms. Hirt.  Is this the letter that she gave you on

14 July 7, 2003?

15      A.    Right, on Monday.

16      Q.    Tell me what you recall that she said

17 during that meeting on July 7, 2003?

18      A.    She stated what's written here.

19      Q.    She, in essence, read the letter to you?

20      A.    Or paraphrased.

21      Q.    Did you say anything?

22      A.    No, not until she was done talking.

23      Q.    What did you say then?

24      A.    I don't recall exactly what I said, but

25 that I was angry.  And I said something like I

B52

# In The Matter Of:

*Baker   v.*
*Town of Symrna*

---

*Harvey Leggett*
*March 22, 2005*

---

*Corbett & Associates*
*1400 N. French Street*
*P.O. Box 25085*
*Wilmington, DE   USA   19899*
*(302) 571-0510    FAX: (302) 571-1321*

Original File 050322V2.ASC, 74 Pages
Min-U-Script® File ID: 0597817971

# Word Index included with this Min-U-Script®

Harvey Leggett                                                      Baker
March 22, 2005                                              Town of Symrna

---

Page 36

[1]  **A:** Yes, Sun Times.

[2]  **Q:** I'm sorry?

[3]  **A:** Sun Times.

[4]  **Q:** Is that the local Smyrna paper?

[5]  **A:** Yes.

[6]  **Q:** Weekly paper?

[7]  **A:** Yes.

[8]  **Q:** Mr. Godwin, did he have any landscaping

[9] background?

[10]  **A:** I don't think so.

[11]  **Q:** Now, in your position as a foreman in the

[12] Department of Public Works at the town of Smyrna, are

[13] you required to have a driver's license?

[14]  **A:** Yes.

[15]  **Q:** Are you required to have what's known as

[16] a CDL license?

[17]  **A:** Do you want to see it?

[18]  **Q:** I just want to know if you're required to

[19] have it.

[20]  **A:** Yes.

[21]  **Q:** And why are you required to have a CDL

[22] license?

[23]  **A:** To drive big trucks.

[24]  **Q:** What type of trucks have you had the

Page 37

[1] occasion, even if just once, to drive on behalf of

[2] the town of Smyrna?

[3]  **A:** All of them.

[4]  **Q:** Can you describe them for me. I don't

[5] know what they are.

[6]  **A:** Big dump trucks.

[7]  **Q:** I'm sorry?

[8]  **A:** Dump trucks.

[9]  **Q:** Dump trucks?

[10]  **A:** Yes.

[11]  **Q:** What tonnage are we talking about?

[12]  **A:** I'd say about 10,000.

[13]  **Q:** 10,000 pounds?

[14]  **A:** Yeah, whatever.

[15]  **Q:** And what else besides dump trucks?

[16]  **A:** That's it.

[17]  **Q:** Pickup trucks?

[18]  **A:** No, you use —

[19]  **Q:** Regular license for that?

[20]  **A:** Right.

[21]  **Q:** But there are dump trucks that the town

[22] has that you've driven that require a CDL?

[23]  **A:** Yes.

[24]  **Q:** Anything else besides dump trucks?

Page 38

[1]  **A:** No.

[2]  **Q:** Now, during the time that you — let me

[3] back up.

[4]    As a — multiplication?

[5]  **A:** Yes.

[6]  **Q:** As a multiplication worker, you were

[7] required to have a driver's license?

[8]  **A:** Yes.

[9]  **Q:** And a CDL?

[10]  **A:** Yes.

[11]  **Q:** So the whole time that you've been an

[12] employee of the town of Smyrna, were you required to

[13] have both the regular driver's license and the CDL

[14] motor vehicle license?

[15]  **A:** Yes, I have.

[16]  **Q:** Okay. Now, while you've been an employee

[17] of the town of Smyrna, is it accurate that you have

[18] been arrested and convicted for driving under the

[19] influence of intoxicating liquor?

[20]  **A:** That's my personal business. That was

[21] from out of the town.

[22]  **Q:** I understand that.

[23]  **A:** So that's my personal business. Okay?

[24]  **Q:** Yeah, but my question is, did you have a

Page 39

[1] DUI conviction?

[2]  **A:** Yes.

[3]  **Q:** And did you lose your driver's license

[4] because of it?

[5]  **A:** Yes, I did.

[6]  **Q:** And for how long?

[7]  **A:** Six months. And no, I did not drive

[8] vehicles.

[9]  **Q:** At the time that you had the first —

[10] your DUI that I'm talking about, had you had a

[11] vehicle assigned to you by the town of Smyrna?

[12]  **A:** Yes, but I wasn't driving it.

[13]  **Q:** I understand.

[14]    What vehicle was assigned to you?

[15]  **A:** 31.

[16]  **Q:** How long have you had that vehicle

[17] assigned to you?

[18]  **A:** Not long.

[19]  **Q:** About how long?

[20]  **A:** Well, it's not assigned. It's

[21] everybody's vehicle.

[22]  **Q:** But that's the one you regularly used?

[23]  **A:** Right.

[24]  **Q:** Okay. And is it fair to say that on a

---

Page 40

[1] daily basis you would get out into that vehicle and
[2] go do something as part of your job functions for the
[3] town of Smyrna?

[4]    A: When I have my license, yes.

[5]    Q: Yes, when you had your license. I'm
[6] sorry. I'm not talking about the time that you
[7] didn't have your license.

[8]    A: Okay.

[9]    Q: While you had a valid driver's license,
[10] you would be driving the town of Smyrna truck on a
[11] daily basis?

[12]    A: Yes.

[13]    Q: And that's because your job required you
[14] to go from place to place?

[15]    A: Right.

[16]    Q: And to get there, you drove?

[17]    A: Right.

[18]    Q: Okay. And that was something that you
[19] would do every day of the week?

[20]    A: Right.

[21]    Q: Now, when you lost your license because
[22] of this DUI, you obviously couldn't drive the truck
[23] anymore?

[24]    A: Right.

Page 41

[1]    Q: So what arrangements were made for you to
[2] get from place to place and do the things that you
[3] needed to do?

[4]    A: Somebody drove me to the job site.

[5]    Q: And who would that be?

