71

1      A.    Yes.

2      Q.    -- file?  Is that her personnel file?

3      A.    Yes.

4      Q.    And you kept that at the library?

5      A.    Yes.  It's locked up.

6      Q.    And is it your practice to make notes like

7   this about other employees in the library, as well?

8      A.    Yes, yes.

9      Q.    Did anyone instruct you to make this note?

10     A.    No.

11     Q.    I would like for you to look at this

12  document.  Now, it indicates that Mr. Steele actually

13  told you that Ms. Smith had spent most of the night at

14  the hospital.

15     A.    Uh-huh.

16     Q.    Now, you left that out when we were talking

17  about it before.  So he did tell you that there was some

18  medical connection between Ms. Smith's absence --

19     A.    It just skipped my mind.

20     Q.    Okay.  And he told you that she had a

21  doctor's excuse, right?

22     A.    Yes.

23     Q.    And you had no reason to question that,

24  correct?

72

1      A.    No.

2      Q.    And then you say:  At the party I was told

3  by Chief Baldwin to speak to Detective Graham about why

4  the alarm went off.

5           Okay.  So actually, Chief Baldwin, when he

6  came up to you at the party, said something about the

7  alarm going off?

8      A.    I guess.  I don't remember everything.

9      Q.    Okay.  But you believe that actually the

10  alarm didn't go off, and they were just saying that,

11  right?

12      A.    Well, I don't know.  See, I don't --

13      Q.    You don't know whether the alarm went off.

14  Okay.

15      A.    I don't know.  See, I wasn't called.  Now,

16  whether or not it did go off and they called Delaware

17  Electric Signal and Delaware Electric Signal didn't call

18  me, that could be the case.

19      Q.    Right.

20      A.    I just didn't get a phone call during the

21  night.

22      Q.    And Will said he would be the person to

23  answer all of my questions.

24      A.    Right.  But he didn't answer all of my

73

1    questions.    I talked to Detective Graham.

2         Q.    This is Will Bordley, right?

3         A.    Right.

4         Q.    And was he telling you this at the party,

5    that Detective Graham would be the person to answer all

6    of your questions?    Did Mr. Bordley tell you that at the

7    party?

8         A.    I'm not sure.

9         Q.    Now, what were the questions that you had at

10   this point?    It says that Will told you that Detective

11   Graham would be the person to answer all of your

12   questions.    What were your questions at this point?

13        A.    Well, that's what they were saying to me.

14        Q.    But you must have had some questions or you

15   must have indicated --

16        A.    Oh, I had some questions.    Where was Kari?

17   Why was there throw up all over the floor?

18        Q.    Why was she at the hospital?    Was that one

19   of your questions?

20        A.    Well, yeah.    Well, I didn't even know at

21   that point if that was related to what the police wanted

22   to talk to me about.

23        Q.    Okay.

24        A.    I had no idea.

84

1          A.      Unh-unh.  I don't know if that 1220 is a

2     date or if that is a time.

3          Q.      Well, since you wrote this on Friday, 12/20,

4     don't you think that it is likely that it's a date?  Met

5     with Dave and Joe on Friday, 12/20?

6          A.      It could be.  I don't remember what it is.

7          Q.      Well, since you wrote this on Friday,

8     December 20th, don't you think you met with Dave and Joe

9     on Friday?  Even if you meant 12:20 p.m., it was Friday

10    that you met with them?

11         A.      Right.

12         Q.      In other words, you had already met

13    with them at the time you wrote this on Friday,

14    December 20th, correct?

15         A.      I guess.

16         Q.      Or did you add that comment at a later time?

17         A.      I don't know.

18         Q.      And since your very next sentence is, on

19    Sunday Kari contacted me, it was probably the next day

20    that you wrote that, correct, which was December 20th?

21    Right?

22         A.      Uh-huh.

23         Q.      You have to make your responses verbal for

24    the record.

145

1      Q.      Did you call him or meet with him in that

2   initial conversation?

3      A.      Oh, I don't remember.

4      Q.      And that was sometime during the week of

5   June 30th, correct?

6      A.      It was after -- Oh, gosh, it happened so

7   fast.  It was after -- It was after Tuesday.  I remember

8   that.  It was after I found out.

9      Q.      It was after Tuesday?

10     A.      It was after I found out what she had gone

11  through to make all of these arrangements about not

12  coming to work.

13     Q.      So it was after the 1st.  It was sometime

14  after the 1st then that you initially spoke to him about

15  it?

16     A.      Yeah, when I found out what she had done.

17     Q.      How did you present it to Mr. Hugg, the

18  issue of her employment?

19     A.      I don't know.  I just asked for a meeting.

20     Q.      And you came over and met with him?

21     A.      Yes.

22     Q.      And how did you start out the conversation?

23     A.      I don't remember.

24     Q.      Do you remember what you discussed with him?

146

1        A.      I don't know.  I just said I had a problem

2    that I wanted to discuss with him, a personnel problem.

3        Q.      Okay.  But I am talking about the actual

4    discussion that you then had with him.  What was said

5    during that discussion?

6        A.      I don't remember exactly what I said.  All I

7    remember is I brought up a few facts.

8        Q.      Can you tell me what some of those facts

9    were?

10        A.      I don't remember.

11        Q.      You don't remember any of the facts that you

12    brought up with him?

13        A.      Not right offhand, no.

14        Q.      Was one of the facts the situation with her

15    asking Nancy to do the children's program?

16        A.      Well, that was one of them.

17        Q.      That was one of them.  You know you

18    discussed that with him?

19        A.      Yes, because that was the part where she

20    lied.  And she falsified her vacation slip, because she

21    said she was coming back and she didn't.

22        Q.      Was another factor that you discussed with

23    him that her car was broken down and she hadn't made it

24    back to work?

147

1          A.    I told him that her car was broken down,

2     yes.

3          Q.    Did you also discuss with him some of the

4     earlier incidents involving Ms. Smith?

5          A.    I told him her performance was down.

6          Q.    Okay.  Did you discuss with him about her

7     breaking the chain of command and coming to see him

8     instead of you on March 11th or 12th?

9          A.    I don't know if I brought that one up.  I

10    don't know.

11         Q.    Did you talk about the incident with

12    Mr. Leggett in the library?

13         A.    No.

14         Q.    You didn't talk about her breaking policy by

15    being in the library after hours?

16         A.    No, because we already knew that.  That had

17    nothing to do with it.  We were just --

18         Q.    So you just discussed subsequent incidents?

19         A.    Yeah, because this was -- this is what she

20    got fired for.