[6]    A: Whoever — whatever job we had to do, I
[7] would ride with people.

[8]    Q: But if you needed to go somewhere, would
[9] you have someone take you?

[10]    A: Yeah, because wherever I went, it was on
[11] the job site that I needed to go. So I did not go
[12] anywhere else but to that job site.

[13]    Q: Okay. Now, when you had your license —

[14]    A: Yes.

[15]    Q: — and you had your own vehicle assigned
[16] to you that you used on a regular basis and you would
[17] go to these job sites, did you go alone or did you go
[18] with other people?

[19]    A: Sometimes people would ride with me.

[20]    Q: And sometimes you'd go alone?

[21]    A: Right.

[22]    Q: So part of your job, before you lost your
[23] license, included times, on a daily basis, that you
[24] would drive alone to different job sites; correct?

Page 42

[1]    A: Correct.

[2]    Q: And so for those job sites that you
[3] generally drove alone for, you would now have to have
[4] someone drive you to them; correct?

[5]    A: That was the stipulations, yes.

[6]    Q: Now, did you receive any discipline from
[7] the town of Smyrna for the fact that you now no
[8] longer had a valid driver's license, which was a
[9] requirement of your job?

[10]    A: Yes, I did.

[11]    Q: What was that?

[12]    A: Yes, I did. Had to go to counseling and
[13] I couldn't drive no vehicles.

[14]    Q: Okay. And what counseling did you go to?

[15]    A: That's all in my record. If you want
[16] that, you have to call them.

[17]    Q: It's in your personnel record?

[18]    A: Yes. And it's personal.

[19]    Q: But it documents what you had to do?

[20]    A: Yes, it does.

[21]    Q: Okay. Now, did you also lose your CDL
[22] license?

[23]    A: Well, that's — that's the only license I
[24] got.

Page 43

[1]    Q: Okay. When your license was reinstated,
[2] did it include reinstating the CDL?

[3]    A: Yes. Do you want to see them?

[4]    Q: I just want to know.

[5]    A: Oh, yes, yeah.

[6]    Q: Okay. Now, did anyone from the town of
[7] Smyrna, once they learned that you had this DUI, did
[8] they ask you about it?

[9]    A: Yes, they did. That's why I went to
[10] counseling.

[11]    Q: Okay. Did they want to know what was
[12] your blood alcohol level?

[13]    A: They already knew.

[14]    Q: Well, what was it?

[15]    A: I can't tell you. If you have everything
[16] right there, it should be right there.

[17]    Q: Well, I appreciate that. But what's your
[18] best recollection?

[19]    A: I don't know.

[20]    Q: Okay. Is that in your personnel file?

[21]    A: I guess.

[22]    Q: Now, the records that I have show that
[23] this happened around March 15th of '03. Does that
[24] sound about right to you?

...ker    v.
...own of Symrna

Harvey Leggett
March 22, 2005

Page 48

[1] say I was inebriated, whatever you want to say.

[2]    Q: Well, let's put aside inebriated. Did

[3] you tell them that you thought alcohol had a role in

[4] your behavior that night?

[5]    A: No. I said we had a couple of drinks.

[6]    Q: Okay.

[7]    A: We both did.

[8]    Q: Did you tell them, though, at some point

[9] that you and the woman did have sexual intercourse?

[10]    A: We did not have sexual intercourse.

[11]    Q: All right. Did you tell them that at

[12] some point you and the woman had a sexual

[13] relationship?

[14]    A: We did not have a sexual relationship.

[15]    Q: So did you tell them that nothing of a

[16] sexual nature occurred that night?

[17]    MR. HERRON: He's just asking about

[18] what you told Mr. Heeger, now. What you remember

[19] telling Mr. Heeger.

[20]    THE WITNESS: No, we didn't have a

[21] sexual relationship.

[22]    MR. HERRON: He's not asking about

[23] what actually happened that night. He's just asking

[24] what you remember telling Mr. Heeger or Mr. Hugg.

Page 49

[1]    THE WITNESS: No, we did not have a

[2] sexual relationship.

[3]        BY MR. FLETCHER:

[4]    Q: And that's what you told them?

[5]    A: Yes, we did not have a sexual

[6] relationship.

[7]    Q: All right. As a result of the incident,

[8] were you disciplined?

[9]    A: Yes.

[10]    Q: What was your discipline?

[11]    A: I was — I was laid off for about two

[12] weeks.

[13]    Q: And did you receive pay for those two

[14] weeks?

[15]    A: Yes, until the outcome of what they

[16] found.

[17]    Q: And after what they found, did you

[18] continue to receive pay?

[19]    A: Yes, and I was instructed not to go to

[20] the library or have anything to do with her.

[21]    Q: What was your position at that time?

[22]    A: Foreman.

[23]    Q: Foreman?

[24]    A: Yeah. Just had started.

Page 50

[1]    Q: Okay. So you were on probation as a

[2] foreman; correct?

[3]    A: No, I was off, I think, yeah, because six

[4] months —

[5]    Q: Well, probation is one year. Were you

[6] still within the first year of your employment as

[7] foreman?

[8]    A: Let's see. Rules have changed. It

[9] wasn't a year.

[10]    Q: Okay. What was it in December of '02?

[11]    A: I think was like six months.

[12]    Q: So do you have a recollection as to

[13] whether or not you were on probation at the time —

[14] as foreman at the time that this incident happened?

[15]    A: No, I don't. No, I don't.

[16]    Q: Where would he be able to make that

[17] determination? What records?

[18]    A: Did you ask Mr. Heeger that?

[19]    Q: I'm sorry?

[20]    A: Did you ask Mr. Heeger that?

[21]    Q: I'm sorry?

[22]    A: Did you ask Mr. Heeger that?

[23]    Q: Are you telling me Mr. Heeger may know?

[24]    A: Yes.

Page 51

[1]    Q: Okay. Would it be in your personnel file

[2] whether you were on probation or not?

[3]    A: Yes.

[4]    Q: After the two weeks that you were laid

[5] off — or kept off of work for which you got paid,

[6] you were then brought back and you continued to

[7] function as a foreman?

[8]    A: Yes.

[9]    Q: And you were told to avoid contact —

[10]    A: Yes.