21         Q.    What was what she got fired for?

22         A.    For lying and falsifying this report and

23    doing what she did.

24         Q.    That was the only reason that she was fired?

B 97

COPY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,                )
        Plaintiff,                      )
                                        )
              v.                        )
                                        ) C.A. No.
                                        ) 04-1286 (JJF)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
  individually and in his official      )
capacity as Town Manager;               )
BEVERLY A. HIRT, individually and       )
in her official capacity as             )
Director of the Smyrna Public           )
Library; and HARVEY LEGGETT,            )
individually and in his official        )
capacity as Supervisor of               )
Streets/Foreman of Public Works,        )
        Defendants.                     )

            Deposition of **DAVID S. HUGG, III**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street Plaza, Smyrna, Delaware, on Tuesday, August 30,
2005, beginning at 9:35 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        AKIN & HERRON
        BY:  BRUCE C. HERRON, ESQUIRE
        PO Box 25047
        Wilmington, Delaware  19801
        Attorney for Defendant.

    **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302) 674-8884**

B 98

12

1    the town police and the library.  And he said:  I need

2    to see you.  Can you meet me?  And I said:  Certainly.

3         Q.    He met you in front of your home?

4         A.    Right.

5         Q.    Was that out in the driveway or in the

6    street?

7         A.    Basically, on the porch.

8         Q.    On the porch?

9         A.    Maybe on the porch or maybe in the front

10   foyer; I don't remember.

11        Q.    What did Chief Baldwin tell you at that time

12   about the incident?

13        A.    He basically told me that there was an

14   incident.  He gave me a very brief, you know, indication

15   of what the allegations were and that it was being

16   investigated.

17        Q.    Specifically, what did he say?

18        A.    He said that there was an incident involving

19   the two employees, that there was an allegation that a

20   sexual assault had taken place, that it was being

21   investigated.  And I think I recall my answer being, you

22   know:  Thank you.  Call me later in the morning and let

23   me know what is going on.  Keep me advised.

24        Q.    Did he indicate who was making the

13

1     allegation?

2          A.     He identified both employees.

3          Q.     Did he indicate that a sexual assault had

4     taken place?

5          A.     I don't remember if he did or not.  He

6     advised me who the two employees were.

7          Q.     Were you surprised at this information?

8          A.     Certainly.

9          Q.     Why were you surprised?

10         A.     One would hope that our employees don't find

11    themselves in situations where their behaviors can be

12    questioned.  And it allegedly took place in a town

13    building for which I am responsible.

14         Q.     Did it surprise you that Mr. Leggett was

15    involved in an incident of this nature?

16         A.     No more than it would surprise me that

17    Ms. Smith was involved.

18         Q.     Now, did Chief Baldwin subsequently inform

19    you of the course of his investigation?

20         A.     He did.

21         Q.     And when did he first speak with you again?

22         A.     Later that morning, I believe.

23         Q.     Was this after you had come to the office?

24         A.     This was after I had come to the office.

B 100

21

1   what was going on and what actions we were going to

2   take.

3        Q.    Is that because of the sensitive nature of

4   the --

5        A.    Because of the sensitive nature.

6        Q.    When you say outside the building, do you

7   mean outside the public works building?

8        A.    Right outside the town buildings.

9        Q.    Okay.  Was it in, let's say, another

10  location, like a restaurant or something?  Or was it

11  just outdoors?

12       A.    I believe we actually discussed it outdoors

13  and at the local donut shop -- I believe we actually

14  went there -- in a corner.

15       Q.    Was there just one meeting between the three

16  of you, where you discussed the incident, or was there

17  more than one meeting?

18       A.    I don't recall.

19       Q.    What was the purpose of having this meeting?

20       A.    Essentially, to advise him that, you know,

21  there was a serious allegation, that we were going to

22  have to take some kind of immediate action, that we

23  weren't going to prejudge whether he was guilty or not

24  guilty -- that was the function of the police

22

1    department -- that we were going to put him on leave

2    pending the outcome of any investigation.

3         Q.    During this meeting that you and Mr. Heeger

4    and Mr. Leggett had, what did Mr. Leggett say about the

5    incident in particular?

6         A.    Actually, we advised him not to discuss the

7    incident with us.  He started to make some comments, and

8    we advised him that that was a matter under

9    investigation by the police department and that our

10   purpose in meeting with him was to advise him of the

11   fact that we needed to take some kind of action

12   immediately until it was resolved.  And I think we

13   advised him not to discuss it with other employees and

14   to cooperate with the police department.

15        Q.    What was it that Mr. Leggett started to say?

16   Do you recall?

17        A.    I believe he started to describe his version

18   of what happened.  And we said:  That is inappropriate

19   for us to discuss with you.

20        Q.    Let me ask you this:  Did Mr. Leggett ever

21   admit to you that he had sexual intercourse --

22        A.    No.

23        Q.    -- with Ms. Smith?

24        A.    No.

26

1          A.    I have certainly not talked to Mr. Leggett

2    about whether he had sex with Ms. Smith or not.

3          Q.    Have you ever talked to Ms. Smith about the

4    incident?

5          A.    Only on a very limited circumstance; I think

6    Beverly or Ms. Hirt, I believe, if I recall correctly,

7    met with her briefly.  I also tried -- I tried in both

8    cases to keep some distance between myself and the two

9    parties involved so that I wasn't biased by, quote,

10   either story should it come down to my having to take

11   some kind of managerial action.

12         Q.    Do you recall when the meeting took place

13   between you and Ms. Hirt and Ms. Smith about the

14   incident?

15         A.    I don't, I don't recall.

16         Q.    Was it around the same time?

17         A.    It would have been around the same time.

18         Q.    That you met with Mr. Leggett?

19         A.    It would have been in that end of the year,

20   first of the year time period.

21         Q.    Did Ms. Smith share her version of what had

22   happened?

23         A.    Again, we did not -- basically, it was to

24   say this matter is under investigation by the

27

1    appropriate law enforcement agencies.  Our

2    responsibility is to deal with the violations of town

3    policy and whatever action we need to take relative to

4    that.

5        Q.    Now, you indicated that Mr. Leggett was

6    placed on administrative leave.  You thought it was

7    about two weeks, but you are not sure?

8        A.    I mean I can go back to the file.  I don't

9    have the file.

10       Q.    I am just trying to determine your

11   recollection at this point.