[11]    Q: — with Ms. Smith?

[12]    A: Yes.

[13]    Q: Okay. But you held your same position;

[14] correct?

[15]    A: Yes.

[16]    Q: You lost no pay grade; correct? Was your

[17] salary altered in any way?

[18]    A: I don't know.

[19]    Q: Well, to the best of your knowledge, was

[20] it altered?

[21]    A: I couldn't tell you.

[22]    Q: Did your rate of pay become lower?

[23]    A: No.

[24]    Q: All right. Other than the two weeks that

Page 52

[1] you didn't work for which you got paid and being told
[2] to keep away from Ms. Smith, did anything else
[3] you can think of that was negative or adverse to you
[4] and your job position happen to you by the town of
[5] Smyrna?

[6]    A: No. I just started my probation all over
[7] again.

[8]    Q: The probation as a foreman?

[9]    A: Yes.

[10]    Q: And when did that start then?

[11]    A: The day that I got back.

[12]    Q: Are we talking January? Is it December
[13] still?

[14]    A: January.

[15]    Q: All right. So that would be January of
[16] '03 you had to start your probation as a foreman
[17] again?

[18]    A: Yes.

[19]    Q: Okay. And then as we've just reviewed —
[20] and I'm not going to go over it all again. But as I
[21] just reviewed, you had a DUI in March of '03, while
[22] you're on probation; correct?

[23]    A: Yes.

[24]    Q: And other than them sending you to

Page 53

[1] counseling and having them provide someone to drive
[2] you around, nothing else happened to you as far as
[3] the town of Smyrna was concerned; is that correct?

[4]    A: Well, I had to pay a big fine.

[5]    Q: Not to the town of Smyrna?

[6]    A: Go to the classes.

[7]    Q: Let's back up a minute. Would you agree
[8] the big fine —

[9]    A: This was on my personal time, what
[10] happened.

[11]    Q: I understand. I understand.

[12]    Did the big fine you're talking
[13] about, you had to pay that to the state of Delaware?

[14]    A: Yes.

[15]    Q: You didn't pay any fine to the town of
[16] Smyrna, did you?

[17]    A: No.

[18]    Q: But you didn't lose your job, did you?

[19]    A: No.

[20]    Q: You weren't demoted in any way, were you?

[21]    A: No.

[22]    Q: Your pay was not decreased in any way,
[23] were you?

[24]    A: No.

Page 54

[1]    Q: What was placed in your personnel file
[2] about this incident?

[3]    A: Everything. It's there.

[4]    Q: And that's — I'm talking about the DUI
[5] now.

[6]    A: Yes.

[7]    Q: Okay. Have you had any other DUIs?

[8]    A: No.

[9]    Q: Before this one in March of '03?

[10]    A: No.

[11]    Q: Have you had any DUIs since then?

[12]    A: No.

[13]    Q: Have you been arrested for DUI since
[14] then?

[15]    A: No.

[16]    Q: Have you been arrested for issues
[17] involving controlled substances since the DUI
[18] incident in March of '03?

[19]    A: Yes. I had to go to class.

[20]    Q: All right. Let's talk about that a
[21] little bit.

[22]    Did that occur in September of '03?

[23] Did the incident occur in September of '03?

[24]    A: I don't think so.

Page 55

[1]    Q: Was it in August of '03 — no, I'm sorry.
[2]    September 8, September 29,
[3] something like that, those dates of the year '03 mean
[4] nothing to you?

[5]    A: It might have been September.

[6]    Q: Okay. Of '03?

[7]    A: Right.

[8]    Q: And weren't you arrested for the
[9] unauthorized or illegal maintaining of a vehicle as
[10] it relates to controlled substances?

[11]    A: It was in the vehicle.

[12]    Q: Yeah. What was in the vehicle? What
[13] were you charged with having in the vehicle?

[14]    A: It's right there.

[15]    Q: Yeah, but you tell me, please. You're
[16] under oath.

[17]    MR. HERRON: Are these charges
[18] still pending?

[19]    THE WITNESS: No.

[20]    MR. HERRON: They've been resolved?

[21]    THE WITNESS: Yeah.

[22]                BY MR. FLETCHER:

[23]    Q: Go ahead.

[24]    A: It — it was a little piece of rock that

Page 60

[1]  A: Yes.

[2]  Q: And as a result of him knowing of the
[3]  incident and that you were going to drug court, did
[4]  he take any action against you as an employee of the
[5]  town of Smyrna?

[6]  A: No, because I had to go to counseling.
[7]  They sent me to a counseling program.

[8]  Q: Is this something different from the drug
[9]  court sending you to counseling?

[10]  A: Yes.

[11]  Q: All right. The town sent you to
[12]  counseling again?

[13]  A: Yes.

[14]  Q: What counseling did you go to as a
[15]  result —

[16]  A: That's the mandatory drug policy.

[17]  Q: As a result of the town's directive, what
[18]  counseling did you go to?

[19]  A: Just counseling, drug counseling.

[20]  Q: But who? where? when?

[21]  A: It's all in there. I can't remember
[22]  that.

[23]  Q: It's all in your personnel file?

[24]  A: Yes.

Page 61

[1]  Q: Did you successfully complete that
[2]  counseling?

[3]  A: Yes, I did.

[4]  Q: Other than going to counseling, did the
[5]  town of Smyrna take any adverse action towards you as
[6]  an employee?

[7]  A: No, because I finished — I was required
[8]  by the drug program to do what I did, and I did it.

[9]  Q: Did you tell Mr. Hugg that you did use
[10]  drugs — controlled substances?

[11]  A: No, I did not.

[12]  Q: Do you contend that you don't? Back then
[13]  I'm talking about.

[14]  A: No, I did not.

[15]  Q: In '03?

[16]  A: That's right.

[17]  Q: Okay. And did the town of Smyrna, at any
[18]  time after learning about these arrests and drug
[19]  court and then sending you to counseling, did they
[20]  ever demote you?

[21]  A: No.

[22]  Q: Did they ever reduce your pay?

[23]  A: No.

[24]  Q: Did they ever suspend you?

Page 62

[1]  A: Just for that one incident.

[2]  Q: I'm talking about for the '03 incident in
[3]  September.