12       A.    Yes.

13       Q.    At some point did that period of leave end?

14       A.    That period of leave ended on --

15       Q.    And what was the reason that it ended?

16       A.    Primarily, because the attorney general

17   declined to file whatever the -- I don't know what the

18   proper legal term is -- but to charge Mr. Leggett with a

19   criminal action.  So the next appropriate step was to

20   bring him back to work and put appropriate conditions,

21   limitations, what have you, on his action.

22       Q.    And specifically, was any discipline imposed

23   on Mr. Leggett as a result of the incident?

24       A.    Let's see.  Again, without looking at the

28

1    specific file, if I recall correctly, we relieved him of

2    his foreman responsibility.  We put him on a

3    probationary status.  We restricted his work locations,

4    things of that nature.

5        Q.    Okay.  Since these actions were taken with

6    respect to Mr. Leggett, it was obviously determined that

7    he had admitted some misconduct, correct?

8        A.    Clearly, being in the library after -- he is

9    not authorized to be in the library, other than in the

10   conduct of his normal business, which would be to do

11   maintenance or whatever at any time.  And he had been in

12   the library after hours, which for whatever reason, was

13   inappropriate.

14       Q.    Did Mr. Leggett admit that he had been in

15   the library after hours?

16       A.    Sure.  He did not deny that he had been in

17   the building.  He was straightforward about it.

18       Q.    And why was that misconduct?  Why did that

19   constitute misconduct, just to be in the library after

20   hours, for Mr. Leggett?

21       A.    He had no reason to be in the library after

22   hours.

23       Q.    Had he ever been instructed that he was not

24   to be in the library after hours?

1       A.      I don't know that he had been instructed.
2   It's not his place of work.
3       Q.      Is there any town policy that indicates that
4   town employees are not allowed in town buildings after
5   hours?
6       A.      Outside of their normal -- and Mr. Leggett
7   would have every potential expectation of being in the
8   public works building after hours, because his job might
9   require that he be so.  He would not have any
10  expectation to be in this building or the library, nor
11  would Ms. Smith.
12      Q.      Well, you indicated that he would have every
13  expectation of being in the public works building after
14  hours.
15      A.      If his job required it, if there was some
16  reason for it; I mean it's a place where he is normally
17  employed.  There would certainly be circumstances where
18  it would not be inappropriate for him to go by the
19  public works building, to bring a tool back, to take
20  care of some paperwork, whatever.
21      Q.      Mr. Leggett has a desk in the public works
22  building, I assume?
23      A.      He has a work location in the public --
24      Q.      A work location?

30

1      A.     Yeah.  They don't have actual desks in the

2    public --

3      Q.     It would not be inappropriate, would it,

4    say, for Mr. Leggett to go into the public works

5    building to retrieve an item that he had left there?

6      A.     Probably not, unless he had been instructed

7    by his department manager, he or anybody else; I mean

8    that they aren't to be there unless they are on call or

9    on duty.

10     Q.     Unless an employee is instructed by their

11   department head not to be in their building after hours,

12   there is nothing disciplinary or inappropriate with

13   going into your own building after hours to retrieve

14   something, correct?

15     A.     Probably not.

16     Q.     There is certainly no written policy that

17   would prohibit that?

18     A.     Not that I can --

19     Q.     But again, getting back to Mr. Leggett, the

20   conduct Mr. Leggett was guilty of was being in a work

21   location other than his normal work location after

22   hours?

23     A.     That's primarily --

24     Q.     Was there any misconduct that he had been

39

1    became a full-time employee, let's say, around July of

2    2002 and this incident occurred in December of 2002 --

3         A.    Then she would have been on regular

4    probation.

5         Q.    -- she would have already been on a regular

6    probation?

7         A.    Yes.  And my statement would have been

8    incorrect.  It wouldn't have been extended.

9         Q.    What discipline was imposed on Ms. Smith?

10         A.    You would have to look at the file.  I don't

11    recall specifically.

12         Q.    Has Mr. Leggett ever had any convictions for

13    driving under the influence during the period of his

14    town employment?

15         A.    Yeah.  Yes, he has.

16         Q.    How many do you recall?

17         A.    I believe he had one.  I believe it was

18    handled under the first -- I know he had one, and it was

19    handled under the first offender's provision.

20         Q.    Do you remember when that occurred?

21         A.    I don't recall.  I mean it's been since I

22    have been here, so obviously, it's been since June of

23    '02.

24         Q.    Okay.  During his testimony -- again, in the

40

1    other case -- Mr. Heeger testified that this incident,

2    when Mr. Leggett had a DUI conviction, occurred around

3    April or May of 2003.  Does that sound consistent?

4         A.    That is probably -- yeah, that may be

5    correct.

6         Q.    That sounds like it might be correct?

7         A.    It might be, yes.

8         Q.    So this was definitely within six months of

9    the incident involving Ms. Smith, correct?

10        A.    Correct.

11        Q.    Now, do you recall whether Mr. Leggett lost

12   his license as a result of the DUI?

13        A.    My understanding is that he lost his license

14   for some period of time.  He was not allowed to drive

15   and did not drive.

16        Q.    Now, it is the case, Mr. Hugg, that

17   Mr. Leggett is required to drive as part of his job

18   responsibilities, right?

19        A.    He is partly required to drive.

20        Q.    That is part of his duties?

21        A.    One of his job duties could involve driving

22   town equipment, correct.  He's not a driver in the sense

23   of that term.

24        Q.    Would it surprise you to learn that

41

1   Mr. Heeger had testified that that was part of his job

2   duties, to drive?

3       A.    Certainly.  Everybody who works as a

4   municipal worker -- I mean one of the things you do is

5   you drive trucks and equipment and what have you.

6       Q.    So that would be part of his normal job

7   duties, correct?

8       A.    Correct.  But he doesn't drive the street

9   sweeper, or he is not a delivery driver where his only

10  duty is to drive.

11      Q.    Is it the case that during this period when

12  he lost his license, Mr. Leggett had to be driven around

13  by other employees?

14      A.    Mr. Leggett was not allowed to drive town

15  equipment.

16      Q.    Are you familiar or are you aware that he

17  actually had to be driven by other employees from

18  different job locations?

19      A.    He did not drive town equipment.

20      Q.    Was Mr. Leggett disciplined in any way for

21  this incident, in other words, this DUI incident that

22  resulted in the loss of his license?

23      A.    I would have to go back and look at his

24  file.  I don't recall.