[4]  A: No.

[5]  Q: Did they make you take time off without
[6]  pay?

[7]  A: They put me back on probation.

[8]  Q: Put you back on probation?

[9]  A: Yes.

[10]  Q: And for how long?

[11]  A: I think it was six months, I think.

[12]  Q: Mr. Godwin, did you recommend him for the
[13]  job that Mr. Baker had?

[14]  A: No. We went over the applications.

[15]  Q: I understand. But did you put in a good
[16]  word for him —

[17]  A: No.

[18]  Q: — to Mr. Heeger?

[19]  A: No.

[20]  Q: To anyone? Mr. Hugg?

[21]  A: No.

[22]  Q: Did you review the applications?

[23]  A: No.

[24]  Q: What was — what did you do as it relates

Page 63

[1]  to Mr. Baker's replacement?

[2]  A: Nothing.

[3]  Q: And I take it by then that you didn't at
[4]  any time tell Mr. Heeger you thought Mr. Godwin was a
[5]  good worker and that he would make a good landscaper?

[6]  A: Well, he was in-house anyway.

[7]  Q: I understand. But did you tell
[8]  Mr. Heeger that, or words to that effect?

[9]  A: Because I didn't look at the application.
[10]  And Mr. Godwin, he was on my pipe crew, so —

[11]  Q: How long did Theo Banes work for the town
[12]  of Smyrna?

[13]  A: A temp service. They only probably did
[14]  four to five months.

[15]  Q: So when did his services end with the
[16]  town?

[17]  A: About January.

[18]  Q: Okay. So around January of '04? We're
[19]  in the year '03 with Mr. Baker. So would it be
[20]  January of '03?

[21]  A: Yes, and that's when they all leave.

[22]  Q: Has he come back?

[23]  A: No.

[24]  Q: Has a group of temps or one or more temps

ORIGINAL        1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,                    )
        Plaintiff,                          )
                                            )
                v.                          )  C.A. No.
                                            )  04-1286 (JJF)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
 individually and in his official  )
capacity as Town Manager;          )
BEVERLY A. HIRT, individually and  )
in her official capacity as        )
Director of the Smyrna Public      )
Library; and HARVEY LEGGETT,       )
individually and in his official   )
capacity as Supervisor of          )
Streets/Foreman of Public Works,   )
        Defendants.                )

        Deposition of **HARVEY LEGGETT**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street Plaza, Smyrna, Delaware, on Tuesday, August 30,
2005, beginning at 11:20 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        AKIN & HERRON
        BY:  BRUCE C. HERRON, ESQUIRE
        PO Box 25047
        Wilmington, Delaware  19801
        Attorney for Defendant.

        **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B 59

5

1          A.      No.

2          Q.      Okay.  Mr. Leggett, how long have you been

3      employed by the Town of Smyrna?

4          A.      I would say about 17 years.

5          Q.      When did you become the public works foreman

6      for the Town of Smyrna?

7          A.      I can't remember.  You probably have that in

8      the records.  I know it's been a lot of stuff, and I

9      can't give you the exact date.  I don't know.  So you

10     got to --

11         Q.      Was it in the year of 2002?

12         A.      Somewhere around in there; like I said, you

13     would have to, you know --

14         Q.      Is that your current position with the Town?

15     Public works foreman?

16         A.      Yes.

17         Q.      When you were placed into that position, did

18     it involve a pay raise?

19         A.      Yes.

20         Q.      Did it involve a change from an hourly rate

21     of pay to a salaried type of pay?  Do you receive a

22     salary?

23         A.      No.

24         Q.      You are still an hourly employee?

B 60

14

1      A.    No, no.  The director has one.  I mean they

2   are assigned out.

3      Q.    So you have one pickup that is assigned to

4   you --

5      A.    Yes.

6      Q.    -- in the course of your duties?

7      A.    Yes.

8      Q.    Now, are you allowed to take that pickup

9   home with you?

10     A.    No.

11     Q.    You have to leave it at work?

12     A.    Yes.

13     Q.    And you have to drive your personal vehicle

14   to work?

15     A.    Actually, I walk to work.

16     Q.    So you live close enough to actually walk to

17   work?

18     A.    Yes.

19     Q.    And you use that assigned pickup to travel

20   to the various job sites, correct?

21     A.    Yes, yes.

22     Q.    So that is something that you need.  You

23   need that pickup to be able to travel to those various

24   job sites that you are working on, correct?

15

1      A.    Yes.

2      Q.    So would you agree that one of your job

3   requirements is to be able to drive around in the pickup

4   truck to the various job sites?

5      A.    Yes.

6      Q.    Do you recall whether Mr. Hugg was involved

7   in interviewing you for the public works foreman

8   position?

9      A.    No.

10      Q.    Is it that you don't recall or he was not

11   involved?

12      A.    I don't recall.

13      Q.    So he may have been involved?

14      A.    He may, but like I --

15      Q.    You don't recall whether he was or not?

16      A.    No, because I went through the director.

17      Q.    But you don't recall whether Mr. Hugg might

18   have been involved?

19      A.    No, I don't.  No, I don't.

20      Q.    You don't recall whether he was or not?

21      A.    No, sir, I don't.

22      Q.    And the director at that time was

23   Mr. Heeger, right?

24      A.    Yes.

24

1    A.    I think it was Mr. Heeger.  Like I said,

2    that was -- I was under so much stress.  I was on so

3    much medication.

4    Q.    Now, I believe you testified in your

5    previous deposition back in March, in the Baker versus

6    Smyrna case, that you didn't suffer any loss of pay as a

7    result of the incident, correct?  Do you remember that?

8    A.    I might have said that.  I probably -- I

9    don't think I did, but you would have to check the

10   records.

11   Q.    You don't recall any loss of pay that you

12   suffered, right?

13   A.    No.  But I suffered enough.

14   Q.    But not any loss of pay, correct?

15   A.    No.

16   Q.    Okay.  And I believe another part of the

17   discipline was there were certain restrictions on where

18   you could be and where you couldn't be, correct, in the

19   town?

20   A.    I think so.  But I'm not -- you know, like I

21   said, it's just --

22   Q.    Do you recall being told you weren't allowed

23   to be around the library unless you were specifically

24   instructed to report to the library?