42

1          Q.     But you are not aware of any at this time?

2     Any discipline?

3          A.     Off the top of my head, I don't recall.

4          Q.     Do you know whether it resulted in a more

5     severe discipline being imposed on Mr. Leggett, since he

6     was still on his probationary period?

7          A.     I don't -- I really do not recall without

8     going back and looking at the personnel file.

9          Q.     You indicated the interview that you had

10    with Ms. Hirt and Ms. Smith shortly after the incident

11    occurred, and you indicated you didn't really go into

12    the specifics of the incident.  Did you ever have any

13    subsequent conversations with Ms. Smith during the

14    period of her employment?

15         A.     There was a time -- again, I don't recall

16    exactly when, but it was sometime later that spring --

17    that she came to see me regarding grievance policies,

18    including sexual harassment.

19         Q.     This would have been the spring of 2003?

20         A.     Yes.  I can't recall specifically what date.

21         Q.     Can you tell me specifically?  What did

22    Ms. Smith tell you?  What did she tell you or ask you?

23         A.     She basically asked me what the grievance

24    procedures were, how one filed the claim of sexual

1      harassment.  She indicated that she felt she was subject

2      to sexual harassment.  I gave her the appropriate

3      sections of the personnel policy and advised her that if

4      she wanted to pursue it, that was the mechanism to

5      follow.

6           Q.    Did she tell you specifically what the

7      sexual harassment was that she was alleging?

8           A.    No.  I don't believe she did.  I don't

9      recall that she did.

10          Q.    Did you assume it had something to do with

11     Mr. Leggett?

12          A.    Yeah.

13          Q.    You did?

14          A.    I assumed that it had something to do with

15     the incident that involved Mr. Leggett.

16          Q.    But was that based on anything that she

17     said?

18          A.    Not that I recall.  I mean I don't really

19     recall the conversation.  It was a relatively brief

20     conversation.  She was asking for how do I file -- how

21     do I pursue the sexual harassment or the charge of

22     sexual harassment.

23          Q.    During this conversation did Ms. Smith make

24     any reference to her supervisor, Ms. Hirt?

44

1      A.     I don't recall.

2      Q.     So she may have?

3      A.     She may have; she may not.  I don't recall.

4      Q.     Do you recall telling Ms. Smith or advising

5   her that she should retain an attorney?

6      A.     Not specifically, but I may very well have.

7      Q.     You might have in that meeting?

8      A.     I might have suggested to her that she may

9   want to discuss the matter with an attorney.

10     Q.     Did you consider the fact that Ms. Smith had

11  come to you to ask you these questions to be

12  inappropriate in any way?

13     A.     No.

14     Q.     Did you consider her to be violating any

15  type of town procedure in coming to you?

16     A.     The normal procedure is one goes to the

17  supervisor.  And if you are not satisfied with the

18  matter with the supervisor, you go to the town manager.

19  The normal procedure is it's a small organization, and

20  people come to talk to me about issues regularly.

21     Q.     So you have an open door policy?

22     A.     Yes.

23     Q.     So in other words, if an employee chooses to

24  come to you to talk about town policies, there is

45

1    nothing inappropriate about that?

2        A.    No.

3        Q.    And if they --

4        A.    And my general course of action would be to

5    ask them if they, in fact, talked to their supervisor or

6    to suggest to them that they talk to their supervisor.

7    But it is not at all inappropriate for any town

8    employee.

9        Q.    And this happens fairly frequently?

10       A.    This happens every day.

11       Q.    Every day town employees come to you?

12       A.    Someone comes in about something, and it's

13   just --

14       Q.    And sometimes an employee might even feel

15   more comfortable talking to you than their supervisor?

16       A.    Sometimes they just come in to vent.  And it

17   is simply blah, blah, blah, and they are comfortable.  I

18   don't hold it against them.  I don't hold it against

19   their supervisor.  It is simply:  Okay.

20       Q.    But it is certainly not a violation of any

21   kind of town policy for them to come to you?

22       A.    I don't consider it to be a violation of

23   town policy for them to come to me.

24       Q.    Do you recall specifically advising

Anthony Reporting
(302) 674-8884

B 114

56

1        Q.      Whether they were corroborated or not, other

2    than the DUI incident that we were discussing before,

3    have you ever heard any other allegations regarding

4    Mr. Leggett having to do with inappropriate drinking?

5        A.      Mr. Leggett has a self-admitted problem with

6    alcoholic beverages.  He and I have talked about that

7    from time to time during his employment -- during my

8    period of employment here.  They have not involved his

9    performance on the job, during job hours, anything of

10   that nature.  But it is not uncommon knowledge that,

11   like a lot of people, Harvey has difficulty.

12       Q.      With alcohol?

13       A.      With alcohol, yeah.

14       Q.      And is it your understanding that this is an

15   ongoing difficulty?

16       A.      It is my understanding that it is a sporadic

17   difficulty, that it's not constant and that, you know,

18   he is aware of it and he takes efforts to make sure that

19   he doesn't get in a situation.  But he has, from time to

20   time, overindulged.

21       Q.      But to your knowledge, it has never affected

22   his job performance?

23       A.      To my knowledge, it has never affected his

24   job performance.

1

```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        -    -    -

4      JOHN R. BAKER, JR.,
                                      :
5           Plaintiff,               : Civil Action
                                      : No. 04-1457
6              vs.                    :
                                      :
7      TOWN OF SMYRNA; DAVID S.       : TRIAL BY JURY OF 12
       HUGG, III, individually and in:
8      his official capacity os Town  :
       Manager; JOSEPH HEEGER,        :
9      individually and in his        :
       official capacity as          :
10     supervisor of Public Works;    :
       and HARVEY LEGGETT,            :
11     individually and in his        :
       official capacity as          :
12     supervisor of Streets,         :
                                      :
13          Defendants.              :
                                      :
14


15                       -    -    -


16                   Deposition of JOSEPH HEEGER, taken
       pursuant to notice before Gail Inghram Verbano,
17     RPR-RMR, CSR No. 8635, in the law offices of
       Schmittinger & Rodriguez, P.A., 414 South State
18     Street, Dover, Delaware 19903, on Tuesday, March 22,
       2005, beginning at approximately 9:40 a.m., there
19     being present:


20


21                       -    -    -


22                   CORBETT & ASSOCIATES
                Registered Professional Reporters
23         1400 French Street     Wilmington, DE 19801
                      (302) 571-0510
24               www.corbettreporting.com
```