25

1          A.     Yes.

2          Q.     Okay.  Do you also recall that you were told

3     not to have any contact with Ms. Smith?

4          A.     Yes.

5          Q.     Okay.  Was there any other restriction on

6     your movements, other than those restrictions, as far as

7     where you could be and where you couldn't be?

8          A.     No.

9          Q.     Once you came back from being on

10    administrative leave and you were told about your

11    discipline, did you resume your normal duties?

12         A.     How could you?  No.

13         Q.     You didn't?

14         A.     I mean --

15         Q.     In other words, did you get back to work?

16    That is my question.

17         A.     Yes, I did.

18         Q.     Okay.  You did your job?

19         A.     Right.

20         Q.     Okay.  And that was your job as the public

21    works foreman?

22         A.     Yes.

23         Q.     And so you came back from your

24    administrative leave, and you started back as public

26

1    works foreman.   Did you do the same things that you had

2    done before the incident?

3            A.     Somewhat, yes.

4            Q.     What do you mean somewhat?   What was

5    different about what you were doing as opposed to before

6    the incident involving Ms. Smith?

7            A.     Well, I couldn't -- it was just -- How can

8    you get back to normal?   I mean there was -- you know,

9    it was just so stressful to even come back to work.

10           Q.     But let me ask you this.   You weren't

11   dilatory in your responsibilities when you came back to

12   work, right?   In other words, you did what you were

13   required to do, right?

14           MR. HERRON:   Was there any change in your

15   duties and assignments when you came back -- I think

16   that is what you are --

17           MR. PRIMOS:   Yes.

18           MR. HERRON:   -- compared to what you were

19   doing before?

20           THE WITNESS:   Other than to stay away from

21   the library.

22   BY MR. PRIMOS:

23           Q.     But other than that, was there any other

24   change in your duties and assignments?

B 65

27

1      A.    No.

2      Q.    So in other words, you continued to direct

3   other employees in the public works department with

4   regard to their duties?

5      A.    Right.

6      Q.    As public works foreman, that is what you

7   did?

8      A.    Yes.

9      Q.    That was your job?

10     A.    Yes.

11     Q.    Every day you went and you told the other

12  employees what they were supposed to do, correct?

13     A.    Yes.

14     Q.    And did you do that to the best of your

15  ability?

16     A.    Yes, I did.

17     Q.    Okay.  Do you recall an occasion, after you

18  came back to work, when you were required to perform

19  work near the library?  In other words, Mr. Heeger

20  instructed you:  You are going to need to work on this

21  job over near the library?

22     A.    Yes.

23     Q.    And specifically, what were you doing near

24  the library?

28

1       A.      Painting.

2       Q.      Painting what?

3       A.      Curb.

4       Q.      Painting the curb?

5       A.      Yes.

6       Q.      Okay.  Were you painting it yellow?

7       A.      Yellow.

8       Q.      Okay.  Was that because the paint had become

9   faded?  Or had it just never been painted before?

10      A.      They just wanted it painted yellow.

11      Q.      Well, had it been painted before and it just

12   became faded?

13      A.      My understanding was there were people

14   parking there when they weren't supposed to, and the

15   director of the library wanted it painted yellow --

16      Q.      Did you take a crew over there and direct

17   them in painting the curb?

18      A.      No.  At that time we were shorthanded, and

19   we had a lot of temps.

20      Q.      So you just went ahead and painted it?

21      A.      Me and another fellow.

22      Q.      Do you remember who the other fellow was?

23      A.      He was a temp.

24      Q.      Did you both do the painting?

B 107

ORIGINAL    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,                    )
     Plaintiff,                              )
                              )
          v.                                )  C.A. No.
                              )  04-1286 (JJF)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
 individually and in his official  )
capacity as Town Manager;          )
BEVERLY A. HIRT, individually and  )
in her official capacity as        )
Director of the Smyrna Public      )
Library; and HARVEY LEGGETT,       )
individually and in his official   )
capacity as Supervisor of          )
Streets/Foreman of Public Works,   )
     Defendants.                         )

        Deposition of **BEVERLY ANN HIRT**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street Plaza, Smyrna, Delaware, on Tuesday, August 30,
2005, beginning at 1:00 p.m.

APPEARANCES:

       SCHMITTINGER & RODRIGUEZ
       BY:  NOEL E. PRIMOS, ESQUIRE
       414 South State Street
       Dover, Delaware  19901
       Attorney for Plaintiff.

       AKIN & HERRON
       BY:  BRUCE C. HERRON, ESQUIRE
       PO Box 25047
       Wilmington, Delaware  19801
       Attorney for Defendant.

    **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

               **ANTHONY REPORTING**
                  **PO Box 234**
          **Dover, Delaware  19903**
            **(302)674-8884**

17

1    Q.    What was her position?

2    A.    Clerk III.

3    Q.    Clerk III.  Okay.  Do you remember what she

4    was paid when she was first hired?

5    A.    No.

6    Q.    Did she have any benefits when she was first

7    hired?

8    A.    No.

9    Q.    And were there any other applicants for the

10   position?

11   A.    Yes.

12   Q.    And did you interview any other applicants

13   besides Ms. Smith?

14   A.    Yes.

15   Q.    How many people did you interview?

16   A.    I'm not sure for that interview exactly how

17   many -- Usually on the norm, it's maybe two or three,

18   and they are narrowed down.  But I can't tell you

19   exactly what with her interview.

20   Q.    What was the deciding factor or factors to

21   let you choose Ms. Smith?

22   A.    She said she worked in a preschool.

23   Q.    Why was that important to you?

24   A.    I needed somebody that was able to work with

Anthony Reporting
(302) 674-8884

B 69

21

Q.    Okay.  And when Ms. Smith became a full-time employee in July of '02, was that when the position was changed to full-time?

A.    Yes.  The title was changed before that.  We had a title change before it went to full-time.

Q.    And when was the title changed?

A.    I don't have the date of that.  I don't remember right offhand.

Q.    So while Ms. Smith was in the position, the title of her position changed?

A.    Uh-huh.

Q.    And what did it change to?

A.    Children's program coordinator.

Q.    And then subsequent to that, she became full-time?

A.    I think something like that, yeah.

Q.    Why was it done in a two-step process like that?

A.    Well, I couldn't get approval by council to increase my staff.  But they went ahead and changed the title, because there was a need.  When she puts out letters, it looks better than signing it clerk III.