B 116

JOSEPH HEEGER

2

```
 1    APPEARANCES:

 2            NOEL PRIMOS, ESQ.
             WILLIAM FLETCHER, ESQ.
 3           SCHMITTINGER & RODRIGUEZ, P.A.
             414 South State Street
 4           Dover, Delaware 19903
               Attorneys for Plaintiff
 5
             BRUCE C. HERRON, ESQ.
 6           AKIN & HERRON, P.A.
             1220 North Market Street, Suite 300
 7           Wilmington, Delaware 19899
               Attorney for Defendants
 8

 9

10                        -     -     -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

JOSEPH HEEGER                                107

1        A    31.

2        Q    Vehicle 31?  And was that the vehicle --

3    during the period that Mr. Leggett was without a

4    license, was that the vehicle that he was being

5    driven around in by other employees?

6        A    I'm sure it was, as well as other

7    vehicles as well.  If there were other vehicles

8    involved in performing whatever tasks were being

9    performed, he would have been in those.

10       Q    Now, we talked somewhat about the

11   incident involving Mr. Leggett and Ms. Smith and the

12   sexual intercourse or allegation of sexual

13   intercourse.

14            Did Mr. Leggett, when you talked to

15   him about it, did he admit that he and Ms. Smith had

16   actually had sexual intercourse?

17       A    Yes.

18       Q    And that they had had it at the library?

19       A    Yes.

20       Q    And was Mr. Leggett authorized to be in

21   the library at the time?

22       A    No.

23       Q    Did Smyrna have a policy about employees

24   having sexual intercourse with one another?

B 118

1          A    I'm not sure.  I doubt that they do.

2          Q    You're not aware --

3          A    I don't know what it would be.

4          Q    You're not aware that that is prohibited,

5    for employees to have romantic involvement with one

6    another?

7          A    I'm not sure.  I mean, I don't know what

8    it says in the town policy.  I know there's

9    harassment -- sections in there about harassment and

10    that kind of thing, but --

11          Q    Would those sections prohibit --

12          A    I'm sure it would.

13          Q    -- this type of activity?

14          A    I'm sure it would.

15          Q    So, in other words, this type of activity

16    that Mr. Leggett was involved in with Ms. Smith would

17    be considered sexual harassment?

18               MR. HERRON:  Objection; calls for a

19    legal opinion.

20    BY MR. PRIMOS:

21          Q    You can answer.

22          A    If it took place during work hours, yes.

23          Q    Well, did this incident take place during

24    work hours?

B 119



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,          )
        Plaintiff,                )
                                  )
             v.                   )  C.A. No.
                                  )  04-1286 (JJF)
TOWN OF SMYRNA; DAVID S. HUGG, III,)
Individually and in his official  )
capacity as Town Manager;         )
BEVERLY A. HIRT, individually and )
in her official capacity as       )
Director of the Smyrna Public     )
Library; and HARVEY LEGGETT,      )
Individually and in his official  )
capacity as Supervisor of         )
Streets/Foreman of Public Works,  )
        Defendants.               )


          Deposition of **BETTY PORTER**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street, Smyrna, Delaware, on Thursday, December 8, 2005,
beginning at 11:45 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        AKIN & HERRON
        BY:  BRUCE C. HERRON, ESQUIRE
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.

        **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

_____

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B 120

11

1          Q.    Was that a frequent thing?

2          A.    Every day.

3          Q.    Why was it that you and Ms. Priller were

4     particularly the ones that closed?

5          A.    Those are the hours that we worked.  When I

6     was hired, I was hired to do that.  I have always worked

7     the closing hours from day one.  And I knew that was

8     what I was hired to do.

9          Q.    Now, you indicated that you did not work

10    with the children's programs?

11         A.    (The witness nodded head from side to side.)

12         Q.    Okay.  You need to say verbally.

13         A.    No.  I did not work with the children's

14    programs.  I don't choose to work with children.

15         Q.    Did you observe Ms. Priller's work with the

16    children's programs?

17         A.    I was not there when she did them.  She did

18    them all in the morning, and I worked the evening.

19         Q.    Did you have any awareness of how

20    Ms. Priller performed in working with the children's

21    programs?

22         A.    Judging from the mothers and the fact that

23    we had -- maybe six or seven kids would come to these

24    programs before she started.  After she started, it just

12

1    grew by leaps and bounds.  I guess they liked her.  They

2    liked the programs she did.  And the parents seemed to

3    like her very much.

4         Q.    So judging from the reaction of the patrons,

5    she did well in that position?

6         A.    Yes.

7         Q.    Do you know?  Did Ms. Hirt ever praise

8    Ms. Priller's work with the children's programs?

9         A.    No.

10        Q.    And do you know why?

11        A.    It's not her nature.

12        Q.    Not Ms. Hirt's nature?

13        A.    It's not Ms. Hirt's nature to give praise

14   for work done.

15        Q.    And that applies to anyone?

16        A.    That applies to anyone.  But the ones that

17   worked the hardest were the ones that had the children's

18   program, and they deserved a pat on the back and never

19   got it.

20        Q.    So you are saying Ms. Priller deserved a pat

21   on the back, but she never got it from Ms. Hirt?

22        A.    She never gave it to anybody.

23        Q.    Did Ms. Priller deserve a pat on back?

24        A.    No, she didn't.  She did an excellent job.

15

1            And I had no problems with Ms. Hirt, because

2    I'm older, and older people are just are more tolerant,

3    I think.  She had a hard time getting along with our

4    younger employees.

5            Q.    Who would have been whom?

6            A.    Kari, and to be real honest, it was all the

7    girls that worked there that had the job of children's

8    coordinator.  There were several before Kari.  There

9    seemed to always be a conflict between Ms. Hirt and

10   them, and they were always younger people.

11           Q.    Do you know Mr. Harvey Leggett?

12           A.    He came in the library, and he joked around

13   with us.  He was in maintenance.  And every time

14   something broke, Harvey was called.