Q.    Okay.

A.    So nothing changed in her qualifications or

36

1         Q.     But you certainly felt that was an

2    appropriate salary for the position, right?

3         A.     I don't know.

4         Q.     But you would assume that since it was in

5    your memo, that you felt it was appropriate, right?

6         A.     Yes, I guess, since I wrote it.  But I don't

7    remember if that was going to be the new starting with

8    the pay or starting at a different step increase and

9    then she would get four more.  I'm not sure how I got to

10   that calculation.

11        Q.     Now, when Ms. Smith was initially hired, did

40

1          A.    Yes.

2          Q.    Yes.  And how did you become aware?  In

3    other words, did someone have a conversation with you?

4          A.    Chief Baldwin.

5          Q.    He's the chief of police?

6          A.    Yes.

7          Q.    Did he just come up to you at the party and

8    start talking about the incident?

9          A.    He came up to me and said that I needed to

10   talk with Detective Graham.

11         Q.    That is a policeman for the Smyrna Police?

12   Detective Graham?

13         A.    Yes.

14         Q.    Did Chief Baldwin tell you what it was

15   about?

16         A.    No.

17         Q.    Did you have any idea what it was about?

18         A.    No.

19         Q.    And did you talk to Detective Graham?

20         A.    After the party, yes.

21         Q.    Where did you talk to him?

22         A.    The police department.

23         Q.    Were you concerned about what it could

24   possibly be about?

41

1    A.    Yes.

2    Q.    Did you have any idea?

3    A.    No.

4    Q.    Could you tell me about your conversation

5    with Detective Graham?

6    A.    I went to his office.  And he told me there

7    was an incident between two employees, one library and

8    one public works.  And they said that the alarm went

9    off -- Well, they had to get the key for the library

10   from one of my employees during the night.  And he

11   wanted me to just tell that employee that the alarm went

12   off.  And I said:  Okay.

42

1      Q.    Annie?

2      A.    Lane.

3      Q.    So he told you that there was an incident

4    involving a library employee and --

5      A.    Two employees.

6      Q.    -- and a public works employee?

7      A.    Yes.

8      Q.    Did he tell you who the employees were?

9      A.    After I guessed who they were.

10     Q.    How did you guess who they were?

11     A.    I said:  Kari and Harvey?  He goes:  Yes.  I

12   said:  Okay.

13     Q.    Did he wonder how you knew who they were?

14     A.    Yes.  I said:  We kind of figured, because

15   she was going to go out.

16     Q.    You kind of figured, because she was going

17   to go out?  Can you explain what you mean?

18     A.    Drinking.

19     Q.    So why did you figure that the incident

20   involved those two employees, just because you knew she

21   was going to go out drinking?

22     A.    Because it involved somebody at the library

23   and -- I don't know.  It was a wild guess on my part.

24     Q.    Did Detective Graham ask you how you knew

43

1  who the employees were?

2      A.    No.  We didn't really discuss a whole lot.

3      Q.    Did he tell you what had happened with the

4  two employees at the library?

5      A.    He just said there was an incident, and they

6  were investigating.  And I did say that I noticed that

7  somebody had been in the library.  And I asked him who

8  got sick, because somebody had gotten sick all over the

9  carpet and I had to clean the wall.  And there was a

10  plant.

11      Q.    A plant what?

12      A.    A plant.

13      Q.    What do you mean there was a plant?  There

14  was a plant in the library that hadn't been there

15  before?

16      A.    Yeah.

17      Q.    Like a potted plant?

18      A.    Yeah, a plastic plant.  It wasn't there the

19  night before.  And it was on her desk.

20      Q.    On Ms. Smith's desk?

21      A.    Right.  And maybe that's why it popped in my

22  head that it was her, you know.

23      Q.    Did Detective Graham tell you there were

24  allegations that Mr. Leggett had raped Ms. Smith?

B 75

48

1        Q.    Did he say why he was asking you that?

2        A.    No.

3        Q.    Had he been in contact with her?

4        A.    I don't know.

5        Q.    You didn't think that was a strange request,

6    that if she came into contact with you to let him know?

7        A.    I don't know.

8        Q.    Did Detective Graham say anything else to

9    you in that conversation?

10       A.    I don't remember.    It was a short

11   conversation.

12       Q.    When did you first talk to Ms. Smith about

13   the incident or communicate with her in any way?

14       A.    It was -- Let me think.  It was -- I don't

15   remember the first time.

16       Q.    Was it that day?  Later that day?

17       A.    No.

18       Q.    Was it that weekend?

19       A.    It might have been that weekend.

20       Q.    And what type of contact was it?  Was it a

21   phone call?

22       A.    An e-mail.

23       Q.    E-mail?  Where were you at the time of this

24   e-mail?

49

```
1        A.     Home.

2        Q.     And where was Ms. Smith?

3        A.     Home.

4        Q.     And who initiated the contact?

5        A.     She did.

6        Q.     And what did she say in the e-mail?

7        A.     It was kind of small talk.  Gosh, I don't
8   know all the details.  She wanted to know what -- Oh,
9   she told me that she talked to Detective Graham, that
10  she told him what I told her about Harvey.  And I told
11  her that was okay.  And then I told her I wasn't going
12  to tell anybody at work.  And she didn't want me to tell
13  anybody at work, anyway.  I think that was about it.

14       Q.     Did you let Detective Graham know that she
15  had contacted you?

16       A.     Yes.

17       Q.     Did you just call him?

18       A.     I don't remember.  I might have called him.

19       Q.     And what did he say when you told him that,
20  that she had contacted you?

21       A.     He said:  Okay.  And I told him I had saved
22  the conversation and I had it if he wanted it.

23       Q.     Did he want it?

24       A.     Actually, I'm not sure if he wanted it or if
```

B77

50

1    I just kept it.

2        Q.    So you don't know whether you ever gave it

3    to him or not?