15           Q.    How long have you been acquainted with him?

16           A.    Just during the time I was at the library,

17   that it belonged to the Town.

18           Q.    Do you recall an incident when Mr. Leggett

19   entered the library in an intoxicated condition and made

20   some inappropriate comments?

21           A.    No, I do not.

22           Q.    Are you aware of what I'm referring to?

23           A.    I've only heard rumors.  I don't know.

24   Nobody ever told me anything.

29

1       A.      No.

2       Q.      Did you ever have any other discussions with

3   Ms. Hirt about the incident after December 20th?

4       A.      I'm sure it came up once or twice when we

5   were talking privately.

6       Q.      Do you remember what was said?

7       A.      Nothing specific, because nobody knew

8   anything for sure.

9       Q.      Did Ms. Hirt ever change her initial

10  impression or her initial opinion that she didn't know

11  whether a rape had occurred or not?

12      A.      She never voiced it to me.  I do know Harvey

13  came in and talked to her for about an hour one day,

14  talked to Ms. Hirt.

15      Q.      And when was that?

16      A.      Sometime within the next month, I'm going to

17  say.

18      Q.      Was Ms. Priller present when he came?

19      A.      No.  It was before she came in to work.

20      Q.      Now, I thought you usually didn't come in

21  until the afternoon.

22      A.      No.  I don't know why Kari wasn't there.  I

23  know Kari wasn't there when it happened.

24      Q.      Did Mr. Leggett go into Ms. Hirt's office

1    and close the door?

2        A.    Yes, yes.

3        Q.    Do you know what they talked about?

4        A.    No.

5        Q.    How do you know they were talking about the

6    incident?

7              MR. HERRON:   Objection to the form of the

8    question.

9    BY MR. PRIMOS:

10       Q.    Let me ask you this:  Do you know whether

11   they were talking about the incident?

12       A.    I don't know for sure, no, because neither

13   one of -- neither she -- neither Ms. Hirt nor Harvey

14   said anything to me afterwards.  I just know he was in

15   there a long time.

16       Q.    Had this ever occurred before, that

17   Mr. Leggett had come in and had a private conversation

18   with Ms. Hirt?

19       A.    Not that I recall.

20       Q.    Did it ever occur subsequent to that?

21       A.    Not that I can remember, no.

22       Q.    And I asked you if you ever had any other

23   conversations with Ms. Hirt about the incident.  Did you

24   ever have any conversations with any other individual



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KARI M. (SMITH) PRILLER,                )
        Plaintiff,                       )
                                         )
            v.                           )  C.A. No.
                                         )  04-1286 (JJF)
TOWN OF SMYRNA; DAVID S. HUGG, III,)
Individually and in his official         )
capacity as Town Manager;                )
BEVERLY A. HIRT, individually and        )
in her official capacity as              )
Director of the Smyrna Public            )
Library; and HARVEY LEGGETT,             )
Individually and in his official         )
capacity as Supervisor of                )
Streets/Foreman of Public Works,         )
        Defendants.                      )

            Deposition of **NANCY R. CONLIN**, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of the Smyrna Town Hall, 27 South Market
Street, Smyrna, Delaware, on Thursday, December 8, 2005,
beginning at 1:55 p.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        AKIN & HERRON
        BY:  BRUCE C. HERRON, ESQUIRE
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.

        **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

        ANTHONY REPORTING
        PO Box 234
        Dover, Delaware  19903
        (302) 674-8884

B 126

12

1    incident?

2         A.    Yes.

3         Q.    What was said about it?

4         A.    That they were caught in the library and

5    pretty much -- I mean you know, they weren't -- they

6    were unsure, because they were caught by the lady that

7    cleans the library.  And they were unsure about whether

8    it was consensual or not.

9         Q.    And you believe Betty Porter told you this?

10        A.    I think she was the one that told me.

11               (Following a discussion off the record:)

12    BY MR. PRIMOS:

13        Q.    Do you know anything else about the

14    incident, other than what you have just told me?

15        A.    No.

16        Q.    Did you ever have any other conversations

17    about the incident other than this conversation about

18    the cleaning lady with anyone?

19        A.    No.  I kind of left it alone.

20        Q.    Okay.

21        A.    It's not something I even want to discuss.

22        Q.    We were discussing before about Ms. Priller

23    being the children's coordinator before you were the

24    children's coordinator.  To your knowledge, did

13

1    Ms. Priller do a good job in that position?

2        A.    Yes.

3        Q.    And why do you say that, or what is that

4    based on?

5        A.    She's just good at it.  The kids loved her,

6    and she was always coordinated and always ready to go.

7        Q.    Did she work hard at it?

8        A.    Yes.

9        Q.    Do you know anything about the interaction

10    or relationship between Ms. Priller and Ms. Hirt?

11        A.    Yes.

12        Q.    Did they have a good relationship?

13        A.    No.

14        Q.    Can you elaborate on that?

15        A.    But this is only my personal opinion.

16        Q.    Well, I would still like to hear it.  I

17    understand it is your personal opinion.  But if you

18    could, go ahead and share that.

19        A.    It was very intense.

20        Q.    Can you give some examples of the tension?

21        A.    When they were in the same building,

22    everything was always very tense.  I don't know how to

23    explain it other than that.  I used to be relieved when

24    one of them would be gone, I guess.  That was the only

14

1    thing that would change it.

2        Q.    Do you know what the cause of that was?

3        A.    No.  Honestly, I don't.  They just didn't

4    get along.

5        Q.    Did you feel that Ms. Hirt gave Ms. Priller

6    the recognition that she deserved for her performance or

7    for her work as the children's coordinator?

8        A.    No.

9        Q.    I'm going to ask you some questions about

10   some incidents surrounding a vacation that Ms. Priller

11   took shortly before she was terminated.  The vacation

12   was at the end of June, the beginning of July of 2003.

13            So stepping back a little bit from that,

14   when did you first hear that Ms. Priller wanted to take

15   a vacation around the July 4th holiday?