4        A.    I don't remember.

5        Q.    Did you let Ms. Smith know that you were

6    going to be contacting Detective Graham and offering him

7    a copy of the e-mail communication?

8        A.    No.

9        Q.    Why?

10       A.    She didn't talk to me much after that.

11       Q.    No.  I mean during the conversation you were

12   having with her through the e-mail, did you say:  I'm

13   going to be letting Detective Graham know that you

14   contacted me?

15       A.    No.

16       Q.    Any reason?

17       A.    It didn't cross my mind.

18       Q.    Okay.  You said that Ms. Smith told you or

19   communicated to you through this e-mail that she had

20   told Detective Graham what you had told her about

21   Mr. Leggett.

22       A.    Uh-huh.

23       Q.    First of all, what did you tell Ms. Smith

24   about Mr. Leggett?

51

1          A.     That he has a drinking problem.

2          Q.     How did you know he had a drinking problem?

3          A.     Well, because I have seen him drunk a couple

4     of times.

5          Q.     When?  Do you remember?

6          A.     On a weekend, when he was off duty, he came

7     into the library one time.

8          Q.     Do you remember when that was?  This

9     incident occurred in December of '02.  When was it that

10    he came into the library drunk?

11         A.     That, I don't know.  I don't know the date.

12         Q.     Was it shortly before the incident in

13    December of '02, or had it been a while?

14         A.     It wasn't shortly before.  But I don't know

15    a time frame of when it was.

16         Q.     It was sometime after you started at the

17    library in 1999, correct?

18         A.     Yeah.

19         Q.     So sometime between '99 and December of '02,

20    he came into the library drunk on a weekend?

21         A.     Uh-huh.

22         Q.     Okay.  What other occasions had you seen him

23    drunk?

24         A.     Well, that was only one time.

52

1    Q.    I thought you said you had seen him drunk on

2    more than one occasion.

3    A.    No.  I saw him drunk to the library once.

4    Q.    Okay.  But you told Ms. Smith that he had a

5    drinking problem.

6    A.    Yes.

7    Q.    How did you know, just by seeing him drunk

8    one time, that he had a drinking problem?

9    A.    That was my account.  The others were just

10   hearsay from other people that he has a drinking

11   problem.

12   Q.    Other people had told you that he has a

13   drinking problem?

14   A.    Yes.

15   Q.    When was the first time you had heard that

16   Mr. Leggett had a drinking problem?

17   A.    Back when I was doing parks and recreation

18   for the Town, back when I was a special projects

19   coordinator.

20   Q.    Someone in the office had told you that he

21   had a drinking problem?

22   A.    I don't think it was the office.  I think it

23   was somebody when I was sitting out -- We were having a

24   program out front here.  And it was just somebody we

53

1    were sitting with in a group.  And I don't know how it

2    came up, but it just came up in a conversation.

3         Q.    It was just a resident of the town, maybe?

4         A.    It could have been.  I don't remember.  I

5    just remember we were sitting on the steps, and it came

6    up.

7         Q.    It came up.  And that was shortly after you

8    had started working for Smyrna, right?

9         A.    Right.

10        Q.    You don't remember who the person was?

11        A.    No.

12        Q.    Okay.  Did you hear on other occasions,

13   hearsay, that Mr. Leggett had a drinking problem?

14        A.    Not really.  I mean it was just that one

15   time and then the time at the library.

16        Q.    So you had heard earlier in your employment,

17   hearsay, that Mr. Leggett had a drinking problem.  And

18   then when he came into the library drunk on a weekend,

19   it sort of confirmed, in your mind, that that was

20   probably true, right?

21        A.    Yeah, yeah.  It could have been.  But he

22   wasn't like drunk, drunk.  He just acted real happy.

23        Q.    And you could smell alcohol on his breath?

24        A.    A little bit; it wasn't real knockover --

54

Q.    So prior to the incident involving her and

Mr. Leggett in the library, you had told Ms. Smith that

Mr. Leggett had a drinking problem, correct?

A.    Yes.

Q.    And what else did you tell her about

Mr. Leggett?

A.    Well, we advised her not to go out with him.

Q.    Who is we?

A.    Betty and me.

Q.    What was your reason for advising her not to

go out with him?

A.    Because she has a reputation to keep,

because she is a children's programmer, and it wouldn't

look good.

Q.    Why wouldn't it look good?

A.    Because she was living with a guy; she had a

boyfriend.  You know, she has a boyfriend.  It doesn't

look good that she's out drinking with Harvey.

Q.    And is part of that because Mr. Leggett was

married?

A.    That, yes.  And she's got a little son, and

she is living with Eric, her boyfriend.

Q.    So part of your reason for telling her not

to go out with him was a concern for her reputation, and

55

1    part of it was your concern because you knew or you

2    believed that Mr. Leggett had a drinking problem,

3    correct?

4         A.    Right.   We were trying to protect her.

5         Q.    Did you share with Ms. Smith anything about

6    something Mr. Leggett had said when he had come into the

7    library that time, that he had said to you?

8         A.    Yeah.   He was getting all sweet.

9         Q.    What do you mean sweet?

10        A.    Well, he was just wanting to know what I

11   wear at night, you know.   He was just asking questions

12   like that.

13        Q.    And that was a pretty inappropriate

14   question, right?   What did you wear at night?

15        A.    Yes.   And I told him it was inappropriate.

16   And I asked him to leave my office, and he did.

17        Q.    So he came into your office?

18        A.    Yeah.

19        Q.    Was this during the regular operating hours

20   of the library?

21        A.    Yes.   We were open.

22        Q.    Was he on duty?

23        A.    No.

24        Q.    What time of day was it?

56

1      A.      Anywhere between nine and two; I don't

2  remember what time, but we were open to the public.

3      Q.      Who else was present in the library?

4      A.      I don't remember what employee was on duty,

5  but they weren't in my office.  It was just, you know, I

6  was sitting there.  And he came in.  The door was open.

7  But you know, he was nice.  I asked him to leave.  I

8  told him it was inappropriate.  And he said he was

9  sorry, and he left.

10     Q.      Did he make any other comments or ask you

11 any other questions other than what do you wear -- In

12 other words, did he just come out and say:  Hi, Bev,

13 what do you wear at night?  Or were there some other --

14     A.      There were probably some others, but I don't

15 remember.