16       A.    Oh, I was never consulted.  I just knew that

17   eventually, she was going to.

18       Q.    How did you find that out?

19       A.    I would not remember that, honest.

20       Q.    Okay.  Do you remember Ms. Priller asking

21   you to cover the children's program?

22       A.    She said that her car was having problems.

23   If there were issues surrounding that, would I mind

24   covering?  And I said -- I remember exactly where I was

# 𝔖𝔪𝔶𝔯𝔫𝔞 𝔓𝔲𝔟𝔩𝔦𝔠 𝔏𝔦𝔟𝔯𝔞𝔯𝔶

**107 South Main Street**
**Smyrna, Delaware 19977**

**Phone 653-4579**

November 05, 2002

Ms. Sabrina Corning
Ridgewood Manor
3023 S. DuPont Blvd.
Smyrna, Delaware 19977

Dear Ms. Corning,

This letter is in request for fulfilling an application requirement for employee Kari Smith. Kari was hired on March 22, 2001 as a part-time Clerk III. Her position consists of working the circulation desk, planning, and organizing Story Time and the children's summer reading program. Recently her position was made full time with a pay of $9.39/hour, $19,531.20/year. Her weekly salary is $375.59 and $1,502.38 monthly.

The Town of Smyrna/ Library Department is her employer, and on a yearly basis the Town gives each employee a cost of living raise plus for the first 4 years, each full time employee is given a merit step increase of 5%, then every 2 years until year 10. Therefore, Kari's yearly salary will increase annually. The Town is currently in budget negotiations, so I cannot give you her salary for 2003.

Please feel free to contact me anytime for more information at 653-4579.

Sincerely,

Beverly A. Hirt,
Library Director
Smyrna Public Library

**EXHIBIT**

Hirt 1
cac 8/30/05

B 130

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KARI M. (SMITH) PRILLER, | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION |
| | * | NO. 04-1286(JJF) |
| v. | * | |
| | * | |
| TOWN OF SMYRNA, DAVID S. | * | |
| HUGG, III, individually and | * | |
| in his official capacity as | * | |
| Town Manager; | * | |
| BEVERLY A. HIRT, individually | * | |
| and in her official capacity | * | |
| as Director of the Smyrna | * | |
| Public Library; and | * | |
| HARVEY LEGGETT, individually | * | |
| and in his official capacity | * | |
| as Supervisor of Streets/ | * | |
| Foreman of Public Works, | * | |
| | * | |
| Defendants. | * | |

### AFFIDAVIT OF KARI PRILLER

STATE OF VIRGINIA          *

                                    *          SS

COUNTY OF  Norfolk  *

      BE IT REMEMBERED, that on this 28th day of February, 2006, A.D.,

2006, personally appeared before me, the Subscriber, a Notary Public in and for the State and

County aforesaid, Kari Priller who, being by me duly sworn according to law, did depose and

say:

      1.     I certify that I am over the age of eighteen years and am competent to make such

B 131

an affidavit.

2.      I further certify that I have personal knowledge of all facts stated in this affidavit.

3.      On the night of December 19, 2002 I met Harvey Leggett at a restaurant. Leggett and I drove separate vehicles to the restaurant. We also drove separate vehicles when we later went to a tavern to play pool.

4.      After playing pool, Leggett and I walked to the Defendant Town of Smyrna Library. During that walk to the library, there was no physical contact between the two of us.

5.      As of June 16, 2003, my work schedule was Monday through Friday from 9:00 a.m. to 5:00 p.m.

6.      On June 16, 2003, I requested to take leave from June 30, 2003 through July 1, 2003. I discovered later that same day, however, that Nancy Conlin was available to fill in for me on the night of July 1, 2003 to lead the children's program.

7.      I immediately notified my supervisor, Beverly Hirt, that Nancy Conlin was able to fill in for me and Hirt agreed to this change in my vacation schedule to permit me to extend my vacation schedule through July 2, 2003.

8.      While on vacation in Virginia, my car broke down completely and I was forced to borrow a car from my sister.

9.      On July 2, 2003 I spoke to Beverly Hirt and informed her that I could not return to work on July 3, 2003 as planned. I did, however, return to work on July 7, 2003 for my normally scheduled shift, beginning at 9:00 a.m.

10.      Therefore, July 3, 2003 was the only day of work I missed other than those days I received permission from Beverly Hirt to take as vacation since July 4th was a holiday and July

B 132

5 and 6 were a Saturday and Sunday.

11.     On March 10, 2003 I saw Harvey Leggett working outside the library. I complained to Beverly Hirt when I saw Leggett outside the library because he had been instructed by the Town not to be near me. When Hirt did not respond to my complaints, I met with the town manager, Dave Hugg and told him of my sexual harassment complaints. Despite my repeated complaints, however, no one from the Town of Smyrna took my claims that I was raped seriously.

12.     The fact that no employee of the Town of Smyrna took my complaints seriously upset me a great deal and caused me severe anguish. It was difficult for me even to go to work for fear that I might encounter my attacker, Leggett, there. I was also afraid to go on errands in the town because I was afraid I might see Leggett. The Defendant Town's failure to act on my complaints caused an extremely hostile work environment for me and made my work difficult to perform.

_____
Kari Priller

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

_____

Notary Public

CAROL L. WILLIAMS
Notary Public
Commonwealth of Virginia
My Commission Expires Nov 30, 2009

B 133

ocation:
107  S Main ST      Smyrna, DE 19977
SMYRNA LIBRARY

I.O. and Incident Overview:
uspect forced victim to have sex with him

| rid | Sector | County | Domestic Related | 4-F-14 Sent? | Gen Broadcast Sent? |
|---|---|---|---|---|---|
| 198-252 | 01 | Kent | ☐Yes ☒No | ☐Yes ☒No | ☐Yes ☒No |

## Victim Information

| ictim Number | Name | | | | | | |
|---|---|---|---|---|---|---|---|
| 001 | HORN, KARI M | | | | | | |

| ype | Sex | Race | | | Ethnic Origin | Age | D.O.B. |
|---|---|---|---|---|---|---|---|
| ndividual | Female | White | | | Non-Hispanic | 26 | 03/27/1976 |

| ddress | Resident Status | Home Telephone | Cell Phone |
|---|---|---|---|
| 126 E Cook  AVE<br>unnyside<br>Smyrna, DE 19977 | Full Time | (302) 659-0509 | |

| eporting Person? | Victim Injured? | Victim Deceased? | Officer Comments |
|---|---|---|---|
| ☒Yes ☐No | ☐Yes ☒No | ☐Yes ☒No | |

| juries | Description of Injuries |
|---|---|
| | |

## Suspect/Defendant Information

| equence | Type | SBI Number | Name | | Nick Name |
|---|---|---|---|---|---|
| 001 | Suspect | 00166083 | LEGGETT, HARVEY R | | |

| ex | Race | Ethnic Origin | Age | D.O.B. | Height | Weight | Skin Tone | Eye Color |
|---|---|---|---|---|---|---|---|---|
| Male | Black | Non-Hispanic | 42 | 03/18/1960 | 5' 02" to 5' 03" | 190 to 200 | Dark | Brown |

| air Color | Hair Length | Hair Style | Facial Hair | Voice Speech | Teeth | Build | Glasses |