16     Q.      Some other comments that were inappropriate?

17     A.      Yes.  But offhand, I don't remember what

18 they were.  I remember the one about what do you wear,

19 but I don't remember what the other ones were.

20     Q.      Had you heard about him making similar

21 comments to other town employees before that?

22     A.      No.

23     Q.      What about after that?  Did you ever hear

24 people say:  Oh, yeah, Harvey makes comments like that?

B 84

57

1          A.      No.

2          Q.      Was this the first time that you ever knew

3    him to make such comment or comments?

4          A.      Well, yes.

5          Q.      Did you let anybody at the Town know that

6    this town employee, Harvey Leggett, was making

7    inappropriate comments in the workplace?

8          A.      No.  That's the one time he did it, and he

9    never did it again.  He came in the next day, Monday

10   morning, and apologized.

11         Q.      The next day?  You are open on Sunday?

12         A.      No, the next working day, which would have

13   been Monday.

14         Q.      The next working day?

15         A.      He apologized profusely and swore he would

16   never, ever do it again.  And he has never done it

17   again.

18         Q.      But you were concerned enough about this

19   incident where he had made these comments to warn

20   Ms. Smith about it and let her know that he had made

21   these comments to you, right?

22         A.      Well, yes.  If she was out drinking with

23   him, I was concerned that she should not be out drinking

24   with him, because he could be a little, you know, sweet

58

talking and stuff like that.  He was never violent or
anything like that.  It just was, you know, sweet
talking type stuff.

    Q.    And you were concerned about that?

    A.    Well, yeah.

    Q.    Okay.  After that e-mail communication
between you and Ms. Smith, did you ever talk to her
again about the incident or communicate with her in any
way about the incident that had occurred?

    A.    At the library?

    Q.    At the library.

    A.    I tried, but she didn't want to talk about
it.

    Q.    When was the first time that you tried?

    A.    When she came back to work.

    Q.    Was that on Monday?

    A.    I don't remember when.  I was on vacation.
It was over Christmas.  So it was when I would have
returned to work and she would have been there.  I don't
know exactly what day it was.  But yeah, I did.  I asked
her how she was doing, and she said she didn't want to
discuss it.

    Q.    You asked her how she was doing, and she
said she didn't want to discuss how she was doing?

59

1      A.      Uh-huh.

2      Q.      Did you specifically ask her about the

3    incident, though?

4      A.      I asked her what happened.

5      Q.      And what did she say?

6      A.      She didn't want to discuss it.

7      Q.      Did you at some point try to conduct an

8    investigation on your own to determine what had happened

9    with regard to the incident?

10     A.      No.  I let the police handle that.

11     Q.      Ultimately, there was discipline imposed on

12   Ms. Smith as a result of this incident, right?

13     A.      Yes.

14     Q.      And you imposed the discipline?

15     A.      Yes.

16     Q.      Prior to imposing that discipline, did you

17   conduct an investigation to try to determine what had

18   happened?

19     A.      Like what type of investigation?

20     Q.      An investigation is a process whereby an

21   employer tries to find out what happened with regard to

22   an incident before they actually impose discipline for

23   that incident.  So did you ever try to find out what had

24   happened with regard to the incident before imposing

60

1    discipline?

2        A.    Well, I guess I would have had to, because

3    she disobeyed the policy of coming into the library.

4        Q.    You would have had to do what?  You would

5    have had to conduct an investigation?

6        A.    Well, the police told me that she was in the

7    library, so she broke that policy.

8        Q.    Do you mean Detective Graham told you that

9    she was in the library?

10        A.    Yeah.

11        Q.    Did you ever have any other conversations

12    with the police about the incident, other than that

13    conversation with Detective Graham?

14        A.    I talked to Will Bordley.

15        Q.    Who is Will Bordley?

16        A.    Will Bordley, he's one of the police

17    officers.

18        Q.    And when did you talk to Will Bordley?

19        A.    I talked to Will Bordley the day -- we

20    walked out of the police station together.

21        Q.    You and Will Bordley?

22        A.    Yes.

23        Q.    And what did you share with Mr. Bordley

24    about the incident?

69

1    in the library, and he didn't know -- or what time the

2    incident occurred, and he didn't know.  What other types

3    of investigation did you conduct?

4        A.    Well, there wasn't too much information I

5    could get from people, because nobody was talking about

6    it.  So I mean I could just go on the fact that she was

7    there.

8        Q.    And that was based on what?  What Detective

9    Graham had told you?

10       A.    Yes, the police.

11       Q.    Had Detective Graham actually seen Ms. Smith

12   in the library?

13       A.    No, but Serm did.

14       Q.    But that was after Ms. Smith had already

15   been terminated that you found that out from Serm?

16       A.    Right, right.  Well, that is true.  But I

17   went back to what the police had said, that she was

18   there.  I mean somebody was in the library.  Somebody

19   put the plant on the desk.  She told -- you know, didn't

20   she tell the police that she put the plant in there?

21       Q.    See, I'm supposed to ask the questions.  Did

22   you ever talk to Mr. Leggett about the incident?

23       A.    I don't think so; not afterwards, no.

24

70

```
 1              (Hirt Exhibit Number 4 was marked for

 2    identification and attached to the record.)

 3    BY MR. PRIMOS:

 4         Q.    Ms. Hirt, I'm handing you another document

 5    that has been produced to us by your attorneys.  This is

 6    Hirt 4.  Is this your handwriting, Ms. Hirt?

 7         A.    Yes.

 8         Q.    What is this that we are looking at, these

 9    two pages here?

10         A.    Let's see.  Oh, this is just some notes that

11    I made after, after I had talked to her boyfriend and

12    the police.

13         Q.    And there is a date of December 20, '02 at

14    the top.  Is that when you wrote the note?

15         A.    Yeah.

16         Q.    And why did you write this note?

17         A.    Just for notes; I keep a lot of notes.

18         Q.    You keep a lot of notes?

19         A.    Yes.

20         Q.    That is just a practice that you have?

21         A.    Yes.

22         Q.    Where did you keep this information?

23         A.    In her file.

24         Q.    In Ms. Smith's --
```