|---|---|---|---|---|---|---|---|
| Black | Short | Afro/Natural | Thin Mustache | | | Average | |

| isguise | Disguise Color(s) | Resident Status | Unusual Characteristics | Armed With |
|---|---|---|---|---|
| | | Full Time | | Unarmed |

| ddress | Home Telephone | Cell Phone |
|---|---|---|
| 103 W Frazier ST<br>SMYRNA, DE 19977 | (302) 653-8919 | |

| rrest Number | Suspect's Clothing Description |
|---|---|
| | |

| mployer/School | Work Telephone |
|---|---|
| TOWN OF SMYRNA | (302) 653-9288 |

## Crimes and Associated Information

| ictim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 001 | DE:11:0772:00a1:F:B | Rape Second Degree Without Consent |

| Location Of Offense | Status | Involvement | General Offense |
|---|---|---|---|
| Government/Public Building | Pending-Active | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐Yes ☒No - N/A | 1103 - Rape/Strong-Arm |

| Burglary Force Involved | Weapon/Force Used |
|---|---|
| ☐Yes ☐No | Personal WeaponsHands/Feet |

| M. O. nformation | MO Class | MO Description |
|---|---|---|
| | Suspect's Sexual Actions | Vaginal Sex |

| ictim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 002 | DE:11:0772:00a1:F:B | Rape Second Degree Without Consent |

| Location Of Offense | Status | Involvement | General Offense |
|---|---|---|---|
| Government/Public Building | Pending-Active | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐Yes ☒No - N/A | 1103 - Rape/Strong-Arm |

| Burglary Force Involved | Weapon/Force Used |
|---|---|
| ☐Yes ☐No | Personal WeaponsHands/Feet |

| M. O. nformation | MO Class | MO Description |
|---|---|---|
| | Suspect's Sexual Actions | Cunnilingus |

| ictim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 003 | DE:11:0772:00a1:F:B | Rape Second Degree Without Consent |

| Location Of Offense | Status | Involvement | General Offense |
|---|---|---|---|
| Government/Public Building | Pending-Active | ☐Alcohol ☐Drugs ☐Computer | |

| Suspected Hate/Bias | Crime Code |
|---|---|
| ☐Yes ☒No - N/A | 1103 - Rape/Strong-Arm |

| Burglary Force Involved | Weapon/Force Used |
|---|---|
| ☐Yes ☐No | Personal WeaponsHands/Feet |

| M. O. nformation | MO Class | MO Description |
|---|---|---|
| | Suspect's Sexual Actions | Object Penetration |

| ictim Number | Crime Seq | Statute | Crime Description |
|---|---|---|---|
| 001 | 004 | DE:11:0769:0000:F:F | Unlawful Sexual Contact First Degree Physical Injury During USC 2nd |

| eporting Officer | Supervisor Approval |
|---|---|
| PL. GRAHAM   - 58099 2 | HOWARD FORTNER OJSMHAF Date 12/26/2002 0713 |

## Statement of Suspect 001 - HARVEY R LEGGETT - Continued

im to stop. Leggett then stated that he pulled off her pants and started rubbing on her vagina rea and penetrated her vagina with his fingers. Leggett stated they were laying on the floor. eggett stated this went on for about 15-20 minutes and that victim was enjoying it she was oaning and at no time did she tell him to stop and prevent him from doing anything. Leggett then ated that started performing oral sex on victim and again she did not tell him to stop but cted like she enjoyed it by her emotions and behavior. Leggett stated this went on for a few inutes and he decided to have intercourse with her. Leggett stated he started to penetrate her ith his penis when Leggett described victim as spazing out. Leggett told writer that he enetrated but stopped when she started yelling for him to stop and questioned him in regards to hat he was doing. Leggett stated that victim just flipped out saying that you are rapping me hat are you doing? Leggett told writer that victim then got sick on the floor from drinking. eggett told writer that victim went to the bathroom and was going to get sick again. Leggett ent into the bathroom to make sure victim was o.k. Leggett stated that victim wanted to know if he wanted him to walk to her car to make sure she got home O.K. but she stated no she was going o call her ex-fiancee. Leggett stated she called her ex-fiancee and that he left. Leggett stated t no time did he rape her it was concscentual until he tried to perform sexual intercourse and e stopped when she told him to. Leggett stated he has no idea why she is doing this to him. (see aped and video of suspects interview).

## Statement of Witness 002 - BRIEN STREET

Writer contacted Street and had him respond to Smyrna P.D. Street stated he was at Tullys le House and observed both victim and suspect. Street stated that they were in the back playing ool and drinking. Street stated he only spoke to Leggett and did not speak to victim. Street ated that they appeared to be getting along with each other and seemed to be having a good ime. Street could not give anymore information he left prior to them leaving.

## Statement of Witness 003 - BEVERLEY HIRT

Writer contacted Beverley Hirt who is victims supervisor at the library. Hirt stated that he was approached by victim a few weeks ago in regards to going out with suspect to have a beer. rt stated that it is not a good idea to be out with suspect when he drinks due to prior oservations of suspect when he drinks. Hirt made victim aware that suspect is married and that ey are both town employees. Hirt told writer that victim and suspect do socialize on occassions en he comes into the library. There have been times that they have talked on the phone. Hirt so told writer that victim knows that she is not allowed to be in the library after hours and at she has been warned because of prior occassions.

## Statement of Witness 004 - ERIC STEELE

Writer spoke to Eric Steele at Smyrna P.D. after speaking to victim. Steele was questioned regards to his and victims relationship and he stated he is her ex-fiancee. Steele stated he ceived a phone call from victim who stated she wanted him to pick her up at the library. Steele ated he could tell something was wrong by the tone of her voice. Steele stated he arrived and cked her up and on the way home she victim began to cry and when he asked what was wrong she ld him what had happened. Steele told her to call the police but she did not want to. Steele ated after talking to her about it she finally agreed to call. Steele stated he called the lice for her.

## Statement of Witness 005 - LINDA DIXON

Writer responded to KGH and contacted Linda Dixon who is one of the SANE nurses. Dixon was d what had occurred. Dixon went ahead and performed the sexual abuse kit. Afterwards writer sponded back down to KGH and took custody of the kit. Dixon explained that there was signs of sical injury o victims vagina area (see report done by Dixon).

| ing Officer | | | | | |
|---|---|---|---|---|---|
| . GRAHAM  - 58099 2 | | | Supervisor Approval HOWARD FORTNER OJSMHAF  Date 12/26/2002 0713 | | |
| ve Notified | | Referred To | | | |
| | | **B135** | | | |
| lity Factors | ☐ Witness ☐ Suspect Located | ☐ M. O. ☐ Suspect Described | ☐ Trace Stolen Property ☐ Suspect Identified | ☐ Suspect Named ☐ Suspect Vehicle Identified | Status Has Follow Up |